UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re Application of THE COALITION TO PROTECT
CLIFTON BAY and LOUIS BACON for an Order
Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for
Use in Foreign Proceedings.

-----------------------------------------------------------------x

**14 MISC 258**

Case No. 14-MC ____

---

# MEMORANDUM OF LAW IN SUPPORT OF APPLICATION AND PETITION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder
Avi Weitzman
Mary Beth Maloney
Ilissa Samplin

200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035

*Attorneys for Petitioners The Coalition To*
*Protect Clifton Bay and Louis Bacon*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION .............................................................................................................1

    A.    Nygård's Environmental Abuses ...................................................................2

    B.    Nygård's Defamation Campaign ...................................................................2

    C.    Nygård's Prior History of Misconduct .........................................................3

    D.    The Feralio Evidence ....................................................................................3

    E.    Section 1782 Discovery .................................................................................5

II.   FACTUAL BACKGROUND ...........................................................................................6

    A.    Petitioners .....................................................................................................6

    B.    Peter Nygård .................................................................................................7

    C.    Nygård's Destruction of the Marine Environment of the Bahamas ................8

    D.    The Save The Bays Actions .........................................................................10

    E.    Nygård's Smear Campaign ..........................................................................11

    F.    Mr. Bacon's Defamation Actions ................................................................13

    G.    Nygård's Involvement In The Smear Campaign ..........................................14

    H.    Mr. Feralio's Evidence................................................................................16

        1.    Evidence Related To The Defamation Actions .................................16

        2.    Evidence Related To The Save The Bays Actions ...................................18

III.  ARGUMENT ..................................................................................................................19

    A.    Section 1782 Entitles Petitioners To Discovery ...........................................20

    B.    The Requested Discovery Satisfies The Statutory Requirements Of Section 1782..............................................................................................................22

    C.    The Discretionary *Intel* Factors Favor Discovery of Mr. Feralio's Evidence .......23

        1.    Mr. Feralio Is Not A Party To The Bahamian Actions.............................23

**TABLE OF CONTENTS**
(continued)

2.    The Foreign Tribunal Is Receptive to Federal Court Assistance Under Section 1782.................................................................................23

3.    Petitioners Seek Discovery In Good Faith................................................24

4.    The Requested Discovery Is Neither Unduly Burdensome Nor Intrusive ...................................................................................................25

D.    No Cognizable Privilege Protects Mr. Feralio's Footage Or Testimony...............26

1.    No Cognizable Attorney-Client Privilege Applies ...................................26

2.    The Journalist's Privilege Is Not Implicated Here....................................28

3.    The 2011 Agreement Does Not Bar Discovery From Mr. Feralio ...........28

IV.    CONCLUSION.....................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F. Supp. 2d 434 (S.D.N.Y. 2011) ................................................................. 21

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ................................................................................. 20

*Chambers v. Capital Cities/ABC*,
  159 F.R.D. 441 (S.D.N.Y. 1995) ....................................................................... 29

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011) ......................................................................... 21, 28

*Dombrowski v. Bell Atl. Corp.*,
  128 F. Supp. 2d 216 (E.D. Pa. 2000) ................................................................ 27

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ......................................................................... 23, 24

*Fleischmann v. McDonald's Corp.*,
  466 F. Supp. 2d 1020 (N.D. Ill. 2006) .............................................................. 25

*Fox News Network, LLC v. U.S. Dep't of the Treasury*,
  911 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................... 27

*Gushlak v. Gushlak*,
  486 F. App'x 215 (2d Cir. 2012) ....................................................................... 20

*In re Application L & M Galleries*,
  249 F.R.D. 96 (S.D.N.Y. 2008) .................................................................... 25, 26

*In re Application of Malev Hungarian Airlines*,
  964 F.2d 97 (2d Cir.1992) ................................................................................. 25

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998) ....................................................... 19, 23, 24, 26

*In re Campania Chilena de Navegacion*,
  No. 03 CV 5382 (ERK), 2004 WL 1084243 (E.D.N.Y. Feb. 6, 2004) ............... 22

*In re Chevron Corp.*,
  650 F.3d 276 (3d Cir. 2011) .............................................................................. 27

*In re Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010) ............................................................... 21

*In re Chevron Corp.*,
  749 F. Supp. 2d 141 (S.D.N.Y. 2010) .......................................................... 20, 21

*In re Chevron Corp.*,
  753 F. Supp. 2d 536 (D. Md. 2010) ................................................................... 23

### TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002) ........................................................ 22

*In re Eli Lilly & Co.*,
No. 3:09MC296(AWT), 2010 WL 2509133 (D. Conn. June 15, 2010) .................................. 30

*In re Fed'n Internationale de Basketball*,
117 F. Supp. 2d 403 (S.D.N.Y. 2000) ........................................... 30

*In re Grand Jury Subpoena Duces Tecum*,
731 F.2d 1032 (2d Cir. 1984) ...................................................... 27

*In re Grupo Qumma*,
No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005) ........................................ 21

*In re JDS Uniphase Corp. Sec. Litig.*,
238 F. Supp. 1127 (N.D. Cal. 2002) ............................................. 30

*In re Lancaster Factoring Co. v. Mangone*,
90 F.3d 38 (2d Cir. 1996) ........................................................... 23

*In re Promnefstroy*,
No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ................................. 23, 24

*In re Sealed Case*,
754 F.2d 395 (D.C. Cir. 1985) ..................................................... 28

*In re Servicio Pan Americano de Proteccion*,
354 F. Supp. 2d 269 (S.D.N.Y. 2004) ........................................... 21

*In re Strand Invs.*,
No. 09-21985-CIV, 2009 WL 2225536 (S.D. Fla. July 24, 2009) ............................... 23, 24

*In re Sveaas*,
249 F.R.D. 96 (S.D.N.Y. 2008) .................................................... 21

*In re Wilhelm*,
470 F. Supp. 2d 409 (S.D.N.Y. 2007) ........................................... 21

*Intel Corp. v. Advanced Micro Devices, Inc.*
542 U.S. 241 (2004) ............................................................. 21, 24

*Irving Trust Co. v. Gomez*,
100 F.R.D. 273 (S.D.N.Y. 1983) ................................................. 28

*John Doe Co. v. United States*,
79 F. App'x 476 (2d Cir. 2003) ................................................... 27

*Kulzer v. Esschem, Inc.*,
390 F. App'x 88 (3d Cir. 2010) ................................................... 30

*Lago Agrio Plaintiffs v. Chevron Corp.*,
409 F. App'x 393 (2d Cir. 2010) ................................................. 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*London v. Does 1-4,*
   279 F. App'x 513 (9th Cir. 2008) ................................................................... 25

*McGrane v. Reader's Digest Ass'n, Inc.,*
   822 F. Supp. 1044 (S.D.N.Y. 1993) ................................................................ 29

*Mosely v. City of Chicago,*
   252 F.R.D. 421 (N.D. Ill. 2008) ...................................................................... 25

*Nygård Inc. v. Uusi-Kerttula,*
   159 Cal. App. 4th 1027 (2008) ........................................................................ 29

*Reed v. Baxter,*
   134 F.3d 351 (6th Cir. 1998) ........................................................................... 26

*RTI Ltd. v. Aldi Marine Ltd.,*
   523 F. App'x 750 (2d Cir. 2013) ..................................................................... 20

*Schmitz v. Bernstein, Liebhard & Lifshitz, LLP,*
   376 F.3d 79 (2d Cir. 2004) ............................................................................... 20

*SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props.*
   LLC, No. 01 CIV. 9291 (JSM), 2002 WL 1455346 (S.D.N.Y. July 3, 2002) ........................ 21

*Wultz v. Bank of China,*
   979 F. Supp. 2d 479 (S.D.N.Y. 2013) ............................................................. 27

**Statutes**

28 U.S.C. § 1782(a) ........................................................................................ 19, 20, 26

## I.      INTRODUCTION

This action seeks discovery under 28 U.S.C. § 1782 ("Section 1782") in aid of seven different lawsuits pending in the Bahamas.  The Bahamian lawsuits arise from the unlawful acts of Peter Nygård, the controversial and scandal-ridden founder of a Canada-based women's fashion company.

