UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

$14 \text{MISC} 258$

In re Application of THE COALITION TO PROTECT      :      Case No. 14-MC _____
CLIFTON BAY and LOUIS BACON for an Order           :
Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for  :      DECLARATION OF
Use in Foreign Proceedings.                        :      JENNY AFIA
                                                   :
------------------------------------------------------------------x

I, JENNY AFIA, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a lawyer and partner at the English law firm Schillings, which specialises in

reputation defence.

2.      In or about 2010, Schillings began acting for Louis Bacon ("Mr. Bacon"), the

New York-based hedge-fund manager and conservationist of world renown, after he was

defamed by an article in the British newspaper, the *Daily Mail*.  We issued libel proceedings on

Mr. Bacon's behalf leading to a fulsome apology, retraction of the false allegations, and payment

of damages.  From other content posted online, we inferred the *Daily Mail* article was part of a

broader campaign to damage Mr. Bacon's reputation.  We then began investigating who was

behind this smear campaign of Mr. Bacon, in an effort to undo the damage it was causing.  In

that capacity, I have either represented Mr. Bacon directly or liaised with counsel in the

Commonwealth of the Bahamas and the United States on a number of legal actions involving

Mr. Bacon, including each of the defamation lawsuits filed in the Bahamas, described more fully

below.  While I do not represent Petitioner The Coalition To Protect Clifton Bay, now commonly

referred to as "Save The Bays" (hereinafter, "Save The Bays"), in the foreign judicial review

actions described below, I have closely followed those lawsuits because Mr. Bacon is one of the

founders of Save The Bays, consistent with his abiding interest in conservation in the Bahamas.

As counsel to Mr. Bacon, I have personal knowledge of the legal disputes involving Mr. Bacon and other matters that are described herein.

3.      I respectfully submit this declaration in support of Save The Bays' and Mr. Bacon's application for discovery pursuant to 28 U.S.C. § 1782 from Stephen Feralio ("Section 1782 Action").

## I.  INTRODUCTION

4.      This Section 1782 Action seeks discovery for use in connection with seven separate litigations currently pending in the Supreme Court of the Commonwealth of the Bahamas[1] concerning two significant matters.  First, Save The Bays, an environmental coalition based in the Bahamas dedicated to preserving Bahamian marine environments, has filed two lawsuits in the Bahamas concerning Peter Nygård ("Nygård"), a controversial Canadian who resides in the Bahamas, and his attempts to develop his property at the expense of the environment and in total disregard for the law.  Second, Mr. Bacon has filed lawsuits to combat a malicious and wide-ranging smear campaign against him orchestrated in secret by Nygård (the "Smear Campaign").

5.      Nygård owns a 150,000-square-foot compound in Lyford Cay, a private gated-community located on Clifton Bay in the Bahamas.  According to the office of the Attorney General of the Commonwealth of the Bahamas, for the past 15 to 20 years Nygård has unlawfully attempted to expand his property far beyond its original footprint by engaging in environmentally degrading activities, such as the construction of sea walls, placement of

---

[1]  The Supreme Court of the Commonwealth of the Bahamas is the court of first instance in certain serious civil and criminal matters.  Appeals from the Supreme Court are heard by the Court of Appeal of the Commonwealth of the Bahamas, and from there to the Judicial Committee of the Privy Council, which sits primarily in London, England, but sometimes in the Bahamas.  There are also Magistrates' Courts, which hear less serious civil and criminal matters.

gabions, and dredging of the seabed, in an effort to expand his property on the north side and the

beach on the south side of his property.  At the same time, Nygård has sought to commercialise

his property into a resort for the wealthy.  The environmental impacts of his expansion activities

are profound:  according to the Attorney General's office, Nygård's expansion activities harm

large areas of the seabed and sea grass bed in Clifton Bay, disturbing and destroying habitat for

marine life in the surrounding area.  In addition, Nygård's unauthorised activities prevent the

natural downstream sand drift that replenishes the beaches throughout Lyford Cay, pollute the

local waters with plastic debris and other detritus, and degrade the natural beauty of the

Bahamas' coastline.  Nygård's activities over the years have led to a veritable outcry for action

by the Lyford Cay community, with one Government minister even recommending Nygård's

prosecution.  But, until July 2010, the Government refused to act and Nygård refused to desist.

6.      In July 2010, however, the Bahamian Government denied Nygård building

permits following a fire on his property.  The Government made clear that it would not issue

permits unless and until Nygård ceased his environmentally degrading activities and restored his

shoreline to its original condition.  Following the denial of his building permits, Nygård

reportedly pumped millions of dollars into the next general election of Bahamian Parliament

members, which took place on May 7, 2012, to support the opposition party and defeat the

controlling party that denied him the building permits.  As expected, after the opposition party

won, Nygård resumed his environmentally damaging activities.  But only for a brief period of

time.  Within approximately 12 months of the election, Save The Bays filed a lawsuit in the

Bahamas and obtained an interim injunction preventing further dredging and construction works

on the seabed by Nygård.

7.      Simultaneously, following the denial of the building permits, Nygård subjected his next-door-neighbor in the Bahamas, Mr. Bacon, to a relentless and malicious international Smear Campaign intended to disparage and intimidate Mr. Bacon and his family, harm Mr. Bacon's reputation around the world, and ultimately drive Mr. Bacon out of his home and away from the Bahamas.  This Smear Campaign appears to be motivated by Nygård's irrational belief that Mr. Bacon is responsible for the Government's permit denials, as well as a damning TV exposé by the Canadian Broadcasting Corporation ("CBC") that was broadcast at around the same time as the Government's permit denials.[2]

8.      More specifically, the CBC programme first aired on or about April 9, 2010, on the CBC News show "The Fifth Estate."  A true and correct copy of the CBC documentary broadcast and a true and correct copy of a certified transcript of the documentary are attached as Exhibits 2 and 3, respectively.  Titled "Larger than Life," the documentary alleged, among other things, that:

- Nygård treats his employees "inhumanely," subjecting them to "workplace bullying," "tirades," and "verbal and psychological abuse and [] intimidation," including "marathon sessions" of screaming and humiliating his employees in public (Ex. 3 at 2, 7, 8, 15, 27);

- Nygård uses his home in the Bahamas as a "mini brothel" where young women are deceived into believing they are auditioning for modeling jobs, when in reality Nygård recruited them for "pamper parties" at which "the girls" are inebriated by Nygård's constant supply of alcohol and then engage in sexual relations with Nygård and his guests (*id.* at 16-21);

---

[2]   Nygård has gone on record stating that he believes that Mr. Bacon was responsible for the CBC broadcast.  On April 12, 2012, Nygård filed a private criminal action against Mr. Bacon and others in the Magistrates Court of the Commonwealth of the Bahamas, alleging, among other things, that Mr. Bacon engaged in a criminal conspiracy with the CBC to extort and defame Nygård in connection with the CBC broadcast.  Nygård's allegations were so utterly without merit that, on April 19, 2012, the Attorney General of the Bahamas issued a *nolle prosequi* of the criminal prosecution, a true and correct copy of which is attached as Exhibit 1 hereto.

- Nygård effectively imprisons his employees on his compound, forcing them to remain at his home unless Nygård personally grants them permission to leave, forcing them to work on his Bahamas estate without work permits, and subjecting them to unfair labor practices, including regular "16-18 hour" workdays (*id.* at 14, 22-23);

- Nygård sexually harasses female employees; one employee described an incident where Nygård "rubbed his hand sort of up her leg and onto her bum," resulting in "this young woman . . . hysterical, crying, sobbing" (*id.* at 12); and

- Nygård and his lawyers fabricated evidence that he submitted to the CBC, such as false correspondence from employees, in an effort to prevent the CBC from airing the documentary (*id.* at 29-31).

9.    Nygård is currently prosecuting a libel action in Canada based on the CBC broadcast. In that libel action, Nygård challenges the veracity of only 83 seconds of the approximately 45-minute CBC broadcast—namely, allegations concerning his alleged sexual assault of an underage woman from the Dominican Republic. Notably, he has not claimed in that lawsuit that any other allegations in the CBC broadcast are false (even though in Canada, the burden of proof is on the libel defendant to prove the truth of the allegedly false allegations).

10.    Seven months after the broadcast of the CBC documentary, on November 18, 2010, *Forbes* published a lengthy exposé about Nygård. That article, titled "Peter Nygard Answers to No One," repeats many of the same allegations in the CBC documentary, and also outlines a host of alleged additional violations of law by Nygård, including abusive labor practices, tax evasion, sexual harassment, and rape. The alleged legal violations identified in the *Forbes* article include:

- A dispute brought by Nygård's former business partner Nancy Ebker, resulting in a 12-year legal battle presided over by the Honorable Irving Cooper, United States District Judge for the Southern District of New York, in which Judge Cooper concluded that Nygård was "evasive," "insincere," and "utterly lacking in credibility";

- A criminal charge brought by Winnipeg authorities alleging Nygård raped an 18-year-old girl that was dropped when the complainant refused to testify;

- A 2003 lawsuit brought by two of Nygård's former employees who alleged Nygård deceived them into accepting jobs to manage his estate in the Bahamas;

- Complaints brought by numerous employees that Nygård mistreats workers by "fining them for petty infractions" and routinely flouts Bahamian immigration laws by failing to obtain work permits for employees;

- A lawsuit brought by a former employee claiming that Nygård wrongfully withheld overtime pay;

- A complaint brought by former employees of Nygård filed with the Manitoba Human Rights Commission, alleging sexual harassment, including repeated "touch[ing] and sexual advances" by Nygård of employees and Nygård's "grabbing" or "fondling himself" in front of employees, and an accusation that Nygård had sexual intercourse with an employee "against her wishes" who was terminated after she rejected his advances; and

- Accusations brought by the National Labor Committee (NLC), a private group in Pittsburgh, that Nygård's clothing was manufactured in a Jordanian "sweatshop" by workers who had "been trafficked to Jordan, stripped of their passports and held under conditions of indentured servitude . . . [and] forced to work 15-hour shifts, seven days a week" under deplorable and inhumane working conditions.

11.     The *Forbes* article also details the aggressive tactics Nygård employs to crush those who challenge or defy him.  The article reports that Nygård "[p]unch[es] back hard"—that "he has sued his accusers and intimidated his critics with a small army of lawyers" initiating legal actions for everything from copyright infringement to defamation to criminal conspiracy.[3] Although his frivolous lawsuits are often quickly dismissed, Nygård has not yet been deterred from his systematic abuse of the legal system.  Attached as Exhibit 4 is a true and correct copy of the November 18, 2010 *Forbes* article.

---

[3] For example, in December 2009, Nygård International filed a copyright infringement lawsuit in the United States District Court for the Southern District of New York against the CBC.  Nygård International sued CBC for recording the "flashy fashion show" he held to celebrate the opening of Nygård International's New York flagship store.  Attached as Exhibit 101 is a true and correct copy of *The New York Times*' January 11, 2010 article entitled, "Nygard Store Tries to Impose a Press Curb."  Following the court's denial of Nygård International's motion for a preliminary injunction, Nygård International voluntarily dismissed the lawsuit in its entirety.  *See Nygard Int'l P'ship v. Canadian Broad. Corp.*, 1:09-cv-10298-PGG (S.D.N.Y.).

12.     Nygård's mistaken belief that Mr. Bacon caused the CBC documentary to be published has led Nygård to seek revenge against Mr. Bacon through Nygård's international Smear Campaign against Mr. Bacon.  Nygård's belief that Mr. Bacon is behind the CBC documentary and the *Forbes* article is baseless and undermined by the fact that Nygård is a highly controversial individual who easily attracts—indeed, courts—significant press attention. For example:

a.     Nygård is on record boasting that he has devoted millions of dollars to stem-cell research and the launch of a biotech company to discover "immortality" and the "fountain of youth."  Nygård's goal is to "live forever," and he claims that his team is making scientific breakthroughs that have "gone from anti-aging to reverse aging."  Attached as Exhibit 5 is a true and correct copy of *CBC News*' February 28, 2014 article entitled, "Peter Nygard boasts possible immortality in Bahamas."  The article includes an embedded video clip of Nygård explaining his "immortality" research in which he states the following:  "From this woman's egg, we took out her DNA, put my 70-year-old DNA in its place [and] grew it in vitro."  Attached as Exhibit 6 is a true and correct copy of *The Tribune*'s April 17, 2013 article entitled, "Nygard Eyes $30m Stem Cell Facility," which claims that Nygård is planning to invest between $25 and $30 million to construct a stem cell research-focused medical facility in Lyford Cay.

b.     Nygård also appears to continue to mistreat employees, in the same way described in the CBC programme.  For example, videos showing Nygård enraged, yelling at, and demeaning his employees for lengthy periods of time for no apparent reason recently have been published on the website www.diaryofahollywoodstreetking.com, true and correct copies of which are attached as Exhibits 7 and 8 hereto.  Attached as Exhibit 9 is a true and correct copy of

hollywoodstreetking.com's February 27, 2014 article entitled, "Peter Nygård's Sadist Wrath

Caught on Camera!," which details the videos.

       c.    Nygård has ties to controversial figures, such as Minister Louis Farrakhan

("Minister Farrakhan") of the Nation of Islam.  As the Court is certainly aware, Minister

Farrakhan is beyond mainstream, and is considered to be racist, homophobic, and anti-Semitic.[4]

Nygård uses Minister Farrakhan to wage his malicious Smear Campaign against Mr. Bacon.[5]

       13.    Without any supporting evidence, the Smear Campaign Nygård is waging falsely

accuses Mr. Bacon of a litany of repugnant crimes and activities, including murder, drug

---

[4] Minister Farrakhan's controversial statements are too numerous to exhaustively list here.  By way of example, in 2010 Minister Farrakhan delivered a speech in Mosque Maryam, Chicago, in which he stated that "[a]ll of us, black people, brown people, yellow people, are under the rule of the Caucasian people and all of the races have been affected by their rule."  In 2000, in the *Philadelphia Inquirer*, he called "White people" "potential humans . . . [that] haven't evolved yet."  Attached as Exhibit 10 is a true and correct copy of the report entitled, "Farrakhan In His Own Words:  On Whites," from the Anti-Defamation League's website.  During a May 27, 2012, gathering at the California Convention Center in San Diego, Minister Farrakhan, in response to President Obama's May 9 endorsement of same-sex marriage, called President Obama the "first president that sanctioned what the Scriptures forbid," and condemned "[m]ales coming to males with lust in their hearts as they should to a female."  Attached as Exhibit 11 is a true and correct copy of *The Huffington Post*'s May 29, 2012 article entitled, "Louis Farrakhan Critiques Obama's Gay Marriage Endorsement."  And at the 2011 Saviours' Day Convention in Rosemont, Illinois, Minister Farrakhan equated Jews with Satan: "Some of you think that I'm just somebody who's got something out for the Jewish people.  You're stupid.  Do you think I would waste my time if I did not think it was important for you to know Satan?  My job is to pull the cover off of Satan so that he will never deceive you and the people of the world again."  Attached as Exhibit 12 is a true and correct copy of the report entitled, "Farrakhan In His Own Words:  On Jews," from the Anti-Defamation League's website.

