# EXHIBIT 31



**UNIVERSITY**
OF MIAMI

**COASTAL ECOLOGY LABORATORY**
**DEPARTMENT OF BIOLOGY**

25 January 2011

TO:   LYFORD CAY PROPERTY OWNERS ASSOCIATION (POA)

FROM: KATHLEEN SULLIVAN SEALEY

RE: SITE VISIT TO SIMMS POINT ON MONDAY, 24 JANUARY 2010
********************************************************************************

*Objectives of Site Visit*

The objective of the site visit was to determine the extent of alterations of the sea floor along the southern coast of Simms Point.  A snorkeler was put into the water, and one person on the survey vessel recorded GPS locations and descriptions of the sea floor.

*General Findings of Site Visit*

The area of sea floor impacted by coastal development at Simms Points encompasses about **84,000 square meters** (8.4 hectares or 20.7 acres).  This is the area directly impacted by dredging, destruction to the seagrass bed, debris and trash from land, and gabions.  There are likely indirect impacts on the marine ecology of a larger portion of West Bay.

Major observations include:

1.) There are SEVERAL TYPES OF ANTHROPOGENIC (HUMAN –CAUSED) IMPACTS on the sea floor adjacent to Simms Point.  The impacts observed include:

| | |
|---|---|
| ***DREDGED BOTTOM and SEAGRASS MEADOW DESTRUCTION*** | There is a suction dredge on a floating platform moored at the property, with pipes in place on the southern beach for sediment deposition.  There was no evidence of sediment fencing to prevent high turbidity events associated with dredging.  Dredging appears to have created several large holes in the sand bottom, and there is evidence of seagrass meadow destruction (undermined roots/ rhizomes). |
| ***SAND BAGS and plastic debris from sand bagging*** | Sand bags were used extensively along the shoreline to stabilize and bulkhead the sand added by dredging.  Sand bags are a temporary way to stabilize shorelines, typically of rivers or streams, in the event of flooding. Sand bags are not an acceptable way to stabilize beaches and marine shorelines.  The bags were made from woven polypropylene, and there was much evidence of plastic debris in the adjacent seagrass beds and patch reefs. The bags measured about 14 inches wide and 24 to 26 inches long; their weight with sand filling was estimated to be 35 to 40 pounds. |
| ***GABIONS and ROCK DEBRIS*** | Gabions are wire structures, in essence large basket that are filled with rock or masonry material to form large blocks for structures such as retaining walls or channel linings.  Gabions are used to control erosion along river channels, not marine coastlines.  Most of the gabions were broken up, and there was a substantial amount of rock debris.  The rock was reef rubble (rounded coral rock, |



**UNIVERSITY**
**OF MIAMI**

coral debris), and could have been mined from some near shore fringing reef area such as Goulding Cay.

***TRASH, CONSTURCTION DEBRIS***   Bottles, line, cinder blocks, PVC pipe fragments, wood and plastic buckets were littered on the bottom, especially in the dredged areas.  There was an increased in the concentration of solid waste on the sea floor adjacent to the Simms Point property.

2.) SUBSTANTIAL AMOUNTS OF SAND HAVE BEEN MOVED FROM THE SEA FLOOR TO THE SOUTHERN BEACH AREA as evidenced by the dredge pipe and deposits in the centre of the beach, and the large dredged areas on the sea floor.  Gabions and sand bags have been used to fortify the beach shoreline.  Areas of dredging, seagrass bed damage and gabion placement are indicated on maps (below).  It is unlikely that the beach is naturally accreted from coastal processes

The map attached shows the survey track and recorded waypoints, and a series of photos are included to show changes in the coastal environment over the past year.

Best regards,
Kathleen Sullivan Sealey, Ph.D.

**TABLE 1: Details of waypoints recorded during the 24 January Site Visit**

| Site | GPS X | GPS Y | Sea Bottom Habitat type | | | | HUMAN IMPACTS | | | |
|------|-------|-------|----|----|----|----|----|----|----|----|
| | | | Medium Seagrass | Sparse Seagrass | Patch Reef | Sand | Dredged | Debris | Gabions | Sand Bags |
| 088 | 242338 | 2770619 | | | | **BEACH** | | | | X |
| 089 | 242456 | 2770568 | | | | **BEACH** | | | | X |
| LC001 | 242556 | 2770332 | | | | x | X | | | |
| LC002 | 242520 | 2770330 | | X | | | | X | | |
| LC003 | 242472 | 2779350 | X | | | | | X | | |
| LC004 | 242449 | 2770384 | | | | X | X | X | X | |
| LC005 | 242482 | 2770564 | | X | | | X | | X | |
| LC006 | 242436 | 2770324 | | | | X | X | X | | |
| LC007 | 242479 | 2770510 | | | | | | | | |
| LC008 | 242340 | 2770341 | X | | | | X | X | | |
| LC009 | 242239 | 2770335 | | | | | X | X | | |
| LC010 | 242314 | 2770579 | | | | X | | | X | X |
| LC011 | 242208 | 2770302 | | | | X | | | | X |
| LC012 | 242485 | 2770224 | | | X | | | X | | |