Nygård may not be widely known in the United States.  He is infamous, however, in the Bahamas and Canada, where he has a long and sordid history.  Over the past several decades, Nygård is alleged to have committed a litany of illegal and reprehensible acts, including environmental abuses, unfair labor practices, sexual assaults, and evidence tampering.  Although Nygård attempts to operate in the shadows, his conduct has led to exposés by the Canadian Broadcasting Company ("CBC") and *Forbes* Magazine.  This action concerns two of Nygård's more recent misdeeds—his destruction of the marine environment of the Bahamas and his relentless smear campaign against one of this nation's most respected conservationists and businessmen, Petitioner Louis Bacon.

A whistleblower has now come forward with smoking-gun evidence—including documents and over one thousand hours of video recordings of Nygård—that will greatly assist Petitioners in their litigation in the Bahamas against Nygård and others.  Although the whistleblower is willing to cooperate, he has legitimate fears of potential retaliation by Nygård and concerns for his safety.  As a result, the whistleblower has moved to a secure location. Petitioners now seek this Court's intervention to ensure that the evidence is produced under court order and supervision, both to protect the integrity of the evidence and militate against any retaliation.

### A.    Nygård's Environmental Abuses

For at least fifteen years, Nygård has damaged the marine environment of the Bahamas by illegally expanding the shoreline and commercializing the beach surrounding his 150,000-square-foot compound in the Bahamas.  Nygård's unlawful land grab, which has been well-documented by leading environmental experts, has had a profound impact on the coastline.  In response, concerned citizens of the Bahamas and international environmentalists formed a non-profit organization to protect the Bahamian coastline.  That organization, The Coalition To Protect Clifton Bay (hereinafter, "Save The Bays"), filed actions in the Bahamas against Nygård and various Bahamian Government officials (the "Save The Bays Actions").  Save The Bays alleges that the Nygård-backed opposition party has refused to enforce Bahamian law to stop Nygård.  In response, a court in the Bahamas temporarily enjoined Nygård's unlawful expansion activities.  These environmental litigations remain pending.

### B.    Nygård's Defamation Campaign

Mr. Bacon is Nygård's neighbor in the Bahamas.  After the Bahamian Government directed Nygård to cease his unlawful expansion activities in 2010, Nygård fixated his attention on Mr. Bacon, apparently believing that he was somehow behind the Government's action. Nygård's crusade against Mr. Bacon has become an irrational obsession.  For several years, Nygård has operated a malicious smear campaign against Mr. Bacon that is extraordinary in its content, scope, and intensity (the "Smear Campaign").  The Smear Campaign enlists paid and corrupted proxies—journalists, publishers, and other individuals and entities—to falsely accuse Mr. Bacon of  repugnant and outlandish crimes and activities, including murder, drug trafficking, and membership in the Ku Klux Klan.  The Smear Campaign has advanced these lies not just in the Bahamian press, but also in the international media, over the Internet, and in staged protest marches.  Just last month, dozens of protestors paid by Nygård marched through the streets of

Nassau, Bahamas carrying placards with "Louis Bacon . . . KKK" emblazoned in red across black and white images of white-robed KKK members.

In an effort to hold Nygård accountable, Mr. Bacon is currently litigating defamation actions in the Bahamas against a number of Nygård's proxies (the "Defamation Actions"). The evidence uncovered to date shows that Nygård is assisted by his Bahamian counsel in coordinating the Smear Campaign, and that Nygård enlists controversial public figures— including Nation of Islam Minister Louis Farrakhan—to further his Smear Campaign. But Nygård's precise involvement, the internal operations of the Smear Campaign network, and the identities of each of Nygård's accomplices is still being uncovered.

## C.      Nygård's Prior History of Misconduct

Nygård's environmental abuses and Smear Campaign are part and parcel of a larger pattern of depravity dating back many years. Nygård's history includes allegations of:

- Sexual assault and harassment of his female employees;

- Use of his Bahamian compound as a "mini brothel";

- Verbal and psychological abuse of his employees;

- False imprisonment of his employees and illegal labor practices; and

- Submission of falsified employee statements to the press.

## D.      The Feralio Evidence

Earlier this year, a concerned whistleblower, 28-year-old videographer Stephen Feralio, contacted Mr. Bacon's office stating that he possesses incriminating evidence of Nygård's activities in the Bahamas. Mr. Feralio acted as the personal videographer for Nygård during the very time that Nygård was destroying the Bahamian coastline and executing the Smear

Campaign.  During this time period (2011–2013 and early 2014), Mr. Feralio taped over one thousand hours of video footage of Nygård.

Mr. Feralio also created, at Nygård's direction, a number of anti-Bacon attack videos that are posted on the Internet as part of what Mr. Feralio himself referred to as the "Bacon smear campaign."  In addition, Mr. Feralio filmed Nygård's meetings with Bahamian Government officials.  Nygård's financial manipulation of Bahamian politics for his own personal gain was a factor that drove Mr. Feralio to disassociate himself from Nygård.

Although Mr. Feralio possesses the video footage, he is fearful of turning it over without judicial intervention.  Mr. Feralio's fears are legitimate.  First, numerous public reports, including the TV exposé by the CBC and the article published by *Forbes* magazine entitled, "Peter Nygard Answers to No One," depict Nygård as vindictive and dangerous.  Second, Mr. Feralio observed first-hand Nygård's words and actions over the course of more than two years and, as a result, now lives in fear of "retaliation from Nygård."  (Declaration of Jack Palladino ("Palladino Decl.") ¶ 8.)  The public reports and Mr. Feralio's own observations reflect Nygård's "history of violent behavior and fits of rage, and using harassment and financially ruinous litigation to intimidate those who speak out against him."  (Declaration of Stephen J. Feralio ("Feralio Decl.") ¶ 10.)

Nygård seeks to silence his employees through confidentiality provisions that purport to limit the information independent contractors or employees may disclose concerning Nygård's clothing company.  Mr. Feralio signed an "Independent Contractor Agreement" with Nygård International Partnership ("Nygård International") that includes such a confidentiality provision. Although these confidentiality provisions cannot apply to Nygård's personal and unlawful

actions, Petitioners informed Mr. Feralio that, in an abundance of caution, they would seek this

Court's intervention to best protect Mr. Feralio and his family.

**E.       Section 1782 Discovery**

Petitioners bring this action pursuant to Section 1782 to obtain discovery from

Mr. Feralio and have a reasonable basis for so doing.  Specifically, Petitioners seek court

authorization to subpoena video recordings and documentary evidence (i.e., handwritten notes

and email correspondence) in Mr. Feralio's possession and to depose Mr. Feralio about his

personal knowledge of the Smear Campaign and Nygård's environmental abuses.  This evidence

is sought in aid of the Defamation Actions filed by Mr. Bacon and the actions filed by Save The

Bays (collectively, the "Bahamian Actions").  Given the seriousness of the issues involved in the

Bahamian Actions, and the likely relevance of Mr. Feralio's evidence to those proceedings, this

is a paradigm case for discovery under Section 1782.

A district court is authorized to grant a Section 1782 application where:  (1) the person

from whom discovery is sought is found in the district where the application is made

(Mr. Feralio will accept service in New York); (2) the discovery is for use in a proceeding before

a foreign tribunal (the actions at issue are before Bahamian courts); and (3) the application is

made by an interested person (Petitioners are plaintiffs to the Bahamian Actions).  These factors

are easily satisfied here.  The discretionary factors considered by courts reviewing a Section

1782 application, include:  (1) the discovery is sought from a nonparty (Mr. Feralio is not a party

to the Bahamian Actions); (2) the receptivity of the foreign government to U.S. federal court

judicial assistance (Bahamian courts have previously been found receptive to Section 1782

discovery); (3) whether the request for discovery is brought in good faith (Mr. Feralio's evidence

is otherwise unavailable and sought in good faith); and (4) whether the request is unduly

intrusive or burdensome (the subpoenas are narrowly tailored and Mr. Feralio is willing to turn

over the materials to Petitioners upon court order).  These discretionary factors also favor

granting Petitioners' 1782 Application.