[5] Minister Farrakhan was invited to the Bahamas by Nygård's lawyer, Keod Smith ("Mr. Smith"), was flown to the Bahamas from the United States in Nygård's private airplane, and attended a celebration thrown in his honor by Nygård at Nygård's Bahamas estate.  Attached as Exhibits 13 and 14 are true and correct copies of *The Tribune*'s March 18, 2013 articles entitled, "Louis Farrakhan Makes Misinformed Observations" and "Nation of Islam Leader's Claim of Mischief Despite Accuracy of Speech Report."  Given the relationship between Nygård and Minister Farrakhan, Minister Farrakhan delivered a speech in the Bahamas in which he made defamatory statements about Mr. Bacon, including false claims that Mr. Bacon "enslave[s] people for [his] benefit."  Attached as Exhibit 15 is a true and correct copy of the *Bahamas National*'s article entitled, "Louis Farrakhan Condemns the Revisionist Louis Bacon," dated March 14, 2013 (as reflected on the last page of the Exhibit), and last accessed on August 10, 2014.

trafficking, and membership in the Ku Klux Klan ("KKK").  Operating from the shadows,

Nygård has orchestrated the Smear Campaign largely through proxies, in an effort to hide his

involvement.  But Mr. Bacon commenced litigation in England and the Bahamas against some of

those proxies, which already has uncovered evidence of Nygård's involvement in the Smear

Campaign.  However, the evidence obtained in those litigations is skeletal; Nygård's precise

involvement, the internal operations of the Smear Campaign, and the identities of each of

Nygård's accomplices remains unknown.

14.     The Smear Campaign continues to this day, and is only escalating.  As recently as

mid-July 2014, the Smear Campaign orchestrated a large public demonstration in Nassau,

Bahamas, in which protesters—who, according to press reports, were paid between $25 and $50

to attend—were outfitted with t-shirts and placards falsely accusing Mr. Bacon of membership in

the KKK, falsely accusing certain directors and supporters of Save The Bays of being "paid

fraud[s]," and threatening to throw Mr. Bacon out of the Bahamas.  Given the large number of

protesters present, the local police were on hand to keep the peace.

15.     As described in the accompanying declaration of Jack Palladino ("Mr.

Palladino"), it has now come to our attention that further evidence exists regarding Nygård's

involvement in and operation of this Smear Campaign.  As Mr. Palladino's declaration explains,

Stephen Feralio ("Mr. Feralio"), a videographer hired by Nygård International Partnership

("Nygård International") to videotape Nygård's activities around the world, apparently as a

vanity project, informed Mr. Palladino during their first meeting that he has in his possession 10

to 12 terabytes of video footage of Nygård and that, at Nygård's instruction, Mr. Feralio created

defamatory videos of Mr. Bacon as part of the Smear Campaign.  In his declaration, Mr.

Palladino further details how, the day following his first meeting with Mr. Feralio, Mr. Feralio

emailed Mr. Palladino a link to the YouTube account for "Paul Pierce"—one of the accounts that, under Nygård's direction, was used to upload defamatory videos about Mr. Bacon.  Mr. Feralio's email further included screenshots of directions provided by Nygård to Mr. Feralio regarding the contents of the defamatory videos posted to that account, including explicit instructions by Nygård to make the videos "more damaging."  Finally, Mr. Palladino states that, during a subsequent meeting with Mr. Feralio, Mr. Feralio explained that he is the only person with a complete copy of the video footage Feralio obtained while working for Nygård International.

      16.     It is therefore apparent that Mr. Feralio has personal knowledge of and evidence regarding the Smear Campaign, including terabytes of audio and video recordings filmed at Nygård's direction.  These videotape recordings thus contain evidence for use in the various Bahamian defamation lawsuits filed by Mr. Bacon.  In addition, Mr. Feralio has evidence and personal knowledge of events relevant to the Save The Bays lawsuit challenging Nygård's environmentally degrading activities.  As described in the declaration of Mr. Palladino, Mr. Feralio filmed and has personal knowledge of meetings between Nygård and Government officials between May 2011 and at least July 2013.  During this time period, Nygård was engaging in environmentally degrading activities and an illegal expansion of his property. Indeed, during this time period Nygård funded the opposition party after the previous Bahamian Government insisted that Nygård restore his property to its original condition, which Mr. Feralio referenced when he described Nygård's "financial manipulation of Bahamian politics for his own personal gain."  Thus, Mr. Feralio apparently is familiar with and has evidence relevant to the Save The Bays environmental lawsuit.

17.     Accordingly, Mr. Bacon and Save The Bays bring this Section 1782 Action seeking authorisation to obtain discovery from Mr. Feralio for use in the ongoing Bahamian proceedings.

## II. BACKGROUND

**A.      Save The Bays and Clifton Bay**

18.     Save The Bays is a nonprofit organisation founded in or about March 2013, consisting of, *inter alia*, community leaders, concerned citizens and residents of the Bahamas, and international environmentalists committed to protecting and preserving the Bahamian environment, including Clifton Bay, through policy change, education, legal action, and advocacy.  Save The Bays was formed in an effort to combat the "substantive new threats to Clifton Bay and other common marine environments" that continue to arise.  Attached as Exhibit 16 is a true and correct copy of relevant excerpts from Save The Bays' website detailing the environmental organisation's history.

19.     Clifton Bay is an ecologically sensitive and culturally important marine environment, located on the western tip of New Providence Island, Bahamas.  Shown below is a map of New Providence Island, with Clifton Bay located on the western coast.



One of the last public beaches on New Providence Island with access open to local Bahamians,

Clifton Bay enjoys a world-famous living coral reef ecosystem, unique coastal wetlands, and

tropical hardwood forests. But, as explained above, Clifton Bay's delicate ecosystem is being

threatened by Nygård's coastal development, as well as by anchor damage and groundings from

leisure boat traffic, diver and swimmer impacts, unmonitored damaging fishing practices, water

pollution, and oil spills.

20.      Given the impending local environmental harm facing Clifton Bay and other areas

of the Bahamas, Save The Bays has a broad mission to protect the archipelago's wetlands,

waters, and bays. For example, Save The Bays currently supports the Bahamas National Trust's

proposal for a marine-managed area to protect the coral reef ecosystems located in the western

portion of New Providence Island. In addition, partly due to the regular occurrence of "oil spills

and waste oil leaching" caused by a major power plant in the area, Save The Bays advocates for

an Environmental Protection Act for the Bahamas to "hold polluters accountable for detrimental

impacts" to the Bahamas' land and marine resources. Save The Bays also works closely with its

community partners to support environmental litigation efforts. It supports Bimini Blue

Coalition ("BBC") in judicial review proceedings challenging dredging activities by Resorts World Bimini for which substantive litigation remains underway.  It also supports Re-Earth in its legal proceedings to stop a "swim with dolphins" tourist attraction in Blackbeard's Cay. Following successful judicial review proceedings last month, the Bahamian Supreme Court ordered the dolphin exhibit shut down and eight captive dolphins released.  Details of the litigation can be found on Save The Bays' website at www.savethebays.bs.

21.     Further, Save The Bays actively works to combat the damage to coral reefs, the increase in marine debris, and the decline in conch populations, among other environmental harms.  Attached as Exhibit 17 are true and correct copies of relevant excerpts from Save The Bays' website, detailing Save The Bays' petition projects.  BahamaIslandsInfo.com has described Save The Bays' environmental conservationist efforts as follows:

> Save The Bays has swept the islands, teaming up with the Bahamas National Trust in its Conchservation campaign, lending support and a voice to the Bimini Blue Coalition, partnering with Earthcare.  Comprised of Bahamian and international members united in their commitment to preserve and protect the Bahamian environment through proactive policy change, education, legal action and advocacy, the non-profit, non-governmental organization has garnered nearly 5,000 signatures on its petition, hosted on Change.org, asking the Prime Minister to take on a variety of issues affecting the environment, including the passage of an Environmental Protection Act and a Freedom of Information Act, the prevention of unregulated development, establishing a Clifton Marine Park and a West New Providence Marine Managed Area, protection of the conch populations and the prevention of oil spills.

Attached as Exhibit 18 is a true and correct copy of BahamaIslandsInfo.com's November 13, 2013 article entitled, "Save the Bays meets with Coalition to Save Clifton at Jaws Beach."

**B.     Louis Bacon**

22.     Mr. Bacon is the Chairman of the Board and Chief Executive Officer of Moore Capital Management, LP ("MCM"), a private investment management firm headquartered in

New York City with additional offices in Washington, D.C., London, and Hong Kong.  Founded by Mr. Bacon in 1989, MCM today has approximately 430 employees worldwide.

23.     Mr. Bacon is a member of a number of corporate and university boards and organizations.  Mr. Bacon sits on the Board of Trustees of Middlebury College; the Board of Overseers at Columbia Business School; the Leadership Council of the Center for Public Leadership at the Harvard Kennedy School of Government; the Investor Advisory Committee on Financial Markets of the Federal Reserve Bank of New York; and the Board of the Foreign Policy Association, a non-profit organization that seeks to educate the public about foreign policy.  Attached as Exhibit 19 is a true and correct copy of Mr. Bacon's biography.

24.     In addition, Mr. Bacon is a world-recognized environmental philanthropist and conservationist.  Over the past 20 years, The Moore Charitable Foundation—founded by Mr. Bacon in 1992 — has supported more than 200 conservation nonprofit organizations focusing on land and water conservation and community organizations including educational and medical nonprofits in the United States, the Bahamas, and Panama.  For example, The Moore Charitable Foundation has been a key supporter of Riverkeeper, an advocacy group that protects New York's Hudson River and the drinking water supply of the region.  Attached as Exhibit 20 is a true and correct copy of *The Wall Street Journal*'s April 22, 2011 article entitled, "Helping Protect the Hudson River."  In addition, Mr. Bacon created The Moore Bahamas Foundation, an affiliate of The Moore Charitable Foundation, which supports environmental education in the diverse ecosystems of The Bahamas.   He also helped found the Waterkeeper Alliance in 1999 with Robert F. Kennedy Jr. and Ted Turner's Foundation.  The Waterkeeper Alliance has grown to 200 members worldwide advocating for the defense of clean water, energy, and family farms.

Mr. Bacon has protected more than approximately 200,000 acres of land for conservation easements in locations around the country, including in North Carolina, Colorado, and Long Island as part of his lifelong goal to protect the environment.  From Mr. Bacon's first donation of a conservation easement on Robins Island in the Great Peconic Bay in 1997, which protects the island as a haven for endangered shorebirds, to his agreement in 2012 with the U.S. Fish and Wildlife Service (FWS) to place approximately 167,000 acres of the Trinchera Blanca Ranch in Colorado under perpetual conservation easements, Mr. Bacon's conservation philanthropy has spanned the width of the country and served to defend vital parts of environment.  Indeed, Mr. Bacon's conservation easement donation of the Trinchera Blanca Ranch in Colorado's Sangre de Cristo Mountains marks the largest such donation to FWS and was also the first step in the establishment of the Sangre de Cristo Conservation Area as the nation's 558th unit of the National Wildlife Refuge System.  Combined with additional donations from Mr. Bacon of conservation easements on Tercio and Red River Ranches, it helps forms a landscape-scale conservation effort of 800,000 acres of protected lands stretching from Great Sand Dunes National Park, Colorado, to northern New Mexico.  Attached as Exhibit 21 is a true and correct copy of *The Denver Post*'s June 15, 2012 article entitled, "90,000 Colorado acres offered for national protected area."  Attached as Exhibit 22 is a true and correct copy of *Forbes*' October 8, 2012 article entitled, "Hedge Fund Giant Louis Bacon's Bold Mission to Save the American West."  Attached as Exhibit 23 is a true and correct copy of Newsday.com's January 13, 2001 article entitled, "Landmark Land Gift from Funds Trader."

25.      Mr. Bacon regularly receives public recognition for his work as an environmentalist and conservationist.  In 1998, The Nature Conservancy of Long Island named him a "Conservationist for Life" and Group for the East End honored The Moore Charitable

Foundation with their "Outstanding Commitment to Open Space Protection" award.  Mr. Bacon

was the 2001 recipient of Riverkeeper's Environmental Leadership Award and the 2010 recipient

of The Colorado Association of Conservation Districts' Ranch Conservationist of the Year

award.  In 2013, Mr. Bacon received The Peconic Land Trusts' Annual Conservation Legacy

Award and the Chairman's Leadership Award from the National Fish and Wildlife Foundation.

In the same year, The National Audubon Society also awarded Mr. Bacon the highly prestigious

Audubon Medal—awarded "in recognition of outstanding achievement in the field of

conservation and environmental protection"—at its annual gala event on January 17, 2013.

Bahamian Prime Minister, Perry Christie, noted at the time:  "I am particularly delighted that this

year's recipient [of the Audubon Medal] is a man who has contributed so significantly to

environmental causes in the United States and elsewhere, including my own country, The

Bahamas, where [Mr. Bacon] has maintained a residence for many years and is held in great

respect and admiration."  Attached as Exhibit 25 is a true and correct copy of The National

Audubon Society's explanation of the Audubon Medal and list of Audubon Medal recipients

from 1947 through 2014.  In April 2014, the land trust community of North Carolina named him

the Stanback Volunteer Conservationist of the Year.

26.     Since 1993, Mr. Bacon has owned a residence known as "Point House" in Lyford

Cay, a private gated-community located on Clifton Bay, next to Nygård's.  Mr. Bacon is also a

founder and director of Save The Bays.

## C.     Peter Nygård

27.     Nygård is a Canadian citizen who has been a permanent resident of the Bahamas

since September 1986, where he also owns a home in Lyford Cay.  Nygård is the founder and

chairman of Nygård International, a privately-held women's fashion company headquartered in

16

Winnipeg, Canada.  Nygård International specializes in selling moderately priced women's wear, and its clothing line can be found in stores throughout North America, including Dillard's and Sears.  According to the Nygård International website (true and correct excerpts of which are attached as Exhibit 26 hereto), Nygård International maintains International Sales and Marketing Headquarters in Toronto, Canada and "World Headquarters" in Times Square, New York, where the company also operates research and design studios.