2





MAP 1: GPS points, Location of gabions (rectangles) and dredging (circles) from site visit on 24 January 2011.

3



UNIVERSITY
OF MIAMI

| PHOTO LOG FROM SITE VISIT | |
|---|---|
|  | **PHOTO 1:**<br>The type of debris seen around Simms Point would appear to be associated with the sand bags (woven polypropylene) and placement of gabions for coastal stabilization |
|  | **PHOTO 2:**<br>The suction dredge is used to maintain access to the finger canal; however, there is evidence of extensive dredging adjacent to the Simms point property. |
|  | **PHOTO 3:**<br>Sand bags and gabions have been used to contain the large amounts of sand moved along the shoreline.  Both sandbags and gabions are best applied along channels or rivers, and are not suitable for long-term marine coastal fortification.<br><br>Substantial amounts of debris from the sand bags and gabions have impacted the adjacent marine benthic habitats. |

4



UNIVERSITY
OF MIAMI



**PHOTO 4:**
Similar view from February 2010 illustrates the change over the past year with deposition of sand on Simms Point.

# EXHIBIT 32



Navigation Menu

Search



Faculty

DEPARTMENT OF BIOLOGY * PEOPLE * FACULTY * KATHLEEN SULLIVAN SEALEY

# Kathleen Sullivan Sealey

**ASSOCIATE PROFESSOR**

25 Cox Science Center
1301 Memorial Drive, Coral Gables, FL 33124
E-mail: ksealey@miami.edu
Office: (305) 284-3013
Fax: (305) 284-3039

## EDUCATION AND PROFESSIONAL EXPERIENCE

ASEL/IFR Pilot - 3000 hours

NOAA Research Diver - 1992 to date

Research SCUBA Diver: University of Miami - 1986 to date

ESRI ArcView Geographic Information Systems Certified Training Program - August 2001, Arc GIS May 2004

American Fisheries Society Course in Histology and Reproduction of marine fishes, Jacksonville, Fl. February 23 - 24 2001

National Science Foundation Short Course in Oceanography. July 1990, University of San Diego, La Jolla, California.

Scripps Institution of Oceanography. University of California-San Diego. Ph.D. Marine Biology. 1982. La Jolla, California 92093.

University of Notre Dame. B.S. Biology. 1978. Notre Dame, Indiana 46556. Graduated cum laude.

## GRANTS AND AWARDS

Organizing Committee Member - NOAA NMFS Office of Habitat Backreef Initiative 1999 to date

"Principal Investigator of the Year" for 2003, Earthwatch Institute, Maynard, Mass - November 2003.

Selected to National Park Management Planning Team, Bahamas National Trust - July 2003

Elected to Council of International Society for Reef Studies - October 2000

Nominated for the Pew Scholars Program in Conservation and the Environment - 1994.

Florida Keys Regional Marine Laboratory State Advisory Board. Selected member of 5-person state board 1990 - 1992.

National Admissions Advisory Board, University of Notre Dame, Notre Dame, Indiana, 46556. Selected 1988 to 2002

Board of Trustees, University of Notre Dame, Notre Dame, Indiana 46556. Elected three-year term 1984-1987.

Astronaut Candidate Interviewee. 1987, 1984. NASA-Johnson Space Center, Houston, Texas.

Best student paper in Ichthyology. Southern California Academy of Science Meetings. 1982.