Accordingly, Petitioners respectfully request that this Court grant their application,

permit the issuance of the requested subpoenas (attached to the Accompanying Declaration of

Orin Snyder as Exhibit A), and set an expedited briefing schedule pursuant to the attached

proposed order to show cause for any future motions related to the subpoenas.  Section 1782

Applications are routinely granted on an *ex parte* basis, with the issuing order directing the

petitioner to serve the requested discovery and to provide notice to the target of the discovery.  In

this case, Petitioners filed this application on notice to Mr. Feralio, who has executed a

stipulation agreeing to accept service of the subpoenas in this District and will refrain from

complying with the subpoenas until the defendants in the Bahamian Actions and Nygård

International have a reasonable opportunity to be heard.  Although Section 1782 does not require

it, Petitioners have included a proposed order to show cause and expedited briefing schedule for

the defendants to the Bahamian Actions and Nygård International to assert any applicable third

party rights with respect to the requested discovery.

## II.     FACTUAL BACKGROUND

The salient facts are summarized below.  A more detailed discussion of the facts is

contained in the Accompanying Declarations of Jenny Afia, Jack Palladino, Louis Bacon, and

Stephen Feralio.

### A.     Petitioners

Mr. Bacon is the Chairman and Chief Executive Officer of Moore Capital Management

("MCM"), a private investment management firm headquartered in New York City.[1]

---

[1] Founded by Mr. Bacon in 1989, MCM today has approximately 430 employees worldwide.  (Afia Decl. ¶ 22.)

(Declaration of Jenny Afia ("Afia Decl.") ¶ 22.)  Mr. Bacon is an active member of a number of corporate and university boards and organizations and a world-recognized environmental philanthropist and conservationist.[2]  (Afia Decl. ¶ 23.)

Save The Bays, a non-profit organization based in the Bahamas, was founded in or about March 2013 by concerned Bahamian residents, international environmentalists committed to protecting Clifton Bay and threatened "marine environments" in the Bahamas, and Mr. Bacon. (*Id.* ¶ 18.)  Among other activities, Save The Bays coordinates with advocacy groups, including the Bahamas National Trust, to seek passage of environmentally protective legislation. (*Id.* ¶ 21.) *See also* http://www.savethebays.bs/.

Since 1993, Mr. Bacon has owned a residence known as "Point House" on Clifton Bay, located on the western tip of New Providence Island, Bahamas.  (*Id.* ¶ 26.)  Mr. Bacon's residence abuts Nygård's 150,000-square-foot beachfront compound (which Nygård calls "Nygård Cay").  (*Id.* ¶¶ 26-27.)

## B.    Peter Nygård

Since September 1986, Nygård has been a permanent resident of the Bahamas.  (Afia Decl. ¶ 27.)  He is the founder and chairman of a Canada-based women's clothing manufacturer, Nygård International, which has world headquarters in Times Square, New York.  (*Id.*)

Nygård has been at the center of controversy for decades.  A number of respected journalists and media outlets, including the CBC and *Forbes* magazine, published exposés that

---

[2] Mr. Bacon serves on the Board of Trustees of Middlebury College, the Board of Overseers at Columbia Business School, and on the Leadership Council of the Center for Public Leadership at the Harvard Kennedy School of Government.  In 2001, Riverkeeper, an advocacy group that protects New York's Hudson River and the drinking water supply of the region, recognized Mr. Bacon's efforts with its Environmental Leadership Award.  Just last year, the National Fish and Wildlife Foundation recognized Mr. Bacon with its Chairman's Leadership Award, and last year the National Audubon Society awarded Mr. Bacon its prestigious Audubon Medal for his charitable good works and dedication to environmental causes.  (Afia Decl. ¶¶ 23, 25.)

track Nygård's sordid past, as well as his attempts to harass and intimidate those who try to expose him.  (*Id.* ¶¶ 8, 10-11, Exs. 2-3 (CBC broadcast and transcript), Ex. 4 (*Forbes* article).) The CBC documentary reported that Nygård subjects his employees to tirades and "verbal and psychological abuse and [] intimidation," subjects his female employees to sexual harassment, uses Nygård Cay as a "mini brothel" where women—many "still in their teens"—are deceived into having sex with Nygård and his guests, effectively imprisons his employees at Nygård Cay under inhumane conditions, and uses aggressive litigation to intimidate those who challenge or defy him.[3]  (*Id.* Ex. 3, at 12–27.)  So extreme are his tactics that Nygård and his counsel submitted fabricated employee correspondence to the CBC in an effort to prevent the airing of the documentary.  (*Id.* Ex. 3, at 29–31.)

**C.**    **Nygård's Destruction of the Marine Environment of the Bahamas**

For the past fifteen to twenty years, Nygård has been expanding Nygård Cay through unpermitted and environmentally degrading activities, including the construction of groynes[4] (the "Groyne Work") and the dredging of the sea bed surrounding Nygård Cay (the "Dredging Work").  (Afia Decl. ¶¶ 31, 33.)  Aerial photography illustrates that Nygård enlarged his compound far beyond its original footprint—from 3.25 acres in 1984 to 6.1 acres in 2012:

---

[3] Nygård is currently pursuing a libel action against CBC challenging the veracity of only 83 seconds of the approximately 45 minute broadcast.  (Afia Decl. ¶ 9.)

[4] A groyne is a wall built out into the sea that interrupts water flow and limits the movement of sediment to prevent beach erosion.



(*Id.* ¶ 31, Ex. 33.)  Nygård's expansion of Nygård Cay misappropriates Crown Land (land held in

trust by the Bahamian Government for the benefit of Bahamians) and, as confirmed by

environmental experts, harms the delicate marine ecosystem surrounding Clifton Bay—including

a world famous coral reef ecosystem, unique coastal wetlands, and tropical hardwood forests, as

well as one of the last remaining public access beaches open to local Bahamians.[5]  (*Id.* ¶¶ 19,

37.)

Following a "mysterious" fire on his property, in July 2010, the Bahamian Government

denied Nygård permits to rebuild unless he restored the shoreline to its original condition.  (*Id.*

¶¶ 6, 39-40, Ex. 39.)  Rather than comply with the Government's demands, Nygård continued his

expansion of Nygård Cay through his Groyne Work and Dredging Work.  (*Id.* ¶ 41.)

Nygård subsequently worked to replace the Bahamian Government officials who denied

him the requested permits.  He reportedly pumped millions of dollars into the opposition party's

---

[5] University of Miami professor Dr. Kathleen Sullivan Sealey, a Bahamian environmental expert and one
of the founding directors of Save The Bays, has studied and commented on the pervasive negative effects
of Nygård's expansion efforts, including, *inter alia*, (1) physical damage to approximately 84,000 square
meters of seafloor; (2) removal of "substantial amounts" of sand from the sea floor; (3) introduction of
plastic debris to sea grass beds and patch reefs; (4) presence of a substantial amount of rock debris; and
(5) increase in the concentration of solid waste on the sea floor.  (Afia Decl. ¶ 32, Ex. 31.)

campaign during the 2012 general election—as Nygård himself acknowledged, he became "one of the major backers of Opposition Leader Perry Christie and his PLP party."  (*Id.* ¶¶ 6, 53, Ex. 49, at 10, ¶ 12(d).)  As Nygård hoped, the opposition party won and the Nygård-funded regime allowed Nygård to resume his environmentally damaging activities.  (*Id.* ¶¶ 54, 58-60.)

**D.      The Save The Bays Actions**

The Save The Bays Actions involve claims related to the Bahamian Government's lack of oversight over Nygård's continued expansion of Nygård Cay.