28.     In or about December 1984, Nygård purchased a residence in Lyford Cay. Nygård's residence is a 150,000-square foot compound formerly known as Simms Point until Nygård asked the current Bahamian Prime Minister, when he was the Minister of Agriculture, Trade and Industry, to change the property's name to "Nygård Cay."  He did so on the express basis that he had just sent a pledge of $10,000 to Mr. Christie's political party.  Attached as Exhibit 24 is a true and correct copy of Nygård's letter to Mr. Christie, dated July 10, 1992. Nygård Cay is described on Nygård International's website as follows:

> In 1987, Peter Nygård fulfilled his creative passion & architecturally designed & built his own 5 acre Robinson Crusoe playground named NYGÅRD CAY.   The private luxury resort includes replicas of Mayan Temples, private tennis court, beaches, pool, aquarium, disco club & state-of-the-art Home Theatre, and 20+ themed cabanas for himself, his family & many celebrity guests who wish to get away for a serene sabbatical.

Attached as Exhibit 27 is a true and correct copy of a relevant excerpt from Nygård International's website.  Nygård refers to Nygård Cay as his "private celestial playground," and the estate is the site of his infamous "pamper parties," described in the CBC documentary.

29.     *The New York Times* in March 2000 noted that Nygård is perhaps most famous for his debauchery and wild parties:

> Hospitality chez Nygard is eye-popping, too.  Where [another neighbor's] housekeeper offers a cocktail to guests, Mr. Nygard offers a masseuse.  He has four housemen who cavort on trampolines anchored in the ocean.  He has a 40-foot dining room table that drops down to become a disco dance floor once dinner

(and bird droppings) are cleared.  On karaoke nights, scantily clad young women dance while he sings 'I Did It My Way' (his favorite song) until 5 a.m.

Attached as Exhibit 28 is a true and correct copy of *The New York Times*' May 25, 2000 article entitled, "Storming the Last Civilized Sandbox."

### III.    NYGÅRD'S DESTRUCTION OF CLIFTON BAY

30.    Since 1984, Nygård has sought to expand the footprint of the beach at Nygård Cay and his property holdings in the area.  As a result, he has been responsible for a significant environmental threat to Clifton Bay.  It appears Nygård's unlawful expansion is motivated, at least in part, by his desire to commercialize Nygård Cay into an "uber-luxurious development for high end visitors."  Nygård announced such plans in or about October 2009.  Attached as Exhibit 29 is a true and correct copy of *The Nassau Guardian*'s November 12, 2009 article entitled, "Nygard Cay compound 'extensively' damaged by fire."  Nygård currently advertises Nygård Cay for rent for "USD 42,000 per day."  Attached as Exhibit 30 is a true and correct copy of a current advertisement for the rental of Nygård Cay available online.

**A.    Nygård's Unlawful Environmental Abuses**

31.    For at least the past fifteen to twenty years, Nygård has sought to unlawfully and without proper authorization enlarge Nygård Cay far beyond its original footprint—from 3.25 acres in 1984 to 6.1 acres in 2012.  A true and correct copy of a map reflecting this expansion of Nygård Cay between 1984 and 2013 is shown below and attached as Exhibit 33 hereto.



### a.    Nygård's "Dredging" and "Groyne" Work

32.    University of Miami professor Dr. Kathleen Sullivan Sealey ("Dr. Sealey"), a

Bahamian environmental expert and one of the founding directors of Save The Bays, has studied

and commented on the pervasive negative effects of Nygård's beach expansion efforts on the

surrounding marine environment, including, *inter alia*: (1) physical damage and destruction to

approximately 84,000 square meters of seafloor; (2) the removal of "substantial amounts" of

sand from the sea floor; (3) the introduction of plastic debris to sea grass beds and patch reefs;

(4) the presence of a substantial amount of rock debris; and (5) an increase in the concentration

of solid waste on the sea floor.  Attached as Exhibit 31 is a true and correct copy of Dr. Sealey's

Environmental Incident Report, dated January 25, 2011.  Attached as Exhibit 32 is a true and correct copy of Dr. Sealey's biography.

33.     To expand the beach at Nygård Cay, Nygård constructed multiple groynes on the sea bed (the "Groyne Works") and dredged the sea bed (the "Dredging Work").
Attached as Exhibit 34 is the Tribune242.com's June 19, 2014 article entitled, "'Cease And Desist' Order Suggested For Nygard Cay."[6]

34.     A groyne is a wall built out into the sea that interrupts water flow and limits the movement of sediment to prevent beach erosion.  Attached as Exhibit 35 is a true and correct copy of a relevant excerpt about groynes from the Scottish Natural Heritage's "A guide to managing coastal erosion in beach/dune systems."  Nygård's groynes consist of wire structures (gabions) filled with rocks, cinder blocks, and debris, which are then coated with concrete.  They are held to the seabed by woven polypropylene sand bags and plastic buckets filled with debris. This Groyne Works is designed to interrupt the natural flow of the ocean water along the coastline and trap the sand being pumped onshore by the dredging.  In so doing, it also cuts off the long-term natural supply of sand to downdrift landowners.

35.     Nygård's variety of Groyne Works commenced in or about 1991 and he conducted different works in different areas of Nygård Cay until approximately June 2013. Attached as Exhibit 36 is a true and correct copy of the *ex parte* application Save The Bays filed in the Supreme Court of the Commonwealth of the Bahamas on May 17, 2013, *see infra*, which provides a description of the Groyne Works at Nygård Cay at pages 17-18.

---

[6]  As long ago as March 2000, *The New York Times* noted that Nygård is "pumping sand daily to expand his stretch of beach on his five acres."  Ex. 28.

36.     The Dredging Work commenced in or about 2010 and continued until
approximately June 2013.  Nygård uses a floating dredger to dredge sand from the sea bed to the
man-made beach at Nygård Cay.  The dredged sand is then pumped onshore to maintain the
artificial beach at Nygård Cay.  *See* Ex. 36 at 17-18.

### b.     Nygård's Misappropriation of Crown Land

37.     By pumping sand from the seabed onto his own property to expand his artificial
beach, Nygård accreted for his own personal and commercial use Bahamian Crown Land.
Crown Land is land that is not owned by any private citizen, and is instead held in trust by the
Bahamian Government for the benefit of the Bahamian people.  For years Nygård has
misappropriated Crown Land (i.e., the seabed) for his own personal benefit (i.e., expansion of his
private breach), without first obtaining a permit from the Bahamian Government.

38.     Bahamian officials and concerned citizens have long attempted to put an end to
Nygård's unlawful accretion, to no avail.  Certain documents and information that have only
recently become public reveal that concerned citizens began complaining about Nygård's
expansion at least as early as the mid-to-late 1990s.  Some of those complaints went to the then
Prime Minister Hubert Ingraham, and warned that the damage caused by Nygård's unregulated
and unpermitted activities at Nygård Cay was causing residents of Lyford Cay to sell their homes
and flee the area.  Bahamian officials ordered Nygård to stop his unpermitted expansion, but
Nygård ignored those directives.  As recently reported in the Bahamian press, in 2000, the
Bahamian Government (led by Prime Minister Perry Christie) commissioned an environmental
report about Nygård Cay, which concluded that Nygård's unauthorized reclamation of the seabed
constituted a theft of Crown land and threatened to harm the Bahamian environment.  The report
recommended that a "cease and desist" order be entered, effective immediately, and that the

Government further direct Nygård to reverse the damage caused by his expansion efforts and return the land to its original state.  In September 2000, the then Ministry of Finance was directed to prepare a prosecution of Nygård for breaching the Town Planning Act based on Nygård's expansion efforts at Nygård Cay.  However, no prosecution was commenced, and Nygård continued with his unlawful and impermissible environmentally-deleterious expansionist development.  Attached as Exhibit 37 are true and correct copies of a series of *The Tribune*'s June 19, 2014 articles entitled, "Nygard Faced Risk of Court For Land Grab," "Nygard Prosecution Urged 14 Years Ago," "'Cease And Desist' Order Suggested For Nygard Cay," and "Nygard Cay's 'Paradigm Shift' In Town Planning."

**B.    The Bahamian Government's Response to Nygård's Unlawful Environmental Abuses**

39.     On or about November 11, 2009, in the midst of Nygård's unlawful expansion efforts, "a mysterious fire" occurred at Nygård Cay, as Nygård himself described it, which engulfed and destroyed a number of structures on Nygård's property.  Attached as Exhibit 38 is a true and correct copy of the Affidavit of Peter Nygård, dated October 4, 2010, filed in the Supreme Court of the Commonwealth of the Bahamas ("Nygård 2010 Affidavit") in connection with a judicial review application brought by Nygård, discussed *infra*.  Nygård describes the 2009 fire at Nygård Cay in paragraph 38 of the Nygård 2010 Affidavit.  Having publicly announced the month before his desire to turn Nygård Cay into a commercial resort, Nygård submitted permit applications to reconstruct Nygård Cay following the fire.

40.     Nygård's permit applications were denied by Bahamian authorities as a result of Nygård's unauthorized expansion efforts.  On July 21, 2010, the Office of the Prime Minister of the Commonwealth of the Bahamas issued a directive to Nygård to return Nygård Cay to its natural state ("July 21, 2010 Letter").  The Prime Minister at the time was Hubert Ingraham, the

leader of the controlling party, the Free National Movement ("FNM") party.  The letter written

by the Prime Minister's Office stated:

> Over the years the property originally purchased by you has expanded significantly as
> shown on the enclosed photo map. This accretion of land has resulted from the strategic
> placement of groins and docks at Simms Point. Over the years you have also built
> structures on and otherwise used the accreted land that formed over the seabed.  It is
> noted that your Attorney . . .  in a letter dated 8th January, 2009 applied on your behalf
> for a lease of the pink areas shown on the enclosed photo map.
>
> I am directed to advise that the Government is not minded to approve a lease of the
> accreted land and request that you remove any structures that would have been erected on
> this land over the years . . . It would be appreciated if you would cause the coastline at
> Simms Point, Lyford Cay, New Providence to be reinstated according to the enclosed
> photo map[.]

Attached as Exhibit 39 is a true and correct copy of the July 21, 2010 Letter.

41.     Nygård did not comply with the Government's demands to restore the Nygård

Cay coastline to its original state.  Instead, Nygård brazenly continued his expansion of Nygård

Cay with the Groyne and Dredging Works.

**C.     Nygård's Response to the Bahamian Government**

42.     Following Nygård's receipt of the July 21, 2010 Letter, Nygård apparently

convinced himself that Mr. Bacon was the root cause of the issues between Nygård and the

Bahamian Government, including the denial of his permit applications following the fire.

Nygård then proceeded to file a lawsuit in retaliation against Mr. Bacon and then make claims

against the Bahamian Government itself.  In addition, Nygård poured money into the campaigns

of politicians who opposed the Bahamian Government officials who resisted his continued

expansion.

**a.      Nygård's Commences Efforts to Harass and Intimidate Mr. Bacon**

43.     On July 22, 2010, just one day after the Government sent Nygård its July 21, 2010

Letter, Nygård filed a civil action in the Supreme Court of the Commonwealth of the Bahamas

alleging that Mr. Bacon improperly prevented Nygård from enjoying an easement over the roadway on Mr. Bacon's property. That easement concerns Nygård's right-of-way to use a 25-foot-wide roadway on Mr. Bacon's property, which is the sole access by land to Nygård Cay, which is adjacent to Mr. Bacon's property in Lyford Cay. Nygård's lawsuit was largely inactive for approximately two years. However, between May and July 2012, Nygård, through his agents, attempted to alter the roadway through, among other things, acts of vandalism, such as spray painting black paint on the roadway with the word "Private," affixing signs on the roadway with the words "Nygård Cay," painting the words "Nygård Cay" on the roadway, and sawing off the gates to Mr. Bacon's home. Attached as Exhibit 40 is a true and correct copy of the Third Affidavit of Eric Gibson, dated June 4, 2012, filed in the Court of Appeal of the Commonwealth of the Bahamas, in *Nygård v. Point House Corporation*. These actions were the subject of a subsequent contempt hearing against Mr. Nygård. The Supreme Court of the Commonwealth of the Bahamas entered a contempt order against Nygård for his actions, but that order was ultimately reversed on appeal.[7] Matters only escalated from there.

44.     On July 26, 2010, just five days after the Government denied Nygård's requested permits, approximately eleven armed Bahamian police officers from the Anti-Terrorist Squad conducted a raid on Mr. Bacon's home in Lyford Cay, with press waiting outside to film their activities. I was informed by Mr. Bacon that this is the first time anything of this nature had happened in Lyford Cay, and that it was deeply traumatic for everyone in his home at the time, which did not include Mr. Bacon, his family, or the house guest Queen Noor of Jordan who had left the week prior. During the four-hour raid, law enforcement officers handcuffed Mr. Bacon's

---

[7]   This civil action relating to the easement has now been settled by Nygård and Mr. Bacon by Deed of Settlement signed on July 5, 2014, and an Order entered by the Supreme Court on July 8, 2014.

employees together, leaving some to swelter in the garage and dragging a couple of them in tow as the officers ransacked the house supposedly looking for weapons.  Disturbingly, the officers took digital photographs of the pictures of Mr. Bacon's three young children, as well as the entrance and windows to the children's bedroom.  It was only as the police were leaving Mr. Bacon's property that they procured the loud speakers dismantled and stored in Mr. Bacon's garage (which had been dismantled and stored there for some time), even though these loudspeakers were the purported "terrorist weaponry" on which the officers attempted to justify their search of Mr. Bacon's home in the first place.  The officers took the speakers with them as they left Mr. Bacon's property, but immediately returned them later that day, as soon as the Higher Command realized the folly of the illegitimate raid.

45.     Following the raid, the international and Bahamian press published a number of articles about the incident along with videos and photos from the news organisations that had— not coincidentally—positioned themselves outside Mr. Bacon's home shortly after the raid commenced, including articles that falsely described the confiscated speakers as "military grade speakers [that] reportedly caused illness" to Nygård.