F. Earl Durham, Jr. Award. Best student paper presented at the Southern California Academy of Science Meetings.

1981

---

## AREAS OF FOCUS

Conservation and Restoration Biology

Tropical Biology

---

## SELECTED PUBLICATIONS

Brunnick, B. and K.M. Sullivan Sealey (in press) Atlantic Spotted dolphins (Stenella frontalis) habitat utilization patterns on the Little Bahama Bank: Lines of conflict with fisheries and prey availability. Marine Ecology Progress Series

Nero, V.L. and K.M. Sullivan Sealey (in press). Island Specific Responses of Bahamian Benthic Flora to Environmental Features. Caribbean Journal of Science.White, Anthony, John Bjerke, Paul Dean and Kathleen Sealey. 2005. Sympatry of grassquits on New Providence Island, Bahamas based on analsis of the Christmas Bird Count, 105th Issue of CSC in American Birds

Semon, K. L., K Sullivan Sealey and V. L. Nero. 2005. The influence of habitat selection and density on the population dynamics of stony coral species of the Bahamian archipelago Proceedings of the 10th International Symposium on Coral Reefs, Okinawa, Japan July 2004.

Nero, V.L and Kathleen Sullivan Sealey. 2005. Characterization of tropical near-shore fish communities by coastal habitat status on spatially complex island systems. Environmental Biology of Fishes 73

Sullivan Sealey, K.M. 2004. Large-scale ecological impacts of development on tropical islands systems: Comparison of developed and undeveloped islands in the Central Bahamas. Bulletin of Marine Science:

Lowe, Aimee M. and Kathleen Sullivan Sealey. 2003. Ecological and Economic Sustainability of tropical reef systems: Sustainable tourism in the Exuma Cays, Bahamas. In Proceedings of the 1999 International Symposium on Coastal and Marine Tourism: Balancing Tourism and Conservation. Washington Sea Grant Publications: 183-194.

Department of Biology
Cox Science Center
1301 Memorial Dr.

UM Home
UM Admissions
MyUM

Phone: 305-284-3973

Fax. 305-284-3039

CaneLink

BlackBoard

Libraries

INFORMATION FOR

Current Students

Alumni

Faculty & Staff



# EXHIBIT 33



PHOTO DATE: MARCH 5, 2013

"1984 SURVEY"

# EXHIBIT 34

# The Tribune

- Login or Sign up

- Local News
- Politics
- Local Business
- Local Sports
- International News

Upvote  0

## 'Cease And Desist' Order Suggested For Nygard Cay

As of Thursday, June 19, 2014

- Sign in to favorite this
- Discuss Comment, Blog about
- Share this Email, Facebook, Twitter

By NEIL HARTNELL

Tribune Business Editor

nhartnell@tribunemedia.net

Nygard Cay's near-doubling in size has resulted from development activity that frequently lacked the proper building permits, with structures not built "to normal coastal construction standards".

Confirmation of what many had long suspected is contained in an April 30, 2013, report from consultants hired by the Christie administration, who recommended that a 'cease and desist' order should be among the options used to halt unpermitted, unregulated development by Peter Nygard.

The report, produced by Coastal Systems International, which is also the engineering consultant for the Resorts World Bimini project, also urged the Government to tackle the issue created by Mr Nygard's reclamation of seabed Crown Land.

This has resulted in the expansion of Nygard Cay from its initial 3.25 acres to 6.1 acres today, and Coastal Systems says the Government needs to determine whether Crown Land was created by "man-made activities" prior to deciding whether to enter into a lease/sale arrangement with Mr Nygard.

Referring to the Canadian multi-millionaire's original purchase of the then-Simms Point, Coastal Systems said: "It appears that certain shoreline improvements have been conducted on Nyg�rd Cay since 1984 that have resulted in

the expansion of the property by as much as 2.85 acres.

"Certain improvements were conducted without proper building permits and do not appear to have been built to normal coastal construction standards."

The report, sent to Creswell Sturrup, permanent secretary in the Prime Minister's Office, said unregulated development at Nygard Cay dated back almost two-decades to the mid-1990s.

It listed a breakwater along Nygard Cay's northern shore; a groin at its southeastern tip; and construction of a solid barrier at the entrance to the boat basin, together with a 'pocket beach', as examples of development activities that expanded Mr Nygard's landholdings despite lacking the proper permits.

"Based on the site observations and a review of available historical documents, these activities do not appear to have been permitted," Coastal Systems said.

"The area along the south side of the project appears to have increased by 2.2 acres. Similarly, with the construction of the breakwater along the northern shoreline and the associated enclosure of a lagoon area, the property is considered to have been expanded on the northern side to the outer perimeter of the breakwater by 0.65 acres.

"Considering the above improvements, the total area of the Nyg�rd Cay property has arguably been enlarged by approximately 2.85 acres since 1984, resulting in a total area of the Cay of approximately 6.1 acres."