On May 17, 2013, Save The Bays filed an *ex parte* application in the Supreme Court of the Commonwealth of the Bahamas for injunctive relief to prohibit Nygård's Groyne Work and Dredging Work, and to prevent Nygård's attorney, Keod Smith, from further demolishing the dock at Jaws Beach ("Dock Work").[6]  (Afia Decl. ¶¶ 61-62, Ex. 36.)  On June 14, 2013, the Court granted the application and issued an interim injunction.   (*Id.* ¶ 63, Ex. 65.)  This action remains pending and the interim injunction remains in effect.  (*Id.* ¶ 63.)  While the injunction remains in place, Nygård's man-made beach slowly recedes back into the ocean.  (*Id.* ¶ 65.)

Despite the injunction, Nygård continues to pursue further development plans.  (*Id.* ¶ 66.)  Last month, Save The Bays filed a second judicial review action in response to Nygård's latest development plans, which the Government effectively has withheld from public inspection and comment.[7]  (*Id.* ¶ 66, Ex. 66.)

---

[6] A judicial review action is a lawsuit that challenges the propriety of the Government's actions or inactions.  (Afia Decl. ¶ 47.)

[7] On July 17, 2014, the Supreme Court of the Commonwealth of the Bahamas enjoined the Bahamian Government from continuing to engage in the alleged flawed consultation process and from considering any current or future development applications for Nygård Cay and surrounding areas until the next judicial hearing.  (Afia Decl. ¶ 67.)

### E.     Nygård's Smear Campaign

Nygård apparently convinced himself that Mr. Bacon—his environmentalist neighbor in the Bahamas—was to blame for the Bahamian Government's denial of his permit applications in July 2010. (Afia Decl. ¶ 69.) Nygård struck back by orchestrating the Smear Campaign against Mr. Bacon through the Bahamian press and over the Internet. (*Id.* ¶¶ 7, 69.) Without a shred of supporting evidence, the Smear Campaign falsely accuses Mr. Bacon of various repugnant crimes, including murder, drug trafficking, and insider trading. (*Id.* ¶¶ 13, 73.)

Operating from the shadows, Nygård orchestrates the Smear Campaign largely through proxies in an effort to hide his own involvement. Starting in the spring and summer of 2010, Nygård, through surrogates, launched a multi-pronged attack against Mr. Bacon, including by staging malicious and patently false news reports and ghostwritten articles in the Bahamian press and through anonymous, anti-Bacon attack websites and blogs. (*Id.* ¶ 72.) Among those proxies is Mr. Farrakhan, the controversial head of the Nation of Islam, who maliciously accused Mr. Bacon of "enslav[ing] people to [his] benefit."[8] (*Id.* ¶ 12(c) n.5, Ex. 15.)

The Smear Campaign also relies on unconscionable manipulations of published news reports. In May 2013, "Vincent Roy" uploaded a series of defamatory videos to YouTube. (*Id.*

---

[8] Mr. Farrakhan's history of racist, homophobic, and anti-Semitic comments has been thoroughly documented and publicized, and could not have been lost on Nygård when Nygård flew him to the Bahamas to further the Smear Campaign against Mr. Bacon. While Mr. Farrakhan's vile comments are too numerous to list here, they include the following: in 2010, Mr. Farrakhan delivered a speech in Mosque Maryam, Chicago, in which he stated that "[a]ll of us, black people, brown people, yellow people, are under the rule of the Caucasian people and all of the races have been affected by their rule"; in 2000, he called "White people" "potential humans . . . [that] haven't evolved yet"; at a gathering in San Diego in May 2012, Mr. Farrakhan, in response to President Obama's endorsement of same-sex marriage, called President Obama the "first president that sanctioned what the Scriptures forbid," and then condemned "[m]ales coming to males with lust in their hearts as they should to a female"; and in 2011, Mr. Farrakhan equated Jews with Satan, stating "Some of you think that I'm just somebody who's got something out for the Jewish people. You're stupid. Do you think I would waste my time if I did not think it was important for you to know Satan? My job is to pull the cover off of Satan so that he will never deceive you and the people of the world again." (Afia Decl. ¶ 12(c) n.4, Exs. 10-12.)

¶¶ 75-81, Exs. 67-68, 71-72.)  By splicing together and doctoring a published news report by

CBS reporter Scott Pelley about the arrest of former McKinsey Managing Director and Chief

Executive Officer Rajat Gupta, one such video entitled, "Is Louis Bacon Racist?" claims

Mr. Bacon is responsible for and has been charged in "one of the biggest Wall Street insider

trading cases ever."  (*Id.* ¶ 76, Exs. 67-68.)  Below is a screen shot of the aired CBS News report

on the left and the YouTube video on the right.

**Actual CBS News Report**          **Vincent Roy YouTube Video**

 

Of course, Mr. Bacon had absolutely nothing to do with the Rajat Gupta insider trading case, and

the Scott Pelley report never mentions him.  (*Id.* ¶ 77; Declaration of Louis Bacon ("Bacon

Decl.") ¶ 8.)  The same YouTube video also splices and doctors an October 26, 2012 ABC News

report entitled, "Inside the New KKK" (Afia Decl. ¶ 79), making it appear as though ABC found

evidence that Mr. Bacon is a member of the KKK.  Screen shots below illustrate the deception.

**Actual ABC News Report**          **Vincent Roy YouTube Video**

 

Again, of course, the ABC News report about the KKK never mentioned Mr. Bacon, and Mr. Bacon has absolutely no involvement whatsoever with the KKK.  (*Id.* ¶ 79; Bacon Decl. ¶ 8.)

Also in the Spring of 2013, "Paul Pierce" uploaded to YouTube a series of defamatory videos which propagate a host of lies about Mr. Bacon, including that he has engaged in fraud and deception, is a racist, and has degraded the environment.  (Afia Decl. ¶¶ 82-83; Bacon Decl. ¶ 8.)  Mr. Feralio has now confirmed that he created the defamatory "Paul Pierce" videos at Nygård's instruction.  (Palladino Decl. ¶ 22.)

The Smear Campaign continues unabated.  Just last month, a large demonstration of paid "protesters" in Nassau, Bahamas marched and chanted, outfitted with t-shirts and placards, repeating the now-familiar false chorus that Mr. Bacon is a KKK member and Save The Bays is a "fraud."  (Afia Decl. ¶ 14.)  Nygård also just last month erected signs on his property that state that  "ITS [SIC] TIME TO THROW THE TRASH OUT!", referring to "LOUIS KKK BACON" and "MOORE CAPITAL MANAGEMENT." (*Id.* ¶ 91.)

## F.    Mr. Bacon's Defamation Actions

To fully expose the Smear Campaign and hold Nygård and his accomplices accountable, Mr. Bacon filed actions in the Bahamas against eleven separate parties (Afia Decl. ¶ 92), including the following currently pending actions:

- *Bacon v. Brown & McKinney*:  On April 13, 2012, Mr. Bacon sued journalist Sherman Brown and radio host Steve McKinney to uncover the source of defamatory articles published about Mr. Bacon on the *Bahamas Citizen* and the *Bahamas National* websites (the "Brown Action").[9]  (*Id.* ¶ 100.)  Those attack websites often published identical or substantially identical articles that falsely alleged, among other things, that Mr. Bacon (1) was involved in several murders, (2) runs an international smuggling and drug trafficking ring, (3) bribed Government officials to cover up his illegal activities; (4) is a racist and avowed member and supporter of the KKK, and (5) maintained illegal military grade "sonic weapon" speakers on his property.  (*Id.* ¶ 93 & n.11; Bacon Decl. ¶ 8.)

---

[9] Mr. McKinney has been voluntarily dismissed from this action.  (Afia Decl. ¶ 104.)

- *Bacon v. Earlin Williams*:  On July 11, 2012, Mr. Bacon filed a defamation action against Earlin Williams, a writer and Nygård's press secretary, for authoring numerous defamatory articles published on the *Bahamas Press* website and in *The Bahama Journal* (the "Williams Action").  (Afia Decl. ¶ 116.)  These articles were also published between early May 2012 and early July 2012, and regurgitate the same false tales of murder, drug smuggling and trafficking, political bribery, and offensive sound systems ("military type acoustic sound blasters").  (*Id.* ¶¶ 113-15; Bacon Decl. ¶ 8.)