46.     The Police Commissioner later personally apologized to Mr. Bacon for the menacing incident, informing him that Nygård was responsible for the rogue police officer's action and that officer was subsequently sanctioned.  This Nygård inspired raid, seemingly in retribution for the July 21, 2010 Letter, commenced an ongoing Smear Campaign against Mr. Bacon—waged in the press and the courtroom—that continues unto this day.  Indeed, just six weeks later, the *Daily Mail* published a defamatory article about Mr. Bacon, in which it suggested that Mr. Bacon was complicit in unethical behavior within his hedge fund business and elsewhere.  Attached as Exhibit 133 is a true and correct copy of the *Daily Mail*'s September

4, 2010 article, entitled, "A hedge fund Godfather with a body in his Jacuzzi who's facing claims of racketeering … Meet the Tory's latest dubious donor."  Ultimately, when challenged, the *Daily Mail* acknowledged "that the allegations concerning [Mr. Bacon] were misleading and published in error," and offered a public apology to Mr. Bacon on page 9 of the *Daily Mail* and on its website, as well as in a statement made in open court.  Attached as Exhibit 134 is a true and correct copy of the Statement in Open Court, dated November 16, 2010, filed in *Bacon v. Associated Newspapers Ltd.* in the Queen's Bench Division of the High Court of Justice of England.  I personally began representing Mr. Bacon in connection with the Nygård-orchestrated Smear Campaign as a result of this *Daily Mail* article.

47.     On or about October 5, 2010, Mr. Nygård, through his counsel Keod Smith ("Mr. Smith"), filed a judicial review action—a lawsuit in the Supreme Court of the Commonwealth of the Bahamas challenging the propriety of the Government's actions or inactions—against a number of Bahamian Government officials then in office, including the Prime Minister, the Minister of the Environment, the Minister of Works and Utilities, and the Attorney General, over their decision to deny him the permits to build on Nygård Cay.  Attached as Exhibit 41 is a true and correct copy of Nygård's Application for Leave to Apply for Judicial Review, dated October 4, 2010, filed in the Supreme Court of the Commonwealth of the Bahamas.  Though citing no evidence, Nygård swore to the court that Mr. Bacon was involved in the denial of his permits and that the denials were "purposefully designed to unlawfully collude with Mr. Bacon to get me to leave Nygard Cay and the Bahamas out of frustration."  *See* Ex. 38, Nygård 2010 Aff. ¶ 32. Nygård further claimed, without evidentiary support, that the expansion of his property was not the result of the Groyne and Dredging Works, but rather, the result of "natural accretion."  *See id.* ¶ 3.

48.     On October 6, 2010, Nygård's request for judicial review was summarily granted without judicial findings (the "October 6 Order").  Attached as Exhibit 42 is a true and correct copy of the October 6 Order entered by the Supreme Court of the Commonwealth of the Bahamas.

49.     On November 8, 2010, the Bahamian Government sought to have the October 6 Order set aside and the previously issued injunction discharged (the "Government's Response"). Attached as Exhibit 43 is a true and correct copy of the Government's Response.  In support of the Government's Response, Kirkland Mackey, Crown Counsel in the Office of the Attorney General, filed a sworn affidavit on February 15, 2011, a true and correct copy of which is attached as Exhibit 44 hereto, explaining that Nygård's judicial review action made material omissions about the Bahamian Government's position with respect to the accreted lands (¶ 11), improperly misrepresented Nygård as the freehold owner of the seabed from which he expanded his beach (¶¶ 10, 12), distorted the Bahamian Government's correspondence with Nygård (¶¶ 18-20), and that the action was an "abuse of the process of the Court" (¶ 17).

50.     The following day, the Lyford Cay Property Owners Association Limited ("LCPOA")—the company representing an association of individuals who own property in Lyford Cay, including Mr. Bacon—filed an application to intervene in opposition to the October 6 Order (the "LCPOA Intervention Application").  Attached as Exhibit 45 is a true and correct copy of the LCPOA's summons for a hearing on the LCPOA Intervention Application.  Attached as Exhibit 46 is a true and correct copy of the Affidavit of Christopher Hampton-Davies, dated May 10, 2011, filed in the Supreme Court of the Commonwealth of the Bahamas ("Hampton-Davies Affidavit") in connection with the LCPOA's Intervention Application.  The LCPOA sought to intervene because "[t]he coastal works that have been performed by the Applicant in

the seabed areas adjacent to Nygard Cay has had a deleterious effect on the neighboring coastal lots of Lyford Cay."  The LCPOA concluded that "the seemingly incessant dredging works performed at the instigation of the Applicant in the seabed adjacent to Nygard has resulted in substantial interruption of the flow of sand beach with erosion effects to small coves and beaches adjacent to some of the coastal lots of Lyford Cay nearby."  Ex. 46, Hampton-Davies Aff. ¶ 7. The Hampton-Davies Affidavit further disputed any claim that the expansion of Nygård Cay was the result of natural accretion, stating that the LCPOA commissioned coastal and seabed studies that concluded that "the purportedly 'accreted land' claimed by [Nygård] in these proceedings is a direct consequence of [Nygård's] coastal works — not by reason of the natural movement of sand by the tide or currents."  *Id.* ¶ 8.

51.     Following the filing of the Government's Response and the LCPOA Intervention Application, on June 30, 2011, Nygård applied to withdraw the judicial review action, and that application was granted.  Attached as Exhibit 47 is the order granting Nygård's application to withdraw the judicial review action, dated June 30, 2011.

52.     On April 6, 2011, Nygård filed a civil suit in the Supreme Court of the Commonwealth of the Bahamas against the Office of the Attorney General, seeking a declaration that he owns the accreted Crown Land ("2011 Declaratory Action").  Attached as Exhibit 48 is a true and correct copy of Nygård's Statement of Claim, dated April 6, 2011, filed in the Supreme Court of the Commonwealth of the Bahamas ("2011 Statement of Claim") in connection with the 2011 Declaratory Action.  In the 2011 Declaratory Action, Nygård again claims that the vast increase in the size of his property is due to natural land accretion:  "the Accreted Land formed as a result of the gradual and imperceptible deposit of materials from the ocean onto the land[,]

28

. . . has not formed as a result of any works carried out by [Nygård] for the purpose of reclaiming land from the sea."  *See* Ex. 48, 2011 Statement of Claim ¶ 5.1.

### b.     Nygård's Efforts to Replace Bahamian Government Officials

53.     At or around the time that Nygård's judicial review action was withdrawn, in 2011, an election campaign was underway in the Bahamas.  The candidates for Prime Minister were Hubert Ingraham of the FNM party, the Prime Minister whose Government denied Nygård's requested permit application, and Perry Christie of the Progressive Liberal Party ("PLP").  Not surprisingly, Nygård supported the PLP, and in particular Perry Christie for Prime Minister.  Nygård has admitted to being "one of the major backers of opposition leader Perry Christie and his PLP party."  Attached hereto as Exhibit 49 is a true and correct copy of the Affidavit of Nygård, dated April 2, 2012, filed in the Supreme Court of the Commonwealth of the Bahamas ("Nygård 2012 Affidavit") in connection with a civil conspiracy action brought by Nygård against Mr. Bacon and others (and subsequently withdrawn after the baseless allegations contained therein received full press coverage).  Nygård describes himself as a major backer of Perry Christie and the PLP on page 10, ¶ 12(d).

54.     In the May 2012 election, the PLP won, making Perry Christie Prime Minister. Demonstrating the closeness between Nygård and the incoming Government, Nygård held a celebration at Nygård Cay attended by numerous PLP Government ministers including Ken Dorsett, Minister of Housing and Environment; Shane Gibson, Minster of Housing and National Insurance; Dr. Michael Darvelle, Minister for Grand Bahamas; Jerome Gomez, Minster of Education; Alfred Gray, Minister of Agriculture; and Dr. Perry Gomez, Minister of Health.  This event was depicted in a YouTube video, aptly titled "Nygård Takes Bahamas Back May 2012." The video also depicts a "Nygård Victory Party" for the "Bahamas 2012 Elections" with an

image of Nygård with his arm around Prime Minister Christie.  A true and correct copy of the YouTube video is attached as Exhibit 50.  It has been publicly reported that Nygård has donated $5 million to the PLP's election campaign, although this has not been confirmed because the Bahamas does not require public reporting of campaign contributions.  Still, some Government officials have wondered aloud whether Nygård's donations were made in anticipated exchange for permit approvals from the Government.[8]

55.     This is not the first time that Nygård improperly attempted to leverage his financial support of politicians, and the PLP in particular, into personal and commercial benefits for himself.  As recently reported in the Bahamas press, in the early 1990s, Nygård pledged at least $45,000 to the PLP, which he then attempted—quite explicitly and shockingly—to exploit to obtain from the Bahamian Government assistance with his expansion efforts at Nygård Cay. In a letter to Prime Minister Christie dated July 10, 1992 (attached as Exhibit 24), Nygård made the purpose of his $45,000 in campaign contributions clear:  "Obviously, this whole world is based on one hand helping the other and you know that I am prepared to do whatever is in my capacity to help out the Bahamas and the PLP party and of course yourself in any way I can." That same letter asked Prime Minister Christie to assist Nygård with "a few 'housekeeping' issues," including arranging for permits authorizing Nygård to build off of his Nygård Cay property and onto beach area (which is Bahamian Crown property), stating:  "Under separate cover, I have sent a pledge for the PLP party for $10,000.  I understand that this brings my total pledge and contributions to the party and some of its members up to $45,000 - quite significant I

---

[8]  Members of the Bahamas Parliament have openly asked if Nygård's supposed $5 million donation to the PLP's election campaign was in exchange for certain approvals from the Government.  Attached as Exhibit 51 is a true and correct copy of Tribune242.com's July 18, 2013 article entitled, "Mp: Concerns that Nygard 'Donated $5m to the PLP.'"  Attached as Exhibit 52 is a true and correct copy of the *Nassau Guardian*'s July 18, 2013 article entitled, "MPs spar over political donations."

think you will agree.   I ask you now to help me bring to a final conclusion to a few 'housekeeping' issues before I come back."   Attached as Exhibit 53 is a true and correct copy of *The Tribune*'s June 24, 2014 article entitled, "Nygard Gave Money To PlP—Then Asked For Help Over Land Issues."

56.      Following the election of the PLP, Nygård obtained a default judgment against the Bahamian Government in the 2011 Declaratory Action due to the Bahamian Government's failure to provide a defence within the period of time prescribed by the Bahamas Supreme Court Rules.   The Bahamian Government subsequently filed an application to set aside the default judgment on procedural and substantive grounds.   Attached as Exhibit 54 is a true and correct copy of the Bahamian Government's summons filed in the Supreme Court of the Commonwealth of the Bahamas on June 6, 2012, in connection with its application to set aside Nygård's default judgment.   The Government's application to set aside the default judgment has not yet been heard and remains pending.

**D.      Save The Bays' Effort to Protect Clifton Bay From Nygård's Unlawful Expansion Efforts**

57.      As part of its efforts to protect the waters and public beaches of Clifton Bay, Save The Bays sought the Bahamian Government's intervention to stop Nygård's unlawful property expansion.   When that failed, Save The Bays sought the intervention of the courts.

**a.      Save The Bays Seeks the Bahamian Government's Assistance**

58.      On multiple occasions in 2013, Save The Bays sent letters to various Bahamian Government agencies about Nygård's recent Groyne and Dredging Works.   In addition, Save The Bays sent letters to the Government about the April 2013 demolition of the old dock on Jaws Beach, construction of a new dock there, and the placement of large boulders on the shoreline of the beach (the "Dock Work").   By his own admission, the Dock Work was carried out at the

31

direction of Nygård's attorney, Mr. Smith.  Attached as Exhibits 55-63 are true and correct copies of the letters that Save The Bays sent to Bahamian Government agencies regarding these environmental matters.

59.     By facsimile dated May 7, 2013, the Ministry of Works and Urban Development in the Bahamas ("Ministry of Works") responded to the letters from Save The Bays regarding the Dock Work.  The Ministry of Works informed counsel that there is no record of any building permit application related to the dock reconstruction, and that, based on the findings of an investigation that it carried out, it would be informing Mr. Smith of the illegality of his activities. Attached as Exhibit 64 is a true and correct copy of the Ministry of Works' May 7, 2013 facsimile.

60.     Save The Bays' letters of complaint regarding the Groyne and Dredging Works, however, went unanswered.

### b.     Save The Bays' Litigation Response to Mr. Nygård

61.     Given the inadequate response by the Government, on May 17, 2013, Save The Bays filed an *ex parte* application in the Supreme Court of the Commonwealth of the Bahamas for leave to apply for judicial review and for injunctive relief (the "Save the Bays 2013 Application") to prohibit Nygård's continued Groyne and Dredging Works and Mr. Smith's Dock Work.  *See* Ex. 36, Save The Bays 2013 Application.  The respondents in that lawsuit are Nygård, his attorney Mr. Smith, Prime Minister Perry Christie, and various Bahamian Government ministers and officials, among others.  In its application, Save The Bays challenges the Bahamian Government's decision "to take no action, alternatively, their breach of their statutory duty to consider whether to exercise their statutory powers to take action, with respect

to certain unauthorised activities" being conducted by Nygård and Mr. Smith in and around

Clifton Bay.  *Id.* ¶ 2.

62.     The Save The Bays 2013 Application (Ex. 36) alleges violations of various

Bahamian laws and breaches of multiple statutory duties caused by Nygård's recent Groyne and

Dredging Works, Mr. Smith's Dock Work, and the lack of action taken by the relevant Bahamian

Government agencies in response to the complained-of Dredging, Groyne, and Dock Works.

63.     The Save The Bays 2013 Application was granted on June 14, 2013, as was an

interim injunction to prevent Nygård from carrying out his Groyne and Dredging Works and Mr.

Smith from carrying out his Dock Work (the "Interim Injunction").  Nygård and Mr. Smith also

received notice that they would be held in contempt of court if they failed to comply with the

Interim Injunction.  In addition, Government officials and agencies were ordered to provide Save

The Bays with copies of all applications made by Nygård and Mr. Smith for permits, approvals,

or leases with respect to the properties at issue, as well as copies of all permits, approvals, or

leases that were granted to those individuals.  Attached as Exhibit 65 is a true and correct copy of

the Supreme Court of the Commonwealth of the Bahamas' Order, dated June 14, 2013 ("June 14

Order").

64.     Though more than one year has passed since entry of the Interim Injunction, the

Government has not produced any document or other record of requests made by or permission

granted to Nygård to engage in the recent Groyne and Dredging Works, or Mr. Smith to engage

in the Dock Works, except for one dredging permit the legitimacy of which is being challenged.

65.     Save The Bays' 2013 action (the "Save The Bays 2013 Action") remains pending.

The Interim Injunction continues to prevent Nygård from maintaining the groyne at Nygård Cay

and engaging in any further dredging activities.  As a result, Nygård's man-made beach is slowly receding back into the ocean.