Coastal Systems' findings, and other documents seen by Tribune Business, raise major questions about why the Government and its regulatory agencies have failed fore more than two decades to take action against Mr Nygard and halt his development activities, despite having full knowledge of them and that he lacked the necessary permits and approvals.

The Christie administration has now been advised to determine whether Mr Nygard's expansion and construction activities can be permitted 'after the fact', once the necessary work to support such approvals has been completed.

"It is recommended that Government take action to bring into compliance the shoreline improvements that were constructed on Nyg�rd Cay without proper permits," Coastal Systems told Tribune Business.

"If a similar project could be permitted today under existing Government regulations, then Government should direct the owner to submit the appropriate engineering and environmental support needed to justify issuance of (after-the-fact) permits for the project.

"Any improvements to the structures to bring them into compliance with normal coastal construction methods must be reviewed and approved by Government, and implemented by the owner. Environmental impacts must be identified and mitigated, permit fees paid, and other fees for the lease or use of Crown Lands must be paid."

To tackle Mr Nygard's unregulated development activities, Coastal Systems recommended that a "cease and desist order should be issued and enforced" for any coastal works going forward.

It added: "Full engineering design drawings and reports should be prepared to repair/replace the existing coastal structures at the project site.

"A full review by all relevant Government agencies should be completed, and the proper permits should be obtained in accordance with existing procedures."

And Coastal Systems further advised: "Determination should be made how to define additional Crown Lands created by natural and man-made activities, and whether to enter into a Crown Lands lease/ownership agreement.

"A Mitigation Plan should be developed to address impacts to natural resources. This plan may include, but is not limited to, in-kind mitigation to fill dredge holes and repair damaged seagrass beds at the project site and elsewhere in Clifton Bay, or out-of-kind mitigation such as the development of aquatic parks, mangrove and reef restoration, or improvement of other public beach facilities around Clifton Bay."

## More like this story

- [Nygard lease plan revealed](#)
- [Top QC: 'Is it Perry or Peter in charge?'](#)
- [Activists seek Nygard permits court Order](#)
- [Nygard Cay's 'paradigm shift' in Town Planning](#)
- [Attorney releases photographs of Nygard Cay construction](#)

## Comments

Use the comment form below to begin a discussion about this content.

## Sign in to comment

Username [                    ]

- ( ) I have an account.
- ( ) **I'm new.**

Password *Forgot?* [                    ]

[ Sign in ]

**Or login with:**

[ Connect to Facebook ]

[ Connect to Twitter ]

[ Google ]

[OpenID](#)

# EXHIBIT 35

# A guide to managing coastal erosion in beach/dune systems

## Summary 12: GROYNES

| | |
|---|---|
| **Appropriate locations** | High value frontages influenced by strong long shore processes (wave induced or tidal currents) where nourishment or recycling are undertaken. Best on shingle beaches or within estuaries. |
| **Costs** | Moderate, but must include for recycling or nourishment (£10,000-£100,000 per structure, plus recycling). |
| **Effectiveness** | Good on exposed shorelines with a natural shingle upper beach. Can also be useful in estuaries to deflect flows. Unlimited structure life for rock groynes. |
| **Benefits** | Encourages upper beach stability and reduces maintenance commitment for recycling or nourishment. |
| **Problems** | Disrupts natural processes and public access along upper beach. Likely to cause downdrift erosion if beach is not managed. |

### General description

Groynes are cross-shore structures designed to reduce longshore transport on open beaches or to deflect nearshore currents within an estuary. On an open beach they are normally built as a series to influence a long section of shoreline that has been nourished or is managed by recycling. In an estuary they may be single structures.

Rock is often favoured as the construction material, but timber or gabions can be used for temporary structures of varying life expectancies (timber: 10-25 years, gabions: 1-5 years). Groynes are often used in combination with revetments to provide a high level of erosion protection.



Recently built rock groyne at estuary mouth, constructed in association with beach renourishment of adjacent foreshore.

### Function

Groynes reduce longshore transport by trapping beach material and causing the beach orientation to change relative to the dominant wave directions. They mainly influence bedload transport and are most effective on shingle or gravel beaches. Sand is carried in temporary suspension during higher energy wave or current conditions and will therefore tend to be carried over or around any cross-shore structures. Groynes can also be used successfully in estuaries to alter nearshore tidal flow patterns.

Rock groynes have the advantages of simple construction, long-term durability and ability to absorb some wave energy due to their semi-permeable nature. Wooden groynes are less durable and tend to reflect, rather than absorb energy. Gabions can be useful as temporary groynes but have a short life expectancy.