- *Bacon v. Phillippa "Lady" Russell*:  On September 30, 2013, Mr. Bacon sued Phillippa "Lady" Russell, a broadcast journalist who Nygård hired and paid to provide so-called "public relations" services, for defamation based on her patently false statements between late May 2013 and early June 2013.  (Afia Decl. ¶¶ 123-27.)  Through her Facebook page, at a public march, and at an interview on the Bahamian television program "The Platform," Ms. Russell repeated many of the same false accusations that are the subject of the Brown Action and the Williams Action.  (*Id.* ¶¶ 123-27, 129.)

- *Bacon v. Carvel Francis*:  On September 30, 2013, Mr. Bacon sued Carvel Francis, publisher of the *Bahamas Press* website, for defamation based on the publication between early April 2013 and late June 2013 of anonymous articles claiming that Mr. Bacon is an "unashamed and bold racist," which—as argued in the defamation suit— has the meaning that Mr. Bacon "is a serial racist and Ku Klux Klan supporter," and a murderer ("what is happening to people who make contact with Louis Bacon or his Point House compound . . . why do they show up dead or missing"). (*Id.* ¶¶ 134-37, Ex. 126.)

- *Bacon v. Jones Communications Ltd. & Wendall Jones*:  On October 10, 2013, Mr. Bacon filed a defamation action against Wendall Jones (owner of Jones Communications) and Jones Communications (collectively, the "Jones Defendants") for airing false and defamatory broadcasts about Mr. Bacon.  (*Id.* ¶ 148.)  In April 2013, May 2013, and August 2013, Mr. Jones, host of the aforementioned Bahamian television program "The Platform," featured interviews with Nygård, statements from Mr. Farrakhan, statements from Nygård's attorney, statements from Ms. Russell, and statements from "news readers" spreading variations on the malicious and defamatory claims that had already appeared in the publications that are the subject of the Brown and Williams Actions.  The broadcasts also falsely claimed Mr. Bacon "outright lied" to receive the 2013 Audubon Society award.  (*Id.* ¶¶ 144-47; Bacon Decl. ¶ 8.)

This Section 1782 Application seeks discovery in aid of each of these pending Defamation Actions. (Afia Decl. ¶¶ 111, 121, 131, 142, 151.)

## G.    Nygård's Involvement In The Smear Campaign

Evidence collected to date shows that Nygård, working in part through his attorney, pays and/or corrupts proxies and accomplices to disseminate defamatory statements about Mr. Bacon. (Afia Decl. ¶¶ 13, 87.)  This evidence includes witness statements, emails, and other documents

14

that demonstrate that Nygård is behind the Smear Campaign.  (*Id.* ¶¶ 87-91.)   Indeed, Nygård

has openly acknowledged his own daily and obsessive fixation with Mr. Bacon.  (*Id.* ¶ 91).

The billing records prepared by Nygård's attorney, for example, evidence Nygård's

involvement in the Smear Campaign.  They confirm that Nygård uses his attorney and other

defendants in the Defamation Actions, including Mr. Williams, to advance the Smear Campaign.

(*Id.* ¶¶ 88-89.)  One of the billing entries from early 2011 reveals that Nygård's counsel met with

Mr. Williams to promote the "overall story of Peter J. Nygard," and counsel also met with a PLP

member of Parliament in an effort to "expos[e] Bacon" "in printed broadsheets."  (*Id.* ¶ 89.)

Sworn statements and documents from several of Nygård's accomplices also implicate

Nygård in the Smear Campaign.  For example, Michael Rolle and Jason Graham—the creators of

the defamatory *Bahamas Citizen* and *Bahamas National* websites—filed sworn statements that

Mr. Brown, a journalist, retained and paid them to create defamatory websites targeting

Mr. Bacon, provided them with the defamatory content to post on their websites, and directed

them to make sure the attack websites show up on Google whenever a user searches for

information about Mr. Bacon.  (*Id.* ¶¶ 95-97.)  Documents produced by Mr. Rolle show that

Mr. Brown received instructions for the attack websites directly from Nygård.  (*Id.* ¶ 96.)

Likewise, Jones Communications acknowledged in a sworn statement read in open court that

Nygård's press secretary, Mr. Williams, was responsible for defamatory statements made about

Mr. Bacon in certain articles appearing in the *Bahama Journal* and on its website.  (*Id.* ¶ 118.)[10]

---

[10] This sworn statement was read in open court as part of the settlement of a prior Bahamian action
Mr. Bacon filed against Jones Communications on June 21, 2012.  This prior action, which concerned
three defamatory articles published in the *Bahama Journal* in May 2012, is not the subject of this
discovery request.  It is separate and distinct from the Jones Action for which Petitioner Louis Bacon
seeks discovery.  (Afia Decl. ¶ 118 & n.13.)

This evidence implicates Nygård in the Smear Campaign and provides a reasonable basis for seeking further discovery here in aid of the Defamation Actions.

## H.    Mr. Feralio's Evidence

Hired by Nygård International as an independent contractor, Mr. Feralio began filming Nygård in May 2011.  From May 2011 through July 2013, and then again in late 2013 and early 2014, Mr. Feralio accompanied Nygård around the world, filming Nygård in his daily life, including while conducting meetings, participating in phone calls, and hosting and attending events.[11]  (Palladino Decl. ¶¶ 12-13.)

After Mr. Feralio came forward as a whistleblower and voluntarily made statements to investigator Palladino, Petitioners learned of the purported confidentiality provision of the Independent Contractor Agreement between Mr. Feralio and Nygård International (the "2011 Agreement").  Petitioners thereafter did not ask Mr. Feralio to play any of his terabytes of video footage or to provide specific details about Nygård.  But from the evidence Petitioners collected through the Bahamian Actions and the statements Mr. Feralio volunteered early on, it is highly likely—indeed almost certain—that Mr. Feralio's evidence, including his testimony, footage, and documents, will aid Petitioners in the prosecution of the Bahamian Actions.  Indeed, Mr. Feralio has made clear that his footage (the "Feralio Footage") would be incriminating to Nygård in his disputes with Mr. Bacon and Save The Bays.  (*Id.* ¶ 6.)

### 1.    Evidence Related To The Defamation Actions

The five Defamation Actions involve statements published between Spring 2012 and Fall 2013, when Mr. Feralio was staying at Nygård Cay while traveling to the Bahamas with Nygård, and filming Nygård's daily activities.  Mr. Feralio has disclosed that during this period he

---

[11] Mr. Feralio filmed Nygård primarily in the Bahamas and the United States, including multiple trips to Nygård International's world headquarters in Times Square, where Mr. Feralio filmed for days at a time and, once, stayed more than one month.  (Palladino Decl. ¶¶ 12, 33-34.)

created and uploaded the malicious and defamatory "Paul Pierce" YouTube videos at Nygård's instruction (*see supra* pp. 13).  (Palladino Decl. ¶¶ 17-22, Ex. 2; *see, e.g.*, Afia Decl. Exs. 73-74.) One such video includes recordings of speeches delivered by Mr. Farrakhan about Mr. Bacon during an event at Nygård Cay.  (Afia Decl. Exs. 73-74.)  Unsolicited, Mr. Feralio also provided handwritten notes—a section of which is included below—containing Nygård's directions to Mr. Feralio, including instructions to emphasize the KKK, Mr. Farrakhan, and allegations that Mr. Bacon is a racist ("Controlled by a KKK members," "LF [Farrakhan] says bacon will be gone with the wind," "Make is [sic] seem like bacon attacking pjn [Nygård] because of his love for Bahamians and blacks") and a "liar" ("Louis Bacon is a liar, a bunch of different people saying he's a liar and cutting them together" and specifically "Bacon lied. Bacon did not . . . save Clifton.").  (Palladino Decl. ¶¶ 17-21, Ex. 2.)