66.     On July 7, 2014, Save The Bays filed a second judicial review action (the "Save The Bays 2014 Action") when the Bahamian Government refused to grant the organization sufficient access to Nygård's latest development plans, and filed an amended application on July 18, 2014 (the "Save The Bays 2014 Application") after the Bahamian Government agreed to extend the deadline of a purported consultation process by 21 days.  Attached as Exhibit 66 is a true and correct copy of the Save The Bays 2014 Application.  The respondents in that lawsuit are Prime Minister Perry Christie, the Director of Physical Planning, the Town Planning Committee, and various other Bahamian Government ministers and officials.  In its application, Save The Bays challenges the consultation process that the Bahamian Government created regarding Nygård's development plans.  Although the Bahamian Government published in mid-June 2014 a public notice inviting the public or interested parties to review and submit its views on Nygård's development plans, the Government has not made those development applications and supporting documentation available for inspection and comment, thereby necessitating the Save The Bays 2014 Application.  Ex. 66 at 13-31.  In addition, the Save The Bays 2014 Application alleges, among other things, that the respondents have acted unfairly, illegally, and irrationally in entertaining certain applications by Nygård while the 2011 Declaratory Action and the Save The Bays 2013 Action are still pending.

67.     On July 17, 2014, the Supreme Court of the Commonwealth of the Bahamas granted Save The Bays 2014 Application, and issued an injunction to restrain the Respondents from continuing to engage in the alleged flawed consultation process and from considering or determining any current or future applications for permits or approvals by Nygård in relation to

Nygård Cay and surrounding areas pending determination of the judicial review challenge.  The interim injunction is to remain in place until a further *inter partes* hearing to determine if the interim injunction should remain in place until trial occurs.

68.     To assist in the prosecution of both the Save The Bays 2013 Action and the Save The Bays 2014 Action I just described, Petitioner Save The Bays seeks discovery concerning communications and interactions between Nygård or his agents, on the one hand, and officials or employees of the Bahamian Government, on the other, as well as any authorizations Nygård received in connection with the Groyne, Dredging, and Dock Works, and communications Nygård or his agents had with Bahamian officials regarding development plans at Nygård Cay.

## IV.     NYGÅRD'S SMEAR CAMPAIGN AGAINST MR. BACON

69.     Nygård's irrational belief that the Bahamian Government "unlawfully collude[d] with Mr. Bacon" to deny Nygård permission to build on Nygård Cay and force Nygård out of the Bahamas, Ex. 38, Nygård 2010 Aff. ¶ 32, has resulted in more than just litigation.  As events unfolded in 2010, Nygård's attack on Mr. Bacon assumed larger and more obsessive dimensions. Specifically, in parallel with his baseless litigation strategy, Nygård orchestrated a wide-ranging attack campaign against Mr. Bacon—through the press, over the Internet, and in staged protest marches—based on overt lies and inflammatory and unsubstantiated accusations.  This intentional and malicious Smear Campaign is extraordinary in scope, magnitude, and duration.

70.     Although some efforts were made to create the false appearance that the defamatory publications about Mr. Bacon appeared organically and spontaneously in multiple media at around the same time, these publications are all part and parcel of a single Smear Campaign originating from a single source.  Although we do not know the full extent and nature of the Smear Campaign, the evidence indicates that its source is Nygård, and that he has

attempted to hide his involvement in the Smear Campaign by operating through accomplices and proxies.

71.     Mr. Bacon does not know the precise motive for and scope of Nygård's obsessive and relentless Smear Campaign against him.  It may be motivated by Nygård's mistaken belief that Mr. Bacon was responsible for the CBC programme, Nygård's aversion to Mr. Bacon's steadfast commitment to protecting the environment, Nygård's own paranoid and distorted views, or merely by Nygård's inability to accept responsibility, and his desire to blame some third party, for problems of his own making.  But from the evidence gathered to date from the litigations described below, Mr. Bacon has reason to conclude that Nygård is behind the Smear Campaign.  In this context, it should be reiterated that Nygård has a long history of unleashing verbal tirades and retaliating against employees and anyone else who dares to defy him, as reported in the CBC documentary and the *Forbes* article attached as Exhibits 2 and 3 (the CBC documentary) and 4 (the *Forbes* article) and summarized above.

72.     Starting in the spring and summer of 2010, Nygård and his surrogates developed a multipronged attack against Mr. Bacon, including by staging malicious and patently false news reports and ghostwriting articles about Mr. Bacon in the Bahamian press and online through anonymous, anti-Bacon attack websites and blogs.  Nygård and his surrogates have used the following means and methods, among others, to tarnish, intimidate, and injure Mr. Bacon:

- organizing staged rallies and press conferences in the Bahamas at which proxies made outlandish allegations about Mr. Bacon and called for him to be expelled from the Bahamas;

- creating malicious and false YouTube videos about Mr. Bacon;

- filing court documents containing false and irrelevant allegations about Mr. Bacon with the goal that the statements would later be republished in the international press, with no intention of pursuing the claims;

- instigating law enforcement investigations and actions in an effort to generate negative press reports about Mr. Bacon;

- undertaking efforts to have the defamatory Mr. Bacon articles republished in broadsheet newspapers; and

- creating pseudonymous Twitter accounts to continuously republish the defamatory materials months and years later.

73.     The lies and smears against Mr. Bacon are manifold and range from the shocking to the outlandish.  Lacking in any substantiation, the Smear Campaign has, and continues to, spread the following malicious lies about Mr. Bacon:

- that he was involved in several murders or mysterious disappearances in the Bahamas;

- that he was involved and implicated in "one of the biggest Wall Street insider trading cases ever";

- that he runs an international smuggling and drug trafficking ring;

- that he is an avowed member of the KKK;

- that he is racist and prohibits black Bahamians from enjoying the beaches of Lyford Cay;

- that he lied and deceived the National Audubon Society to receive the  prestigious Audubon Award;

- that he keeps illegal military grade speakers on his property that have the potential to cause structural damage and even death;

- that he is guilty of various forms of criminal conduct, including smuggling and harboring individuals who are under the suspicion of the Bahamian Immigration Authority; and

- that he has bribed Government officials to cover up his illegal activities.

**A.    Attacks on Mr. Bacon Through False News Reports**

74.    Not only do these lies and smears lack any basis in fact, several of the most unconscionable smears have been cobbled together by distorting and manipulating actual news reports to falsely incriminate Mr. Bacon in criminal and other scandalous activities.

**a.    The "Vincent Roy" YouTube Video**

75.    For example, on May 10, 2013, an individual using the pseudonym "Vincent Roy" uploaded a video to YouTube titled, "Is Louis Bacon Racist?"  A true and correct copy of the video and a true and correct copy of a certified transcript of that video are attached as Exhibits 67 and 68, respectively.  This video maliciously defames Mr. Bacon by stating, explicitly and implicitly, that Mr. Bacon is among the KKK's ranks and is responsible for and has been caught in "one of the biggest Wall Street insider trading cases ever."  It does so by editing news reports and splicing video footage in a false and defamatory manner.

76.    For example, the "Vincent Roy" YouTube video alleges that Mr. Bacon has been caught in "one of the biggest Wall Street insider trading cases ever."  While showing a photo of Mr. Bacon with the title "Insider Trading Exposed," the  "Vincent Roy" YouTube video airs CBS reporter Scott Pelley saying the following:

> We begin tonight with one of the biggest Wall Street insider trading cases ever.
> At a time when many Americans were losing their 401(k)s, prosecutors say was
> leaking secret corporate information to a hedge fund tycoon so that that tycoon's
> fund wouldn't suffer the same fate.  [It] was in a perfect position to do that inside
> the board rooms of some of the country's biggest corporations.  The result,
> prosecutors say, was that the hedge fund made millions while ordinary Americans
> got soaked.

77.    In truth, the Pelley report did not concern or name Mr. Bacon.  Rather, the YouTube video intentionally and misleadingly edits an October 26, 2011, news report that aired on The CBS Evening News with Scott Pelley regarding the high-profile arrest of Rajat Gupta for

providing insider tips to Raj Rajaratnam.  Attached as Exhibit 69 is a true and correct copy of

CBS Evening News' October 26, 2011 news report.  The below images on the left are

screenshots of the actual CBS News report while the images on the right are screenshots from the

manipulated video "Is Louis Bacon Racist?"

<u>**Actual CBS News Report**</u>          <u>**Vincent Roy YouTube Video**</u>










78.     Such manipulation of the Pelley report maliciously and intentionally suggests to the viewer that Mr. Bacon not only routinely engaged in insider trading, but that Mr. Bacon is facing criminal charges in the United States for insider trading in "one of the biggest Wall Street insider trading cases ever."  This is patently false.

79.     Having manipulated one news report, the "Vincent Roy" YouTube video then edits and distorts a second.  After Scott Pelley appears on that second YouTube video, the YouTube video proceeds by airing an October 26, 2012, ABC Nightline special report titled, "Inside the New KKK."  Once again, though, the Smear Campaign doctored this video, adding an image of Mr. Bacon with the title "Bacon Exposed" when the ABC reporter stated, "A rare look inside the secret world of the KKK, and it may surprise you who is among their ranks."  In reality, the ABC Nightline report did not concern or reference Mr. Bacon at all.  The below images on the left are screenshots of the actual ABC news report while the images on the right are screenshots from the video "Is Louis Bacon Racist?"  Attached as Exhibit 70 is a true and correct copy of ABC Nightline's October 26, 2012 special report.

| **Actual ABC Nightline Report** | **Vincent Roy YouTube Video** |
| --- | --- |
|  |  |
|  |  |



80.     Such manipulation of an actual news report leaves the patently false impression that Mr. Bacon is a member of the KKK and that Nightline has proof of it.  Nothing, however, could be further from the truth.

81.     These are just some of the examples of the ways that the Smear Campaign has maliciously attempted to injure Mr. Bacon.  In total, "Vincent Roy" uploaded three videos to YouTube in May 2013.  Another one of the videos is titled "Is Louis Bacon a Murderer?"  This

video explicitly suggests that Mr. Bacon was behind the murder of several individuals on his property, including his former employee and friend Dan Tuckfield.  A true and correct copy of the video and a true and correct copy of a certified transcript of that video are attached as Exhibits 71 and 72, respectively.

> **b.      The "Paul Pierce" YouTube Videos**

82.      In addition to the defamatory "Vincent Roy" YouTube videos uploaded in May 2013, at about that same time, a user named "Paul Pierce" also uploaded to YouTube a series of defamatory videos about Mr. Bacon.  On March 15, 2013, an account was created on YouTube under the pseudonym "Paul Pierce."  That account subsequently uploaded, between March 16, 2013 and May 31, 2013, approximately 16 defamatory videos, most of which concern Mr. Bacon.  The "Paul Pierce" YouTube videos propagate malicious and false accusations regarding Mr. Bacon, including that:  (1) he is a serial and profound racist; (2) as a result of his racist attitude towards Bahamians, Mr. Bacon has and intends to continue to exclude Black Bahamians from Lyford Cay; (3) he has lied about his involvement in the fight to save Clifton Beach in the Bahamas; and (4) he obtained the National Audubon Society's prestigious Audubon award through lies and deception.

83.      The videos about Mr. Bacon are catalogued in the below chart, along with the date each video was uploaded.

| Title | Date Uploaded |
|---|---|
| BREAKING NEWS!!! Louis Bacon is a FRAUD! | April 22, 2013 |
| Louis Bacon receives Audubon Medal under FALSE Pretenses | May 8, 2013 |
| Louis Bacon – A Story of 5 Lies | May 31, 2013 |
| 5 Lies of Louis Bacon | May 28, 2013 |

| Bacons Lies TV Ad | May 8, 2013 |
|---|---|
| Louis Bacon is LIAR – BACON DID NOT SAVE HISTORIC CLIFTON SIGHT | March 18, 2013 |
| Louis Bacon is LIAR – BACON DID NOT SAVE HISTORIC CLIFTON SIGHT – Part 1 | March 18, 2013 |
| Louis Bacon is LIAR – BACON DID NOT SAVE HISTORIC CLIFTON SIGHT – Part 2 | March 18, 2013 |
| Louis Bacon is LIAR – BACON DID NOT SAVE HISTORIC CLIFTON SIGHT – Part 3 | March 18, 2013 |
| Louis Bacon Faces the Wrath of Farrakhan | March 16, 2013 |
| Peter Nygård Stem Cell TV Ad [suspended] | May 8, 2013 |
| Nygård Donates 250k for Reef Restoration in Bahamas TV Ad [suspended] | May 8, 2013 |
| Peter Nygård Donates $250,000 for Reef and Mangrove restoration at Nygård Cay [suspended] | May 8, 2013 |
| Thank you Peter Nygård [suspended] | April 3, 2013 |
| BAHAMIANS SAVED CLIFTON – NOT LOUIS BACON [suspended] | March 19, 2013 |

84.    For example, the video "Louis Bacon is LIAR – BACON DID NOT SAVE HISTORIC CLIFTON SIGHT," which "Paul Peirce" uploaded in four separate parts on May 18, 2013, features several statements by Minister Louis Farrakhan, the spiritual leader of the Nation of Islam, proclaiming Minister Farrakhan's friendship with Nygård while defaming Mr. Bacon by alleging, *inter alia*, that Mr. Bacon "lied" because he "did not save Clifton," but rather, it was saved by a "grassroots movement" lead by Bahamians.  In one such clip, excerpted from a town hall meeting in downtown Nassau on March 12, 2013 at which Minister Farrakhan was the keynote speaker, Minister Farrakhan insinuates that Mr. Bacon is racist, stating that Mr. Bacon tried to "rewrite" black Bahamians history (by taking credit for the Saving Clifton Campaign)

43

and threatens that Mr. Bacon will be "gone with the wind."  The video also includes a clip of a speech from Minister Farrakhan during an event at Nygård Cay in which Minister Farrakhan praises Nygård and states that Mr. Bacon is persecuting Nygård because Mr. Bacon is disturbed by the "warmth" and "gayety" occurring at Nygård Cay.  In addition, the video contains a press conference held by Minister Farrakhan following the event at Nygård Cay in which Minister Farrakhan suggests that *The Tribune* wrote the misleading and defamatory article about the event in order "to protect Bacon," stating that the newspaper is "representing Louis Bacon" and insulating that Mr. Bacon had paid the newspaper.  The video also features footage of Shane Gibson, the Bahamian Minister of Labour, at Nygård Cay.  A true and correct copy of the video and a true and correct copy of a certified transcript of that video are attached as Exhibits 73 and 74, respectively.