Groynes along a duned beach must have at least a short "T" section of revetment at their landward end to prevent outflanking during storm events. The revetment will be less obtrusive if it is normally buried by the foredunes.

Beach recycling or nourishment (Summaries 5 and 7) is normally required to maximise the effectiveness of groynes. On their own, they will cause downdrift erosion as beach material is held within the groyne bays.



Groyne planshape

Long section

Cross section

## Methods

Groynes can have a significant impact on the shoreline, and schemes should always be undertaken under the supervision of a competent coastal consultant. Information on the design of rock structures is available from the CIRIA/CUR "Manual on the use of rock in coastal and shoreline engineering" with further detailed guidance on the use of groynes found in the CIRIA "Beach Management Manual". The accompanying figures provide initial guidance but this should be confirmed for each site. Temporary structures can be formed using sand bags (Summary 6) or gabions (Summary 8), although gabions can be more to remove or relocate than rock.

As with all rock structures on the shoreline the rock size, face slopes, crest elevation and crest width must be designed with care. Rock size is dependent on incident wave height, period and direction, structure slope, acceptance of risk, cross-sectional design, and the availability/cost of armour rock from quarries. In general 1-3 tonne rock will suffice for the landward parts of the groynes, provided that it is placed as at least a double layer, with a 1:1.5 to 1:2.5 face slope, and there is an acceptance of some risk of failure. Larger rock, probably 3-6 tonne, may be needed for the more exposed body and seaward head of each structure.

Randomly dumped rock with a high void to solid ratio is hydraulically more efficient than placed and packed rock. However, rock structures on recreational beaches should be built with a view to minimising the potential for accidents involving beach users slipping between rocks.

The groynes should be built prior to nourishment, with the rocks being laid into a shallow trench. On gravel beaches a geotextile is not normally required, as upward sediment migration is less important than on a sand beach. The groyne berm should be built to the anticipated crest level of the beach. The groyne berm length should equal the intended crest width of the updrift beach. The groyne should extend down the beach at a level of about 1 m above the anticipated updrift shingle beach, normally at a slope of about 1:5 to 1:10. The groyne head should extend down into the sand beach, allowing for some future erosion. On a shingle beach there is not significant benefit to creating any novel head extensions

The groyne-dune interface may need additional protection to reduce the possibility of outflanking. Short lengths of revetment, longer on the downdrift side, will ensure greater resistance to storm erosion. Where a high degree of erosion protection is required it may be necessary to construct a full rock revetment (Summary 14) to provide a fixed line of defence along the shoreline.

As a general rule, groynes should not be built on an open beach unless construction is accompanied by a commitment to regular recycling or nourishment. Without this commitment the groynes are likely to cause downdrift erosion as the upper beach becomes starved of sediment. Where there is a plentiful sediment supply, or where downdrift erosion is not considered to be a significant issue, then recycling may not be required.

Groynes should normally only be considered for beaches with a significant proportion of gravel. Structure length should extend across the full width of the steeper upper beach, allowing for beach reorientation after construction and recycling/nourishment. Further extension across the sandy lower beach is generally not effective as the sand will be transported over and around the groynes as suspended load. Groyne lengths should be reduced at the downdrift end of a series to reduce the tendency for local erosion.

Groyne spacing will depend on the nearshore direction of the dominant waves and the expected orientation of the upper beach after construction. The design of larger schemes should make use of numerical models to assess the optimum lengths and spacings.

Within estuaries groynes are used primarily to deflect tidal flows away from an eroding shoreline. To be effective structures must be large, both in elevation and lengths. Impacts can be significant on other areas of the estuary, and are difficult to predict with certainty. The services of specialist estuary consultants should be commissioned at preliminary appraisal stage.

Construction costs are mainly dependent on structure dimensions, but can be heavily influenced by the availability of suitable rock (or other material), transport and the associated costs of recycling or nourishment. Rock structures can be assumed to have an unlimited life with respect to economic assessments.

## Impacts

Groynes have a significant impact on the landscape and can create barriers to the recreational use of the upper beach. They often cause downdrift erosion unless there is a long term management commitment to beach recycling or nourishment. Downdrift erosion may well lead to pressure for further defence works.

Timber groynes must be built from hardwood to endure the harsh shoreline environment. Much hardwood comes from tropical sources, making it both costly and potentially environmentally unacceptable. Timber groynes tend to

reflect, rather than absorb, wave energy making them significantly less effective than rock on exposed coasts. They are also more likely to structural failure due to formation of scour channels around their seaward ends.