These notes are just the tip of the iceberg. Mr. Feralio has only shared some very limited material in his possession.  He certainly has much more, given the frequency with which Nygård transacted with the proxies he paid or corrupted to wage his Smear Campaign.  Indeed, most of the defendants in the Defamation Actions have either acknowledged, or been proven to have, a close relationship with Nygård or his direct reports.  For example, Ms. Russell is a broadcast journalist whom Nygård hired and paid to provide "public relations" services.  (Afia Decl. ¶¶ 87, 122.)  Earlin Williams is Nygård's press secretary who received instructions from Nygård and/or

his attorney to publish defamatory articles against Mr. Bacon.  (*Id.* ¶¶ 89, 112, 118.)  Sherman

Brown, a journalist, received instructions directly from Nygård.  (*Id.* ¶¶ 107-08.)  Mr. Brown was

the intermediary whom Nygård used to instruct Messrs. Rolle and Graham to create the attack

websites, the *Bahamas Citizen* and the *Bahamas National*, and Mr. Brown paid and directed the

two men on what to publish on these websites.  (*Id.* ¶¶ 95-97.)  Wendall Jones publicly

interviewed both Nygård and Ms. Russell on his television show, "The Platform," during which

they maliciously defamed Mr. Bacon.  (*Id.* ¶¶ 129, 144-146.)  And Carvel Francis is the

publisher of the *Bahamas Press* website that published articles, some anonymous and others

believed to have been written by Nygård's personal attorney, that contain some of the most

outrageous lies about Mr. Bacon.  (*Id.* ¶¶ 133-36.)

Critically, Mr. Feralio was at Mr. Nygård's side and freely recording him for hours each

day during the precise time period that each of the defendants in the Defamation Actions

published the statements at issue—May 4, 2012 to August 2, 2013.  Mr. Feralio began working

for Nygård International in May 2011 and through at least July 2013.  (Feralio Decl. ¶ 2.)  Thus,

it is highly probable, if not certain, that Mr. Feralio has direct knowledge and evidence regarding

the defendants and the statements at issue in the Defamation Actions.

### 2.    Evidence Related To The Save The Bays Actions

The Save The Bays Actions put at issue activities that occurred at Nygård Cay—

including the Groyne and Dredging Works—during the time period that Mr. Feralio was residing

there and filming Nygård's life, including meetings with Bahamian Government officials.[12]  Mr.

---

[12] The Groyne Work and Dredging Work that are the basis for the initial Save the Bays Action continued
through approximately June 2013 (Afia Decl. ¶ 35), while Mr. Feralio was staying at Nygård Cay.
(Palladino Decl. ¶ 12).  The demolition of the dock at Jaws beach, which is also the subject of the initial
Save The Bays Action, was carried out by Mr. Smith in April 2013 (Afia Decl. ¶ 58), while Mr. Feralio
was working for Nygård and staying at Nygård Cay (Palladino Decl. ¶ 12).  Mr. Feralio also worked for

Feralio thus was present and filming at the scene of the environmental crime—the precise location where Nygård was engaging in the Dredging and Groyne Works that are the subject of the Save The Bays Actions.  Mr. Feralio also likely filmed any communications Nygård had with others (including government officials) regarding his plans to expand Nygård Cay.

Indeed, Mr. Feralio shared with Petitioners evidence of Mr. Nygård's manipulation of Bahamian Government officials.  (Palladino Decl. ¶ 15.)  Mr. Feralio showed Mr. Palladino approximately 30 seconds of video footage on his iPad, in which Nygård, while speaking on the telephone, stated that he has influence with Bahamian politicians "because the politician(s) owe [him]."  (*Id.*)  Importantly, one of the Paul Pierce videos includes footage of the Bahamian Minister of Labour at Nygård Cay.  (Afia Decl. ¶ 84, Exs. 73-74.)  This is proof positive that Mr. Feralio was present at and recorded footage of Nygård's interactions with Bahamian officials, just as Mr. Feralio stated.  (Palladino Decl. ¶ 15.)  Thus, as with the Defamation Lawsuits, it is highly probable, if not certain, that Mr. Feralio's direct knowledge and evidence will aid the Save The Bays Actions, including but not limited to allegations related to Nygård's illegal expansion activities and his communications with Bahamian officials in relation to those activities.

## III.    ARGUMENT

28 U.S.C. § 1782 empowers a district court to order discovery in the United States for use in a foreign tribunal.  Section 1782 contains "modest prima facie elements" consistent with "Congress's goal of providing equitable and efficacious discovery procedures."  *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).  Petitioners here easily satisfy the requirements of Section 1782.

---

Nygård again in late 2013 and early 2014 (Feralio Decl. ¶ 2), when Nygård was likely preparing the development plans that are the subject of the second Save The Bays Action (*see* Afia Decl. ¶ 66).

**A.        Section 1782 Entitles Petitioners To Discovery**

Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." 28 U.S.C. § 1782(a). Congress enacted Section 1782 to "provid[e] efficient means of assistance to participants in international litigation in our federal courts and encourag[e] foreign countries by example to provide similar means of assistance to our courts." *Gushlak v. Gushlak*, 486 F. App'x 215, 218 (2d Cir. 2012) (citation and quotations omitted).  Pursuant to Section 1782, "'any interested person'" may apply to a district court for an order permitting him or her to take discovery "'for use'" in a foreign proceeding. *See RTI Ltd. v. Aldi Marine Ltd.*, 523 F. App'x 750, 751 (2d Cir. 2013) (quoting 28 U.S.C. § 1782(a)).

The statutory requirements to obtain discovery under Section 1782 are simple and few:  "a district court is authorized to grant a Section 1782 application where (1) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *In re Chevron Corp.*, 749 F. Supp. 2d 141, 160 (S.D.N.Y. 2010) (citation omitted), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

"Once the statutory requirements are met, a district court is free to grant discovery in its discretion." *Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004) (citation and quotation omitted). The Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.,* identified four factors a district court may consider in determining whether to grant a Section 1782 Application:  (1) whether the respondent from whom discovery is sought is a

20

"participant in the foreign proceeding"; (2) the receptivity of the foreign tribunal to U.S. court assistance; (3) whether the Section 1782 request is an attempt to "circumvent foreign proof-gathering restrictions"; and (4) whether the discovery sought is "unduly intrusive or burdensome."  542 U.S. 241, 264-65 (2004); *see also In re Chevron*, 749 F.Supp.2d at 160.

Courts in this District routinely grant Section 1782 applications based on the satisfaction of these statutory and discretionary factors.  *See e.g., Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434 (S.D.N.Y. 2011) (Rakoff, J.); *In re Sveaas*, 249 F.R.D. 96 (S.D.N.Y. 2008) (Keenan, J.); *In re Wilhelm*, 470 F. Supp. 2d 409 (S.D.N.Y. 2007) (Haight, J.); *In re Grupo Qumma*, No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005) (Chin, J.); *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269 (S.D.N.Y. 2004) (Marrero, J.); *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props.* LLC, No. 01 CIV. 9291 (JSM), 2002 WL 1455346 (S.D.N.Y. July 3, 2002) (Martin, J.).  For example, in *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010), the Honorable Louis A. Kaplan granted a Section 1782 application seeking hundreds of hours of video evidence and deposition testimony concerning footage from a documentary film depicting events related to a fraudulent Ecuadorian lawsuit brought against Chevron.  Finding that Chevron "satisfied the threshold requirements of Section 1782," (*id.* at 291) "satisfied the *Intel* discretionary factors," (*id.* at 293) and had "overcome" any arguable privilege (*id.* at 298), Judge Kaplan granted Chevron's discovery request.  The Second Circuit affirmed.  *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

These cases apply with full force here.  As we now demonstrate, Petitioners' 1782 Application satisfies the statutory and discretionary factors and does not violate any applicable privilege.

**B.      The Requested Discovery Satisfies The Statutory Requirements Of Section 1782**

The three statutory requirements for obtaining discovery under Section 1782 are easily

met here.