85.     Following publication of the "Vincent Roy" and "Paul Pierce" YouTube videos, we attempted to discover the whereabouts and true identity of "Vincent Roy" and "Paul Pierce" to no avail.  We therefore concluded that "Vincent Roy" and "Paul Pierce" were pseudonyms hiding the true identity of the individual(s) who created and uploaded these malicious lies and smears of Mr. Bacon.  As Mr. Palladino explains in his declaration, "Paul Pierce" is a pseudonym for Mr. Feralio, a videographer who formally worked for Mr. Nygård.  *See* Declaration of Jack Palladino ("Palladino Decl.") ¶ 22.

## V. MR. BACON'S EFFORTS TO DISCOVER THE ORIGINS AND FULL SCOPE OF THE SMEAR CAMPAIGN AGAINST HIM

86.     Through actions for discovery orders and defamation actions filed in the Bahamas against a number of publishers, journalists, and others, Mr. Bacon has obtained evidence that

Nygård is secretly the architect of the unlawful and ongoing Smear Campaign waged against Mr. Bacon.[9]

87.    Evidence collected to date suggests that Nygård's attorney is helping or has previously helped coordinate the Smear Campaign on Nygård's behalf through proxies and accomplices.  Working through his attorney, Nygård pays publishers, journalists, and others to publish, write, or publicly proclaim unsubstantiated and defamatory statements about Mr. Bacon.  Various Bahamian actions for discovery orders and defamation actions initiated by Mr. Bacon have revealed that certain individuals joined Nygård's Smear Campaign and are acting at Nygård's direction, including:

- Michael Rolle:  the creator of the *Bahamas Citizen* website, which was created for the sole purpose of publishing defamatory articles about Mr. Bacon;

- Jason Graham:  the creator of the *Bahamas National* website, which was created for the sole purpose of publishing defamatory articles about Mr. Bacon;

- Sherman Brown:  a journalist based in New Providence, Bahamas who, with assistance from Mr. Smith and others, established the defamatory *Bahamas Citizen* and *Bahamas National* websites;

- Earlin Williams:  Nygård's press secretary, who authored several defamatory articles accusing Mr. Bacon of running an international drug trafficking ring, involvement in murders and their cover-ups, and bribery of government officials;

- Phillippa "Lady" Russell:  a broadcast journalist who Nygård hired and paid to provide so-called "public relations" services, including issuing false and defamatory statements accusing Mr. Bacon of being a racist and a member of the KKK;

- Carvel Francis:  the publisher of the *Bahamas Press* website that published false and defamatory articles accusing Mr. Bacon of being a racist, involvement in murders at his Lyford Cay residence, and the orchestration of an elaborate cover-up of those murders; and

---

[9]    Under Bahamian law, intentional libel is a criminal violation punishable by up to two years in prison. *See* Bahamas Penal Code §§ 315-322, a true and correct copy of which is attached as Exhibit 76 hereto.

- Wendall Jones:  the publisher of a newspaper and host of a television program that published malicious and defamatory statements about Mr. Bacon, including statements made by Nygård accusing Mr. Bacon of being a racist and supporter of the KKK who seeks to exclude Bahamians from Lyford Cay.

88.     To date, witness statements, emails, and other documents collected in these Bahamian actions reveal some information about Nygård's role in the unlawful Smear Campaign.  Among the most probative evidence are "fee notes" (referred to in the United States as attorney "time entries" or "billing records") prepared by Nygård's lawyer.[10]  On July 23, 2013, *The Tribune* published an editorial describing these fee notes and excerpting portions of certain of the fee notes.  Attached hereto as Exhibit 77 is a true and correct copy of *The Tribune*'s July 23, 2013 editorial entitled, "Money can talk – even with journalists," which disclosed the existence of these fee notes.

89.     As set forth in *The Tribune* editorial, the fee notes confirm that Nygård has used his attorney, and others, such as Earlin Williams and Bahamian Government officials, to advance his malicious Smear Campaign.  Indeed, the editorial states that the fee notes show that, in February 2011, Nygård's attorney met with a member of Parliament from the PLP (then in opposition, now in Government) on a "PR approach in exposing Bacon through GEMS," which refers to the popular Bahamian radio station GEMS 105.9 FM.  The editorial further quotes from several other entries in Nygård's counsel's fee notes:

February 29 - March 3, 2012       "Teleconference (02/03) with PR on matters including update on stories in broadsheets on Bacon, dining reporters,

---

[10]   Mr. Bacon obtained a court order requiring the production by *The Tribune* of the fee notes on which its July 23, 2013 editorial was based.  The fee notes are not attached here or relied upon directly because, under Bahamian law, the fee notes are subject to an implied undertaking of confidentiality. The implied undertaking of confidentiality prohibits the disclosure of documents obtained in discovery unless and until the documents are made public in a court proceeding or with permission of the Bahamian court.

|                              | equipment (2.5 hrs). Amount Due: $1,500; our Fee: $1,000" |
|------------------------------|-------------------------------------------------------------|
| February 29 - March 3, 2012  | "Discussing and agreeing with Earlin to have him redirect his focus from the documentary for the time being to getting story in printed broadsheets.  Set fees plus disbursements in achieving bringing broadsheets on our side as well as working to establish right atmosphere to get overall story of Peter J. Nygård printed so that it could take off in Canada and Europe (1.5 hrs) Amount Due $5,000; Our Fee $600." |
| March 4, 2012                | "Meeting with Broad Sheet No. 1 along with Earlin going over getting his support of our focus; explaining the overall strategy as to PR in these issues and need for publication on demand to secure ongoing exclusives; went over details of issue coming out of letter to real estate association (2.5hrs). Amount due: $259; Our fee: $1,000." |

90.    Of course, the fee notes quoted in *The Tribune* article only reference several days, and we do not know what happened on all of the other days.

91.    In addition, Nygård has made his animus toward Mr. Bacon public on a number of occasions.  For example, on a televised interview of Nygård that aired on a television program called "The Platform" on April 10, 2013, Nygård claimed, without any supporting evidence, that Mr. Bacon is "so proud of his own plantations and the Ku Klux Klan," that Save The Bays was "engineered [by Mr. Bacon] to get at me[] . . . to try[] to steal my property," and that Mr. Bacon is responsible for the Bahamian Government's refusal to grant Nygård the permits he sought.  A true and correct copy of a relevant portion of The Platform's April 10, 2013 broadcast and a true and correct copy of a certified transcript of the relevant portion of that broadcast are attached hereto as Exhibits 78 and 79, respectively.  Just recently, in mid-July 2014, two large signs attacking Mr. Bacon were placed on Nygård's property.  Those signs stated that "ITS [SIC] TIME TO THROW THE TRASH OUT!", referring to "LOUIS KKK BACON" and "MOORE CAPITAL MANAGEMENT."  Attached hereto as Exhibit 80 is a true and correct photograph of the attack signs against Mr. Bacon located on Nygård's property.  Indeed, Nygård has openly

47

acknowledged his daily and obsessive fixation with Mr. Bacon.  In a television interview on May 30, 2013, Nygård claimed that he spends about 5% of his time "on Louis Bacon," meaning at least 1 hour each day focusing on Mr. Bacon.  Given that the only litigation at the time between Messrs. Nygård and Bacon was a roadway dispute and the 2013 Save The Bays Action, neither of which could reasonably occupy much of Mr Nygård's time, Nygård's statement is at least a tacit acknowledgement of his fixation on and orchestration of the Smear Campaign.  A true and correct copy of The Platform's May 30, 2013, broadcast and a true and correct copy of a certified transcript of the broadcast are attached hereto as Exhibits 129 and 130 (relevant portion at p.25), respectively.

92.     Thus, while Mr. Bacon has obtained probative evidence of Nygård's involvement in the Smear Campaign against Mr. Bacon, the full extent of Nygård's actions and the identity of all his accomplices remain unknown.  To fully expose the Smear Campaign, hold Nygård and his accomplices accountable, and take steps to vindicate his reputation, Mr. Bacon has filed a number of lawsuits in the Bahamas.  In all, since mid-2011, Mr. Bacon has filed seven separate actions against 11 different parties.  This Section 1782 Action seeks critical discovery in aid of each of the five currently pending litigations, as well as the currently pending Save The Bays Actions.

A.     *Bacon v. Rolle and Graham*:  Nygård's Role in the Smear Campaign Is First Established

93.     In or about mid-2010 and through early 2011, the *Bahamas Citizen* and the *Bahamas National* websites began publishing defamatory articles about Mr. Bacon.  Attached as Exhibits 81-84 are true and correct copies of certain of these defamatory articles.  The content of many of the articles was nearly identical across the two websites, suggesting that they came from the same source.  For example, on April 11, 2011, both the *Bahamas Citizen* and the *Bahamas*

*National* websites published substantially similar defamatory articles about Mr. Bacon, with the *Bahamas Citizen* article entitled, "Louis Bacon Being Watched" and the *Bahamas National* article entitled, "Bacon being watched."  On May 5, 2011, the *Bahamas Citizen* website published an article entitled, "Louis Bacon is being watched," with identical content to the article published by the *Bahamas National* website on or around May 9, 2011, and entitled, "Louis Bacon to be investigated."[11]

94.     On June 24, 2011, Mr. Bacon filed an action for a discovery order, commonly known as a Norwich Pharmacal Order,[12] in the Supreme Court of the Commonwealth of the Bahamas against Michael Rolle ("Mr. Rolle"), the creator of the *Bahamas Citizen* website, and Jason Graham ("Mr. Graham"), the creator of the *Bahamas National* website (the "Rolle/Graham Action").  The Rolle/Graham Action sought to identify the person or persons responsible for the slew of defamatory articles about Mr. Bacon published on the *Bahamas Citizen* and the *Bahamas National* websites.  Attached as Exhibit 85 is a true and correct copy of the Application for a Norwich Pharmacal Order, dated June 24, 2011, filed in the Supreme Court of the Commonwealth of the Bahamas in connection with the Rolle/Graham Action.

95.     On October 26, 2011, the Supreme Court of the Commonwealth of the Bahamas granted Mr. Bacon's application and entered a Norwich Pharmacal Order requiring both Rolle and Graham to provide the information requested (the "Rolle/Graham Order").  Attached as

---

[11]  Those attack websites—the *Bahamas Citizen* and *Bahamas National* websites—often published identical or substantially identical articles that falsely alleged, among other things, that Mr. Bacon (1) was involved in several murders, (2) runs an international smuggling and drug trafficking ring, (3) bribed Government officials to cover up his illegal activities; (4) is a racist and avowed member and supporter of the KKK, and (5) maintained illegal military grade "sonic weapon" speakers on his property.

[12]  A Norwich Pharmacal Order is a court order for the disclosure of documents or information from a party who may have been involved in wrongdoing.

Exhibit 75 is a true and correct copy of the Rolle/Graham Order.  Following entry of the

Rolle/Graham Order, Mr. Rolle filed two affidavits explaining the origins of the defamatory

articles about Mr. Bacon on the *Bahamas Citizen* website.  True and correct copies of the Mr.

Rolle affidavits are attached as Exhibits 86 and 87.  Mr. Rolle swore that he was retained by

Sherman Brown ("Mr. Brown"), a journalist based in New Providence, Bahamas, in July or

August 2010, "to create a website called bahamascitizen.com," and that Mr. Brown subsequently

paid Mr. Rolle between $1,500 and $2,000 to publish the defamatory articles about Mr. Bacon.

Ex. 86 ¶¶ 4-5; Ex. 87 ¶¶ 4-5, 11, 37.  Mr. Rolle also received defamatory articles from

anonymous email addresses, including mrbigboy242@gmail.com.  Ex. 86 ¶¶ 29, 30; Ex. 87 ¶ 18.

Mr. Rolle also swore that he assisted in the management of the *Bahamas National* website at the

request of Mr. Brown and Steve McKinney ("Mr. McKinney"), the host of "Hard Copy," a

Bahamian radio show.  Ex. 86 ¶¶ 26-34.

      96.     Messrs. Brown and McKinney created the *Bahamas Citizen* and *Bahamas*

*National* websites to attack and smear Mr. Bacon.  Mr. Rolle's sworn statement notes that when

Mr. Brown first commissioned Mr. Rolle to create the *Bahamas Citizen* website, he instructed

Mr. Rolle that "he needed the site to show up on Google when anyone typed in Louis Bacon."

Ex. 87 ¶ 12.  Mr. Brown further instructed Mr. Rolle to purchase domain names based on Mr.

Bacon's name, including "louisbacon.org" and "louisbacon.info."  Ex. 87 ¶ 13.  And

documentary evidence produced by Mr. Rolle reveals that Mr. Brown was working on behalf of

an unnamed client, whom Mr. Brown referred to as "the chief."  Ex. 86 at 18 ("Exhibit MR 7").

      97.     Following issuance of the Rolle/Graham Order, Mr. Graham also filed several

affidavits, true and correct copies of which are attached as Exhibits 88-90.  Mr. Graham was

examined in court by Mr. Bacon's counsel on January 24, 2013.  A true and correct copy of the

transcript of that examination is attached as Exhibit 91.  Mr. Graham's statements and testimony

demonstrate that, like Mr. Rolle, Mr. Graham was hired and paid by Mr. Brown to develop and

host the *Bahamas National* website, and that Mr. Brown "was solely responsible to the editorial

content of the material included on the website."  Ex. 91 at 21-22.  During his cross examination,

Mr. Graham acknowledged his concerns with posting defamatory articles on the *Bahamas*

*National* website about Mr. Bacon.  *Id.* at 29-30.  The Rolle/Graham Action is no longer

pending.

**B.**     ***Bacon v. Brown & McKinney***

98.     On March 29, 2012, based on evidence and testimony obtained in the

Rolle/Graham Action, Mr. Bacon's counsel sent a letter to Mr. Brown (the "March 29, 2012

Letter") requesting information about Mr. Brown's involvement in "an unlawful conspiracy to

damage the reputation of [Mr. Bacon]":

> It is plain that you have been acting on behalf of a client.  The particulars of the
> information we require you to disclose are set out below; fundamentally we require the
> name of your client and confirmation of the nature of your instructions.  If you refuse to
> provide this information voluntarily, our client will seek an order that you be compelled
> to disclose it.

Attached as Exhibit 92 is a true and correct copy of the March 29, 2012 Letter.  A similar letter

was sent to Mr. McKinney.  Attached as Exhibit 93 is a true and correct copy of the March 29,

2012 letter that was sent to Mr. McKinney.

99.     Mr. Brown did not comply with the request for information set forth in the

March 29, 2012 Letter.