## Best practice and environmental opportunities

Provided that groynes are used in appropriate locations, they reduce dependency on regular recycling or nourishment, and therefore reduce future disturbance of the shoreline environment. Localised accumulations of beach material will encourage new dune growth. Recycling, fencing and transplanting will help to keep the revetment sections buried, thereby enhancing habitat regeneration.

All dune management schemes should observe the following guidelines to maximise the probability of success and minimise impacts on the natural and human environment:

- Each dune erosion site must be considered independently, with management approaches tailored to the specific site.
- A policy of "Adaptive management" (Summary 1) should be considered for all sites before other options are assessed.
- Work should not be undertaken unless the beach-dune system and nearshore coastal processes have been monitored over several years and a reasonable understanding of the physical and natural environment has been established. Hasty responses to erosion may prove to be either unnecessary or damaging.
- No work of a permanent nature should be undertaken unless important immovable or irreplaceable backshore assets are at risk.
- Local interest groups, such as landowners, nature trusts, fishing associations and recreational users, should be consulted early to ensure that a broad view of the shoreline and nearshore zone is considered prior to implementing any particular management approach.
- Consideration must always be given to both long term "average" and short term extreme weather and sea conditions to determine the life expectancy of any operations.
- Consideration must be given to the consequences of failure, such as construction debris spread along the beach, public safety hazards, loss of amenity access, deterioration of the landscape, etc.
- Work should be planned and scheduled to limit damage to fragile ecosystems and to recreation. Consideration should be given to vegetation, bird nesting and migration, intertidal invertebrates, fisheries, public access, noise levels and public safety.
- All site staff must be made aware of the need for careful working practises to avoid environmental damage, and to avoid hazards associated with steep and unstable dune faces.
- Temporary or permanent management access routes to the dune face for materials, equipment and labour must be planned and constructed to minimise trampling damage to the dunes and to limit the formation of blowouts. Boardwalks or other temporary surfaces should be laid and should follow the natural contours of the dunes rather than cutting straight lines susceptible to wind erosion. Fencing should be used to stabilise sand adjacent to the track.
- Public access routes to the beach should be clearly laid out and fenced where necessary to prevent trampling that may lead to blowouts.
- Educational displays at backshore car parking areas or along footpaths should be used to explain management schemes and encourage public interest and support for the management objectives.
- Warning signs should be set up highlighting the dangers of unstable dune faces, any construction work in progress or any other hazards associated with the management schemes (gaps in rock structures, slippery algal growth, buried defences, submerged structures, mud deposits, etc)
- Post project monitoring should be undertaken at least bi-annually to assess the beach-dune evolution and the success of the scheme relative to the objectives. Appendix 2 of this guide provides monitoring guidelines.

In addition to these general guidelines, the following are of specific importance to groynes:

- Further guidance on the design of rock structures is available from the CIRIA/CUR "Manual on the use of rock in coastal and shoreline engineering" and from the CIRIA "Beach management manual".
- Groyne construction should normally be accompanied by an ongoing programme of beach recycling or nourishment. Regular monitoring and management is required to establish a successful scheme. Monitoring must include adjacent shorelines as well as those immediately within the groyne scheme.
- Groyne heights, lengths and profiles can be modified if monitoring indicates that the initial layout is not achieving the required objectives. Modification is easier to achieve with rock structures than with timber. Any observed storm damage, such as displaced rocks, should be rectified during maintenance operations.
- Timber used for groyne construction should be derived from sustainably managed forests.
- Groynes in estuaries may need navigation marks to ensure public safety.
- Where possible fencing and transplanting should be undertaken to establish a new line of foredunes along the

Case 1:14-mc-00258-DLC   Document 11-4   Filed 08/14/14   Page 23 of 23

stabilised upper beach. These dunes will enhance the coastal landscape, provide additional erosion protection and re-establish a natural succession of dune habitats from the shoreline to the backshore.

- The use of local rock should not be a requirement of design unless there are genuine landscape considerations, such as adjacent rocky outcrops; even in this instance local rock should only be used if it is readily available in the size range required and is a sound material for coastal construction.

- The use of builder's rubble is unlikely to ever be appropriate for dune management. Most material is too small to be effective and will be drawn down the beach during any significant storm. The rubble may contain material that is either hazardous to beach users, toxic or simply unattractive. Large concrete slabs may be acceptable from an engineering perspective but are unlikely to meet approval with respect to their landscape impact or their safety for use in a public area.