1.      <u>Mr. Feralio can be found in this District</u>.  Ample evidence establishes

Mr. Feralio's regular and consistent presence in this Judicial District.  While working for Nygård

International, Mr. Feralio travelled to New York with Nygård six to eight times from 2011

through 2013 for the purpose of filming in New York, including at least one trip during which

Mr. Feralio remained in New York for more than one month.  (Palladino Decl. ¶¶ 33-34.)

Mr. Feralio has also returned to New York after his service to Nygård International ceased,

including returning to New York in April 2014 to respond to a summons for violating local New

York ordinances against the use of drone helicopters, which he violated while filming for Nygård

International.  (*Id.* ¶ 34.)  In addition, Mr. Feralio has retained counsel in New York and the

video recordings that are the subject of this 1782 Application are stored in a safe located in New

York.  (Feralio Decl. ¶¶ 9, 12.)  Finally, given Mr. Feralio's stipulated agreement to accept

service of the subpoenas in this District, there can be little doubt that he can be found in this

Judicial District for purposes of Section 1782.  *See, e.g.*, *In re Edelman*, 295 F.3d 171, 180 (2d

Cir. 2002) (witness who does not reside in New York and not present at the time the 1782

application is granted may be "found" in the district if served with a subpoena in the district); *In*

*re Campania Chilena de Navegacion*, No. 03 CV 5382 (ERK), 2004 WL 1084243, at *4

(E.D.N.Y. Feb. 6, 2004).

2.      <u>The discovery requested is for use in foreign proceedings</u>.  Petitioners seek

discovery for use in six separate proceedings before a foreign tribunal:  the Supreme Court of the

Commonwealth of the Bahamas.  *See, e.g.*, *Intel,* 542 U.S. at 258; *In re Strand Invs.*, No. 09-

21985-CIV, 2009 WL 2225536, at *1-2 (S.D. Fla. July 24, 2009) (granting Section 1782 application in connection with a Bahamian proceeding).

        3.      <u>Mr. Bacon is an interested party</u>.  As claimants in the Bahamian Actions, each of Save The Bays and Mr. Bacon is an "interested person" for purposes of this 1782 application.  *In re Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996); *see also In re Chevron Corp.*, 753 F. Supp. 2d 536, 539 (D. Md. 2010); *In re Strand Invs.*, 2009 WL 2225536, at *1

        Petitioners have met the statutory prerequisites under Section 1782.

**C.**      **The Discretionary *Intel* Factors Favor Discovery of Mr. Feralio's Evidence**

        Each discretionary *Intel* factor also strongly supports granting the requested discovery.

        **1.**      **Mr. Feralio Is Not A Party To The Bahamian Actions**

        The first *Intel* factor strongly favors discovery.  Mr. Feralio is a United States citizen who resides in the United States, and is not a party to any of the Bahamian Actions.  The Feralio Footage is located in this Judicial District, not in the Bahamas.  (Feralio Decl. ¶ 12.)  Therefore, this is not a situation where "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Intel*, 542 U.S. at 264.  The first *Intel* factor weighs in Petitioners' favor.  *See id.*; *In re Chevron,* 753 F. Supp. 2d at 539.

        **2.**      **The Foreign Tribunal Is Receptive to Federal Court Assistance Under Section 1782**

        The Bahamian courts are receptive to receiving, and have previously received, Section 1782 discovery.  "Receptivity" is not a question of whether the foreign court would permit discovery in this or any other particular case; instead, it is an inquiry into whether a foreign legal system would "*reject* evidence obtained with the aid of section 1782."  *In re Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009); *see also In re Bayer AG*, 146 F.3d at 196; *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1100 (2d Cir. 1995).  To show

lack of receptivity, the opposing party has the burden of providing "authoritative proof" that the foreign tribunal would reject the evidence sought under Section 1782. *See In re Promnefstroy*, 2009 WL 3335608, at *7; *Euromepa S.A.*, 51 F.3d at 1099-100.

There is no evidence—let alone authoritative proof—that the courts in the Bahamas would not be receptive to Section 1782 discovery. Courts in the United States have already held that because Bahamian courts are receptive to Section 1782 discovery, the second *Intel* factor weighs in favor of granting Section 1782 discovery. *See, e.g., In re Strand Invs.*, 2009 WL 2225536, at *1 (granting Section 1782 discovery after concluding that "the requested discovery would likely not meet procedural roadblocks in the Bahamas, and presents no substantial intrusion or burden").

### 3.     Petitioners Seek Discovery In Good Faith

The third discretionary *Intel* factor—whether the applicant is attempting to "circumvent foreign proof-gathering restrictions"—is meant merely to preclude bad faith abuse of process. There is no requirement for a petitioner to seek discovery of materials from the foreign tribunal before filing a Section 1782 application. *Intel*, 542 U.S. at 253 ("We now hold that § 1782(a) does not impose [] a [foreign-discoverability] requirement."); *In re Bayer*, 146 F.3d at 196 ("Indeed, a 'quasi-exhaustion requirement' . . . has been rejected by . . . courts").

Petitioners' request is a good faith effort to obtain otherwise unavailable evidence. Terabytes of the Feralio Footage are in Mr. Feralio's sole possession (Palladino Decl. ¶ 31); the Feralio Footage itself is not available from any other source. It would be impossible to track down and interview each person who appears in the Feralio Footage without first obtaining the Feralio Footage, and even then, it would be hugely inefficient, burdensome, and unlikely to succeed. The video recordings are the best—and in many instances the only—evidence of the conversations and events captured by the Feralio Footage.

Petitioners are unaware of any restrictions in proceedings in the Bahamas that would prohibit the discovery Petitioners seek here.  Thus, Petitioners' requests for discovery in aid of the Bahamian Actions are made in good faith and in satisfaction of the third *Intel* factor.  *See, e.g.*, *Fleischmann v. McDonald's Corp.*, 466 F. Supp. 2d 1020, 1032 (N.D. Ill. 2006).

### 4.      The Requested Discovery Is Neither Unduly Burdensome Nor Intrusive

Mr. Feralio is a whistleblower who has come forward to turn over evidence under the Court's supervision.  This case presents the opposite of burden and intrusion; the person in possession of the evidence wishes to cooperate with Petitioners in producing the requested discovery.

"[T]he district court retains broad authority under Fed.R.Civ.P. 26(b)(1) to fashion discovery orders issued pursuant to section 1782." *In re Application L & M Galleries*, 249 F.R.D. 96, 106-07 (S.D.N.Y. 2008) (citing *In re Application of Malev Hungarian Airlines,* 964 F.2d 97, 102 (2d Cir.1992)).  Petitioners seek limited discovery here:  documents and footage already in Mr. Feralio's possession and to which he has ready access, and his deposition.  This presents little, if any, burden to Mr. Feralio.  To the extent Mr. Feralio would be subject to any burden resulting from compliance with Petitioners' subpoenas, it would be one of cost and Petitioners have agreed to compensate Mr. Feralio for his reasonable expenses.  (Feralio Decl. Ex. 1.)  *See also Mosely v. City of Chicago*, 252 F.R.D. 421, 433 (N.D. Ill. 2008) ("It is difficult to see what burden production of any audio or videotapes of interviews of [plaintiff] would impose" given defendants' offer "to pay any costs involved in complying with the subpoena."); *London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008) (no undue burden "[g]iven the need for the evidence, and the minimal invasion required" where § 1782 request was narrowly tailored).

"Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).  However, "because the Court is called upon only to resolve a discovery issue that arises from underlying litigation in foreign jurisdictions, the court should be particularly wary of denying discovery on relevance grounds." *In re Application L & M Galleries*, 249 F.R.D. at 107.  Here, Petitioners only seek relevant discovery from Mr. Feralio. The subpoenas seek only narrowly tailored discovery targeted to particular relevant issues in the Bahamian actions, including Nygård's role in the Smear Campaign and evidence of Nygård's illegal Dredging and Groyne Works, including communications with public officials regarding continued development of the shoreline around his property.  *See* Snyder Declaration, Ex. A.