100.     On April 13, 2012, Mr. Bacon filed an action for a Norwich Pharmacal Order in

the Supreme Court of the Commonwealth of the Bahamas against Messrs. Brown and McKinney

to obtain through court order the information Mr. Brown would not voluntarily disclose (the

"Brown/McKinney Action"). Attached as Exhibit 94 is a true and correct copy of the Norwich Pharmacal application filed in support of the Brown/McKinney Action.

101. On June 13, 2012, the Supreme Court of the Commonwealth of the Bahamas granted Mr. Bacon's application and entered a Norwich Pharmacal Order against Messrs. Brown and McKinney (the "Brown/McKinney Order"). The Brown/McKinney Order instructed Messrs. Brown and McKinney to provide "an overview of the smear campaign against [Mr. Bacon] by providing a full list of all the other individuals embroiled in this campaign, together with a full explanation of the person or persons with overall responsibility for coordinating and funding the smear campaign." Attached as Exhibit 95 is a true and correct copy of the Brown/McKinney Order.

102. Messrs. Brown and McKinney steadfastly refused to make any disclosures as required by the Brown/McKinney Order. On August 7, 2012, Mr. Bacon sought leave to apply for a committal order against both individuals ("Brown/McKinney Committal Application"). Attached as Exhibit 96 is a true and correct copy of the Statement in Support of Application filed in support of the Brown/McKinney Committal Application. On December 19, 2012, the Supreme Court of the Commonwealth of the Bahamas granted Mr. Bacon's application for a committal order against Messrs. Brown and McKinney for their failure to comply with the Brown/McKinney Order. Attached as Exhibit 97 is a true and correct copy of the Supreme Court of the Commonwealth of the Bahamas' December 19, 2012 Order.

103. On January 30, 2013, after being notified of the Brown/McKinney Committal Application, Mr. McKinney submitted an affidavit in response in which he asserted that he did not have any personal knowledge whatsoever regarding the matters listed in the

Brown/McKinney Order.  Attached as Exhibit 98 is a true and correct copy of Mr. McKinney's

January 30, 2013 affidavit.

104.    On February 27, 2013, counsel for Mr. Bacon sent a letter to Mr. McKinney

requesting responses to questions based on the evidence and admissions obtained from Messrs.

Graham and Rolle in the Rolle/Graham Action.  By letter dated June 28, 2013, Mr. McKinney's

counsel responded to those questions, stating, among other things, that Mr. McKinney "has no

involvement with the *Bahamas National* website" and "did not discuss Louis Bacon or anyone

else with Mr. Brown and/or Mr. Rolle."  Attached as Exhibit 99 is a true and correct copy of

counsel for Mr. McKinney's June 28, 2013 letter.  Following receipt of Mr. McKinney's further

answers, Mr. Bacon discontinued the Committal Application against Mr. McKinney.

105.    On January 31, 2013, upon learning of the Brown/McKinney Committal

Application, Mr. Brown submitted an affidavit in defence ("First Brown Affidavit").  The First

Brown Affidavit denies Mr. Brown's ownership interest in the *Bahamas National* website and

the allegations of Messrs. Rolle and Graham.  Attached as Exhibit 100 is a true and correct copy

of the First Brown Affidavit.

106.    On July 8, 2013, Mr. Brown submitted a second affidavit, in which, among other

things, he: (i) denied any involvement or knowledge in a Smear Campaign against Mr. Bacon;

(ii) denied involvement in the *Bahamas Citizen* website, stating that he had no "dealings with the

ownership operation or maintenance of the *Bahamas Citizen* website"; and (iii) claimed that the

"ultimate editorial and veto power control over what is allowed on the [*Bahamas National*]

website resided solely in the hands of Rev. Graham" ("Second Brown Affidavit").  The Second

Brown Affidavit included Mr. Brown's denial of having worked on behalf of any specific

individual.  The Second Brown Affidavit further claimed, without any evidence or support, that

emails produced in prior proceedings insinuating anything to the contrary were "doctored."
Attached as Exhibit 102 is a true and correct copy of the Second Brown Affidavit.

107.    The Second Brown Affidavit is contrary to the evidence, including Mr. Rolle's
and Mr. Graham's testimony and documents.  For example, an August 25, 2010 email shows
Nygård instructing Mr. Brown to "get a team of BLOCKERS to now attack all this nonsense,"
referring to articles claiming that "Peter Nygard has dessimated [sic] the shoreline."  Mr. Brown
then forwarded Nygård's instruction to Mr. Rolle, with the instruction:  "Mike please read and
advise me.  URGENT!!! Thanks."  *See* Ex. 86 at 16 ("Exhibit MR 5").

108.    An August 27, 2010 email shows Nygård forwarding Mr. Brown a Google alert
he had placed on "Louis Bacon" and instructing Mr. Brown to "put [a] Google alert on your Own
Machine."  Mr. Brown then forwarded Nygård's instruction to Mr. Rolle.  *See id.* at 17 ("Exhibit
MR 6").

109.    On August 23, 2013, Mr. Bacon's attorneys sought a hearing in the
Brown/McKinney Action to test the veracity of the Second Brown Affidavit through cross-
examination of Mr. Brown ("Application for Evidentiary Hearing in the Brown Action").
Attached as Exhibit 103 is a true and correct copy of the Application for Evidentiary Hearing in
the Brown Action.

110.    Mr. Bacon is currently awaiting a hearing date in response to its Application for
Evidentiary Hearing in the Brown Action.

111.    To assist in the prosecution of the Brown/McKinney Action I just described,
Petitioner Mr. Bacon seeks discovery concerning, among other things, Mr. Brown's
communications and interactions with Nygård and Nygård's involvement in Mr. Brown's
publication of defamatory statements about Mr. Bacon.  Such discovery would be highly relevant

to the action, particularly in connection with the Evidentiary Hearing in the Brown Action and the pending committal application.

**C.      *Bacon v. Earlin Williams***

112.      Earlin Williams ("Mr. Williams") is a writer and Nygård's press secretary.  Mr. Williams has directed that the *Bahamas Press* website and *The Bahama Journal* publish numerous maliciously false articles about Mr. Bacon.

113.      For example, on May 4, 2012, the *Bahamas Press* website published a defamatory article with the byline "E. Williams" entitled, "Louis Bacon's Conspiracy and Corruption at Lyford Cay."  Without any supporting evidence, the article states that Mr. Bacon is running a sophisticated international drug smuggling and drug trafficking ring with the consent of certain Bahamian Officials.  To prevent Nygård from disturbing Mr. Bacon's illegal operations, the article further claims that Mr. Bacon is attempting to drive Nygård from Nygård's Bahamian home.  The article also states that Mr. Bacon was involved in the suspicious death of an individual on his property and that Mr. Bacon was involved in "burn[ing]" the individual "to hide the evidence."  Attached hereto as Exhibit 104 is a true and correct copy of the *Bahamas Press*' May 4, 2012 article.

114.      On May 9, 2012, the *Bahamas Press* website published a defamatory article with the byline "E. Williams" entitled,  "Louis Bacon hedges a bad bet in The Bahamas as ruling FNM trounced in General Elections," on the *Bahamas Press* website.  The following day the article appeared in *The Bahama Journal*.  The article asserts, *inter alia*, that Mr. Bacon is guilty of various forms of criminal conduct, including participating in an illegal drug smuggling operation, harboring two German nationals and an American under the suspicion of the Bahaman Immigration Authority, and torturing Nygård through the use of "several military type acoustic

sound blasters."  The article further states that Mr. Bacon "bank rolled the FNM to the losing

tune of $15 million and spend [sic] another $5 million in individual campaign contributions to

FNM Candidates," including Environmental Minister Earl Deveaux, so that FNM Government

officials would "turn[] a blind eye and giv[e] solace, cover and unlawful assistance to" Mr.

Bacon's illegal activities.  Attached hereto as Exhibit 105 is a true and correct copy the *Bahamas

Press*' May 9, 2012 article.[13]

115.    Further, on July 9, 2012, the *Bahamas Press* website published a defamatory

article with the byline "E. Williams" entitled, "Will Louis Bacon Move operations to TI as

dragnet closes on him in The Bahamas?"  Without any supporting evidence, the article declares

that Mr. Bacon is running an international drug smuggling and trafficking ring, and that he has

bribed a number of Government officials to cover up his illegal activities:  "Louis Bacon's most

powerful ally in the former FNM Government may have used his relationship with a high

ranking senior government official to frustrate international investigators on a trail of an

international smuggling ring operating out of Lyford Cay."  Without any evidence, the article

asserts that Mr. Bacon has not been caught for these alleged activities because "certain

politicians in the FNM were getting so much Bacon grease they just decided to turn a blind eye

to what was going on in the little nooks and crannies of the perpetual Isle of June. . . . Powerful

figures in the FNM got discounts as much as 90 per cent [sic] on luxury watches and precious

stones for their lady friends. Gifts were walked into the offices of powerful personalities and

signed for without blinking an eye.  Everyone knew that the former senior official had included

---

[13]    On May 6, 2012, the *Bahamas Press* website published an article titled "Smuggling, How a
Billionaire Plays Nintendo – Meet the Three Louis Bacons."  The full text of that article (excluding
the headline) was republished in the *Bahamas Press*' May 9, 2012 article, "Louis Bacon hedges a bad
bet in The Bahamas as ruling FNM trounced in General Elections."  Attached hereto as Exhibit 106 is
a true and correct copy of the *Bahamas Press*' May 6, 2012 article.

them on his 'Friends of Louis Bacon List' and every effort was made to keep on his 'good side.'" Attached hereto as Exhibit 107 is a true and correct copy of the *Bahamas Press*' July 9, 2012 article.

116.    On July 11, 2012, Mr. Bacon filed a defamation action against Mr. Williams in the Supreme Court of the Commonwealth of the Bahamas (the "Williams Action").  Mr. Bacon seeks damages (including aggravated damages), an injunction, costs, and any further relief the Court deems appropriate.  Attached hereto as Exhibit 108 is a true and correct copy of the Writ of Summons, dated July 11, 2012, filed in the Supreme Court of the Commonwealth of the Bahamas in connection with the Williams Action.

117.    In his defence, Mr. Williams asserts that he did not author the articles at issue. Mr. Williams does not otherwise defend the articles, either by claiming that they are truthful, fair comment, or non-defamatory.  Attached hereto as Exhibit 109 is a true and correct copy of Mr. Williams' Defence & Counterclaim, dated September 3, 2012, filed in the Supreme Court of the Commonwealth of the Bahamas.

118.    Contrary to Mr. Williams' asserted defence, the evidence collected to date clearly demonstrates that Nygård commissioned Mr. Williams to write the defamatory articles about Mr. Bacon under the byline "E. Williams" in furtherance of the Smear Campaign.  During a prior lawsuit Mr. Bacon filed against Jones Communications,[14] the publisher of the defamatory articles at issue in that lawsuit consented to the reading in open court of the following statement that

---

[14]   Mr. Bacon filed this prior action against Jones Communications in the Supreme Court of the Commonwealth of the Bahamas on June 21, 2012 (the "2012 Jones Communications Action").  The action concerned three defamatory articles published in the *Bahama Journal* in May 2012.  As part of the settlement of that action, Jones Communications consented to the reading in court of the statement attached hereto as Exhibit 110 and quoted from above.  This 2012 Jones Communications Action is separate and distinct from the action brought by Mr. Bacon against Jones Communications and Wendall Jones in the Supreme Court of the Commonwealth of the Bahamas on October 10, 2013, described in paragraphs 143-150 below.

proves Mr. Williams' and Nygård's involvement in publishing the defamatory articles at issue in

the Williams Action:

> In 2012, . . . Mr. Wendall Jones[] was approached by journalist Mr Earlin Williams who
> asked if he could be an unpaid columnist for [Mr. Jones]. . . . Mr Jones had heard that Mr
> Williams, along with another reporter, Mr Sherman Brown, had been working with Mr
> Peter Nygard.
>
> In May 2012 [Mr. Jones] published a series of extremely defamatory articles about [Mr.
> Bacon], written by Mr Earlin Williams entitled: "Louis Bacon's Conspiracy and
> Corruption at Lyford Cay"; "Louis Bacon Hedges a Bad Bet as FNM Trounced in
> Elections" and "Louis Bacon Continues to Outrun Law" (the "Articles"). . . . .
> …
> After [Mr. Bacon sued Jones Communications for defamation], Mr Jones spoke to Mr.
> Peter Nygard to find out if he had any evidence to support the claims made by Mr Earlin
> Williams in the Articles.  Mr Nygard told Mr Jones that he wanted [Mr. Jones] to find a
> way to defend the claims in order to force [Mr. Bacon] into court to give evidence. . . .
>
> [Jones Communications] now accepts that the allegations in the Articles are entirely
> false. It follows there is no factual basis for any element of them whatsoever.
>
> [Jones Communications] believes that it has unwittingly been used by a person or persons
> who had an agenda against [Mr. Bacon].  [Jones Communications] understands from [Mr.
> Bacon] that grossly defamatory and false claims have been published about [Mr. Bacon]
> in various different forums as well, including on anonymous attack websites.

Attached hereto as Exhibit 110 is a true and correct copy of the November 8, 2012 Consent

Order attaching this statement, and entered by the Supreme Court of the Commonwealth of the

Bahamas in the 2012 Jones Communications Action.

119.    In addition, as described above, the fee notes of Nygård's lawyer further confirm

that Nygård commissioned Mr. Williams to author defamatory articles about Mr. Bacon.  Those

fee notes specifically refer to "Earlin" and make clear that he was part of the Smear Campaign

against Mr. Bacon.  *See* Ex. 77.

120.    Discovery is ongoing in this action.  Witness statements are due to be filed on

August 29, 2014, and trial is scheduled to commence in March 2015.

121.    To assist in the prosecution of the Williams Action I just described, Petitioner Mr.

Bacon seeks discovery concerning, among other things, Mr. Williams' communications and

interactions with Mr. Nygård, as well as Nygård's involvement in Mr. Williams' authoring of the

defamatory articles about Mr. Bacon.

**D.    *Bacon v. Phillippa "Lady" Russell***

122.    Phillippa "Lady" Russell ("Ms. Russell"), a broadcast journalist, has actively

participated in the Smear Campaign against Mr. Bacon.  In public, on television, and over social

media, Ms. Russell has repeatedly made defamatory remarks, including accusations that Mr.

Bacon participated in multiple murders, is a racist, is a member of the KKK, and should be

excluded from the Bahamas.