The fourth *Intel* factor weighs heavily in Petitioners' favor.

**D.     No Cognizable Privilege Protects Mr. Feralio's Footage Or Testimony**

Under Section 1782, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a).[13]  Petitioners' Application does not seek discovery "in violation of any legally applicable privilege." *Id.*

**1.     No Cognizable Attorney-Client Privilege Applies**

There is no evidence that the Feralio Footage captures any conversations between Nygård and any attorney that is protected by the attorney-client privilege.[14]  Mr. Feralio was videotaping

---

[13] Because this action is brought under federal statute, any privilege issues pertaining to the action are governed by federal common law.  *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998).

[14] The attorney-client privilege attaches "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4)

26

Nygård in all of his daily activities, and there is no indication that the recording was conducted at the request of an attorney or to further any privileged attorney-client communication.[15]  Mr. Feralio does not claim that he was acting in the employ or as an agent of Nygård's counsel, and in fact has stated otherwise in his voluntary statements to Petitioners' investigator.  (*See* Palladino Decl. ¶ 13.)

But even if communications with counsel are captured by the footage, any privilege would be waived by Mr. Feralio's presence.  *See, e.g.*, *John Doe Co. v. United States*, 79 F. App'x 476, 477 (2d Cir. 2003) (no privilege for correspondence between company employees and a private investigator hired by company attorneys because, "at the time [the correspondence documents] were created, they were not intended by the parties to be confidential").  As the Third Circuit squarely held in connection with a Section 1782 action, confidential communications recorded by a filmmaker are "not made 'in confidence' due to the presence of the filmmakers at the time of the communications, and so the protections of the attorney-client privilege never attach[] to [such] communications."  *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011); *see also Dombrowski v. Bell Atl. Corp.*, 128 F. Supp. 2d 216, 218 (E.D. Pa. 2000) (communications are not confidential if made in "the presence of strangers") (citation and quotations omitted).  Because the Feralio Footage depicts only those events and discussions that, by definition, occurred in the presence of third parties (Mr. Feralio), it cannot be subject to the attorney-client privilege.

---

made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . . ."  *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir. 1984) (citation and quotations omitted).

[15] To the extent Mr. Feralio filmed meetings between Nygård and his counsel during which business or other non-legal advice was sought or rendered, any such meetings and conversations cannot be privileged.  *See, e.g.*, *Wultz v. Bank of China*, 979 F. Supp. 2d 479, 465 n.103 (S.D.N.Y. 2013); *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012).

In addition, Mr. Feralio volunteered that he has incriminating video footage concerning Nygård's misconduct.  (*See* Palladino Decl. ¶ 6.)  Thus, any communications between Nygård and his counsel regarding the Smear Campaign or Nygård's land grab would also lose any protection pursuant to the crime-fraud exception to the attorney-client privilege.  *See, e.g.*, *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) ("Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct."); *Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 276 (S.D.N.Y. 1983) (crime-fraud exception applies to communications made in furtherance of "intentional or reckless tortious behavior").[16]

### 2.  The Journalist's Privilege Is Not Implicated Here

The Feralio Footage is not protected from disclosure by the journalist's privilege.  The Second Circuit recognizes a qualified privilege for video recordings only where the videographer retains his independence from those who otherwise have a stake in the recordings.  *See Chevron v. Berlinger*, 629 F.3d 297, 306-09 (2d Cir. 2011).  That exception clearly does not apply here.  Mr. Feralio was acting as Nygård's personal videographer, working under Nygård's control, not a journalist.

### 3.  The 2011 Agreement Does Not Bar Discovery From Mr. Feralio

The confidentiality provisions in the 2011 Agreement do not apply to the discovery sought in this action for several reasons.  The "Confidentiality Obligation" in Section 1.1 of the 2011 Agreement purports to protect from disclosure information regarding "the business or the affairs of Nygård International Partnership, including its affiliates and subsidiaries [] and their respective directors, officers and employees."  (Palladio Decl. Ex. 4, Schedule A, § 1.1.)  As

---

[16] Indeed, Petitioners allege that Nygård's attorney, Mr. Smith, was involved in the illegal Smear Campaign.  (Afia Decl. ¶¶ 87-89, 134, 145.)

described on its website, Nygård International "is a leading fashion company that designs and markets women's fashion apparel." (Afia Decl. Ex. 26.)  It is obvious that the matters at issue in the Bahamian Actions—Nygård's environmental abuses and the Smear Campaign—have nothing to do with "the business or the affairs of Nygård International Partnership," but rather with Nygård's activities conducted in his personal capacity.  And the subpoenas Petitioners have presented to the Court are narrowly tailored to seek only evidence for use in the Bahamian Actions relating to Nygård's environmental abuses and the Smear Campaign, not evidence concerning "the business or the affairs" of Nygård's women's clothing business, and certainly not any of Nygård International's "sensitive economic information" or "trade secrets."  *Nygård Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1045 (2008) (interpreting Nygård Inc. confidentiality provision narrowly).  For this reason, the confidentiality provisions, even if enforceable, simply do not apply to the specific categories of evidence sought by Petitioners in this action.[17]

In any event, these confidentiality provisions, if implicated, cannot shield Nygård and his proxies from the discovery sought here because they are unenforceable as against public policy. Courts in this District and elsewhere do not enforce confidentiality provisions to prevent disclosure from third parties regarding improper, tortious, or unlawful acts.  *See McGrane v. Reader's Digest Ass'n, Inc.*, 822 F. Supp. 1044, 1046 (S.D.N.Y. 1993) ("Courts are increasingly reluctant to enforce secrecy arrangements where matters of substantial concern to the public—as distinct from trade secrets or other legitimately confidential information—may be involved."); *see also Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 444-45 (S.D.N.Y. 1995)

---

[17] At the time Mr. Feralio signed the 2011 Agreement, Mr. Feralio was in his mid-twenties and apparently was not represented by counsel.  The circumstances surrounding the signing the 2011 Agreement are not known.  There are likely a host of additional reasons why an overbroad application of the 2011 Agreement to silence a whistleblower, such as Mr. Feralio, should not be countenanced.

29

(confidentiality agreements do not precluded interviews of the defendant's current and former employees); *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 1127, 1134-38 (N.D. Cal. 2002). This principle applies with full force to Section 1782 actions, in which courts have consistently granted discovery where the party resisting production claimed the material sought was "confidential."  *See In re Eli Lilly & Co.*, No. 3:09MC296(AWT), 2010 WL 2509133, at *4 (D. Conn. June 15, 2010) (granting discovery of sensitive and confidential business information under Section 1782 in connection with a patent infringement suit in Canada); *Kulzer v. Esschem, Inc.*, 390 F. App'x 88, 83 (3d Cir. 2010) (affirming grant of Section 1782 discovery where a German bone-cement manufacturer had a substantial need for confidential documents of a chemical company); *In re Fed'n Internationale de Basketball*, 117 F. Supp. 2d 403, 406-08 (S.D.N.Y. 2000) (ordering the production of personal records of professional basketball player in Section 1782 action, despite claim that collective bargaining agreement rendered such information confidential).

There is no legitimate basis for invoking any cognizable privilege to shield the requested evidence from discovery.

//

//

//

//

//

//

//

//

## IV.    CONCLUSION

The Section 1782 Application should be granted and this Court should issue the

requested subpoenas directing Mr. Feralio to produce documents and to appear for a deposition.

Petitioners further request that the Court issue the proposed scheduling order requiring any

interested parties to intervene by a date certain.

Dated:    August 13, 2014                                  Respectfully submitted,
          New York, New York

                                                           GIBSON, DUNN & CRUTCHER LLP
                                                           Orin Snyder
                                                           Avi Weitzman
                                                           Mary Beth Maloney
                                                           Ilissa Samplin
                                                           200 Park Avenue
                                                           New York, New York 10166
                                                           T: (212) 351-4000
                                                           F: (212) 351-4035

                                                           *Attorneys for Petitioners The Coalition To Protect*
                                                           *Clifton Bay and Louis Bacon*