123.    On May 27, 2013, Ms. Russell first posted the following on her Facebook

webpage:  "We may need to conduct a DEMONSTRATION at the HOA [referring to the House

of Assembly] on Wednesday Steve Cleare, to make it clear to our politicians that the Bahamian

people will NOT tolerate being intimidated by foreign guests such as Louis Bacon.  With people

going missing from his Lyford Cay property and former Navy Seals trained personnel turning up

drowned and suddenly cremated, we wish Bacon declared PERSONA NON GRATA!".

Attached hereto as Exhibit 111 is a true and correct copy of Ms. Russell's May 27, 2013,

defamatory Facebook posting.

124.    On June 7, 2013, Ms. Russell organized and participated in a public

demonstration and march against Mr. Bacon during the Sir Randol Fawkes Labor Day Parade

(the "Russell March").  She held a sign stating, *inter alia*, that Mr. Bacon "called Bahamian

police 'terrorists'" and displaying an image of a Ku Klux Klan member with the words "Bacon is

a racist" (the "Placard").  Attached hereto as Exhibit 112 are true and correct copies of images of the Placard.

125.    During the Russell March, Ms. Russell also wore a t-shirt with an image of a Ku Klux Klan member stating "Racists want our Clifton . . .  Clifton belongs to us . . .  Louis Moore Bacon go home" (the "Russell T-Shirt").  Attached hereto as Exhibit 113 is a true and correct copy of a photograph of Ms. Russell wearing the Russell T-Shirt.

126.    At the Russell March, Ms. Russell also gave a public speech declaring that Mr. Bacon should be excluded from the Bahamas because he is a "fraud," a "racist," and seeks to exclude Bahamians from Clifton Bay (the "Russell Speech").  Attached hereto as Exhibit 114 is a true and correct copy of a YouTube video of Ms. Russell holding the Placard, wearing the T-Shirt, and making the Speech.

127.    On September 30, 2013, Mr. Bacon filed a defamation action against Ms. Russell in the Supreme Court of the Commonwealth of the Bahamas (the "Russell Action").  Mr. Bacon seeks damages, an injunction, costs, and any further relief the Court deems appropriate. Attached hereto as Exhibit 115 is a true and correct copy of the Writ of Summons, dated September 30, 2013, filed in the Supreme Court of the Commonwealth of the Bahamas in connection with the Russell Action.

128.    Ms. Russell does not deny publication of the defamatory statements.  Her defences are that the statements were fair comment on a matter of public interest.  Attached hereto as Exhibit 116 is a true and correct copy of Ms. Russell's defence, dated November 18, 2013 and filed in the Russell Action.

129.    On August 2, 2013, in a broadcasted interview, Ms. Russell was introduced as "representing certain interests that support Mr. Peter Nygård."  During the broadcast, Ms.

Russell admitted that Nygård paid her to engage in public relations work for him and further acknowledged that Nygård is her "boss."  In that same interview, Ms. Russell further defamed Mr. Bacon, calling him a racist and a member of the KKK, and stating that Mr. Bacon has sought to "destabilize the duly elected government of the Bahamas."  A true and correct copy of a relevant portion of The Platform's August 2, 2013 broadcast and a true and correct copy of a certified transcript of the relevant portion of that broadcast are attached hereto as Exhibits 117 and 118, respectively.

130.    Discovery is ongoing in the Russell Action.  Specifically, initial disclosures have been exchanged and, following requests from Mr. Bacon's attorneys, Ms. Russell provided supplementary discovery.  Mr. Bacon's attorneys made a second supplemental disclosure request, and are currently awaiting judgment on that application for disclosure.  A trial date will be scheduled following the determination of that application.

131.    To assist in the prosecution of the Russell Action I just described, Petitioner Mr. Bacon seeks discovery concerning, among other things, Ms. Russell's communications and interactions with Nygård and Mr. Smith, and Nygård's and Mr. Smith's involvement in Ms. Russell's publication of defamatory statements about Mr. Bacon.

132.    Notwithstanding the filing of the defamation lawsuit against Ms. Russell, staged protests in which Mr. Bacon is defamed have continued in the Bahamas.  Most recently, on June 14, 2014, as reported in *The Tribune*, "[s]cores of supporters of Lyford Cay billionaire Peter Nygard marched noisily through downtown Nassau yesterday in defence of the fashion designer."  The defence of Nygård included outfitting the protesters with t-shirts and signs calling Mr. Bacon a "criminal," falsely accusing Mr. Bacon of membership in the KKK, and threatening to expel Mr. Bacon from the Bahamas.  Attached as Exhibit 119 is a true and correct

copy of *The Tribune*'s July 15, 2014, article entitled, "Crowds March in Support of Nygard."

Attached hereto as Exhibit 120 are true and correct copies of photographs of demonstrators from

the protest rally in support of Nygård and denouncing Mr. Bacon and Save The Bays.  It has

been reported in the press that Nygård paid Bahamians $25 to $50 to attend the staged protest

wearing defamatory t-shirts and carrying defamatory placards.  Attached as Exhibit 121 is a true

and correct copy of *The Tribune*'s July 16, 2014 article entitled, "Moss Claims People Were Paid

To Join Nygard Support March," and attached as Exhibit 122 is a true and correct copy of *The

Tribune*'s July 20, 2014 article entitled, "Shame on Pro-Nygard Protesters."

**E.**      ***Bacon v. Carvel Francis***

133.     Carvel Francis ("Mr. Francis") is the publisher of the *Bahamas Press* website.

Mr. Francis has used his position of power to further Nygård's Smear Campaign by publishing

defamatory articles about Mr. Bacon on the *Bahamas Press* website.

134.     On April 5, 2013, the *Bahamas Press* website published an article believed to

have been written by Mr. Keod Smith entitled, "An Open Letter as to why The Clifton Heritage

Authority must RESIGN!"  Without evidentiary support, the article accuses Mr. Bacon of being

a racist and claims that Save The Bays is nothing more than a front for Mr. Bacon's efforts to

exclude Bahamians from particular areas of the Bahamas:  "[a]lthough Bacon would have you

believe that the purpose of Bacon's Coalition is to SAVE THE CONCH in Clifton Bay, . . . they

wish to bar ALL BAHAMIANS from using any of the coastline of Clifton to fish off of the rocks

or by boat, or to otherwise use the Clifton Bay for recreation . . .  [Mr. Bacon] is an unashamed

and bold racist with his eyes on owning and controlling our Clifton Heritage."  Attached hereto

as Exhibit 123 is a true and correct copy of the *Bahamas Press*' April 5, 2013 article.

135.    On June 5, 2013, the *Bahamas Press* website published an anonymous article entitled, "Another police is dead!  Corporal Buchanan was the officer who attempted to deliver Louis Bacon a writ."  Without any evidentiary support, the article accuses Mr. Bacon of being responsible for multiple murders in the Bahamas:  "Someone must soon – and we mean soon – begin to question what is happening to people who make contact with Louis Bacon or his Point House compound and ask why do they show up dead or missing.  Last week a young aspiring police officer, Corporal Buchanan Alexander Deveaux, was laid to rest after he too suddenly fell ill, collapsed and died after rushing to hospital while on duty.  Get this; the corporal was the officer who delivered a writ to . . . Louis Bacon for infractions a few months back."  The article further states that "Louis Bacon's Point House has been the site of much death," "Tony Hepburn is also believed to have been murdered [there]", and "Dan Tuckfield was also believed to have been murdered [there]."  Attached hereto as Exhibit 124 is a true and correct copy of the *Bahamas Press*' June 5, 2013 article.

136.    On June 27, 2013, the *Bahamas Press* website published an anonymous article entitled, "Dead body of white male discovered in Lyford Cay vanishes while in police custody – NO FURTHER INVESTIGATION BY POLICE!"  Addressing the disappearance of a white male whose body was pulled from the waters near Mr. Bacon's Bahamian home, the article insinuates that Mr. Bacon was responsible for the man's death and that he orchestrated an elaborate cover-up of the murder:  "[P]olice have not yet provided any details surrounding the discovery of [the drowning victim] opening the door of suspicion of a possible cover up.  But no amount of cover up can detract from the fact that a number of suspicious deaths have occurred on or around Louis Bacon's Lyford Cay property and so far there are NO BODIES to be

examined to determine a cause of death."  Attached hereto as Exhibit 125 is a true and correct copy of the *Bahamas Press*' June 27, 2013 article.

137.    On September 30, 2013, Mr. Bacon filed a defamation action against Mr. Francis in the Supreme Court of the Commonwealth of the Bahamas, alleging that Mr. Francis published or caused the aforementioned defamatory articles to be published (the "Francis Action").  Mr. Bacon seeks damages (including aggravated damages), an injunction, costs, and any further relief the Court deems appropriate.  Attached hereto as Exhibit 126 is a true and correct copy of the Writ of Summons, dated September 30, 2013, filed in the Supreme Court of the Commonwealth of the Bahamas in connection with the Francis Action.

138.    Ms. Russell has admitted that Mr. Francis was the individual responsible for the *Bahamas Press* website.  *See* Mr. Bacon's Reply and Defence to Counterclaim filed in the Supreme Court of the Commonwealth of the Bahamas in the Francis Action (¶ 3.4), a true and correct copy of which is attached as Exhibit 127 hereto.

139.    Mr. Francis' primary defence is that he was not responsible for publishing the three articles that form the basis of the Francis Action.  Attached hereto as Exhibit 128 is a true and correct copy of Mr. Francis' Defence and Counterclaim, dated December 11, 2013, filed in the Supreme Court of the Commonwealth of the Bahamas.[15]

140.    Mr. Francis' alternative defences are that, if responsible for publication, (1) he published the articles responsibly, or (2) the articles constitute honest comment on a matter of public interest.  *See* Ex. 128 ¶¶ 4, 6(B), 8, 10(B), 12, 14(B).

141.    Discovery has not yet begun in this action.

---

[15]  Mr. Francis has also interposed a counterclaim, alleging that the allegations set forth in Mr. Bacon's September 30, 2013 Writ of Summons are defamatory.  *See* Ex. 128 ¶¶ 21-25.

142.     To assist in the prosecution of the Francis Action I just described, Petitioner Mr. Bacon seeks discovery concerning, among other things, Mr. Francis' communications and interactions with Nygård and Mr. Smith and Nygård's and/or Mr. Smith's involvement in Mr. Francis' publication of the defamatory articles about Mr. Bacon on the *Bahamas Press* website.

**F.     *Bacon v. Jones Commc'ns Ltd. & Wendall Jones***

143.     Jones Communications is the parent company of several media entities, including JCN Network 14.  Wendall Jones ("Mr. Jones") owns Jones Communications and is the host of The Platform (a television program on JCN Network 14).  Mr. Jones has used his position of power to further Nygård's Smear Campaign against Mr. Bacon by publishing defamatory broadcasts about Mr. Bacon on JCN Network 14.

144.     On April 10, 2013, The Platform featured an interview with Nygård claiming, without supporting evidence, that Mr. Bacon is "so proud of his own plantations and the Ku Klux Klan, and this horrible history of the world . . . .  He really does not like the fact that I open my gates, my house, to the ordinary Bahamian people.  Who, most of them for the first time either their life have been able to go behind those gates of Lyford Cay and be welcomed? . . . It wasn't until Mr. Bacon came did that become a no-no."  A true and correct copy of a relevant portion of The Platform's April 10, 2013, broadcast and a true and correct copy of a certified transcript of the relevant portion of that broadcast are attached hereto as Exhibits 78 and 79, respectively.

145.     On May 30, 2013, The Platform featured an interview with Nygård claiming, without supporting evidence, that Mr. Bacon "outright lied" to receive the 2013 Audubon Society award.  The broadcast also featured two videos with defamatory remarks about Mr. Bacon by unknown newsreaders and commentators and by Nygård's attorney, Mr. Smith, who stated, "I have made it very clear that Mr. Bacon was a liar."  The videos contain excerpted clips

from the speech Mr. Bacon gave when he accepted the Audubon Society award, as well as defamatory commentary about Mr. Bacon—labeling Mr. Bacon a "liar" and insinuating that Mr. Bacon is a racist and a supporter of the KKK.  A true and correct copy of The Platform's May 30, 2013, broadcast and a true and correct copy of a certified transcript of the broadcast are attached hereto as Exhibits 129 and 130, respectively.

146.    In addition, on August 2, 2013, The Platform featured the aforementioned interview with Ms. Russell (Exs. 117-118), during which Ms. Russell made defamatory comments about Mr. Bacon.

147.    All three broadcasts featured defamatory statements about Mr. Bacon, some of which were made by Nygård himself, while others were made by Nygård's agents:  Minister Farrakhan[16] and Ms. Russell.

148.    On October 10, 2013, Mr. Bacon filed a defamation action against Jones Communications and Mr. Jones (the "Jones Defendants") in the Supreme Court of the Commonwealth of the Bahamas (the "Jones Action").  Mr. Bacon seeks damages (including aggravated damages), an injunction, costs, and any further relief the Court deems appropriate. Attached hereto as Exhibit 131 is a true and correct copy of the Writ of Summons, dated October 10, 2013, filed in the Supreme Court of the Commonwealth of the Bahamas in connection with the Jones Action.

---

[16]  As reported in *The Tribune*, Nygård's attorney, Mr. Smith, invited Minister Farrakhan to the Bahamas and flew him from Miami to the Bahamas on Nygård's private airplane.  While in the Bahamas and attending an event at Nygård's residence, Minister Farrakhan made "his usual racially divisive comments" and denounced Mr. Bacon.  *See* Exs. 13-14.

149.    The Jones Defendants failed to defend the Jones Action, and on November 5, 2013, Mr. Bacon obtained a default judgment.  Attached hereto as Exhibit 132 is a true and correct copy of the Judgment in Default of Appearance, entered November 5, 2013.

150.    A hearing to assess damages is currently scheduled for November 2014.

151.    To assist in the prosecution of the Jones Action I just described, Petitioner Mr. Bacon seeks discovery concerning, among other things, the Jones Defendants' communications and interactions with Nygård and Nygård's involvement in the Jones Defendants' publication of the defamatory broadcasts.  Such discovery would be highly relevant to an assessment of damages.  For example, video footage demonstrating that the Jones Defendants knew Nygård had personal animus towards Mr. Bacon, or were compelled by Nygård to publish defamatory material about Mr. Bacon without conducting any inquiry into the truth of the material would be directly relevant to establishing the Jones Defendants' knowledge of the falsity of the defamatory statements at the time of publication and would assist the Court when evaluating the level of damages to be awarded to Mr. Bacon.

## VI.    CONCLUSION

152.    Wherefore, I respectfully request that this Court promptly grant Petitioners' application in its entirety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in London, England, on August 12 2014.

_____
JENNY AFIA