UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                                   :
In re Application of THE COALITION TO PROTECT  :   Case No. 14 Misc. 258 (DC)
CLIFTON BAY and LOUIS BACON for an Order       :
Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for  :   DECLARATION OF
Use in Foreign Proceedings.                    :   STEPHEN J. FERALIO
                                                                   :
-------------------------------------------------------------------x

        I, Stephen J. Feralio, pursuant to 28 U.S.C. § 1746, declare as follows:

        1.        I am 28 years old.  I am a United State citizen and a United States resident.  I was

formerly a resident of Los Angeles, California.  I am not and never have been a party to any

lawsuit or other legal proceeding pending in the Bahamas.

        2.        I provide this declaration to respond to certain false accusations made against me

and incorrect statements contained in the September 10, 2014 letter of Nygård International

Partnership ("Nygård International") and Nygård Inc. (collectively, the "Nygård Companies"),

and the filings submitted in this matter on September 18, 2014 by the Nygård Companies and

Peter Nygård (collectively, the "Nygård Parties") including the September 18, 2014 declaration

of Daane Clifford.  I also seek to clarify the record regarding other relevant matters in issue in

this proceeding.

## A.    BACKGROUND AND HIRING

        3.        Around May 2011, I began providing services as an independent contractor for

Nygård International.  I formally resigned and ended my services with Nygård International on

January 8, 2012.  Around February 17, 2012, I again started providing services to Nygård

International.  I continued providing services through about July 2013, when I again ended my

association with Nygård International.  Later, I began again to work for Nygård International for

a brief period beginning in January 2014.  I never signed any agreement to perform services for

Nygård Inc. or Peter Nygård personally.  However, I provided services to Peter Nygård on certain personal matters relevant to this proceeding without a written contract.

4.      Specifically, I first provided services as a videographer to Nygård International beginning in or about May 2011 without any contract.  After approximately six months, on November 21, 2011, I signed an Independent Contractor Agreement to serve as its creative director.  I was given a copy of the form contract to read and sign.  Although the Independent Contractor Agreement states that I had been afforded the opportunity to obtain independent legal advice with respect to the details of the agreement, I was only 25 years old, recently out of film school, and could not afford a lawyer.  No one explained to me the meaning of the confidentiality provision or any other provision of the agreement.  There was no negotiation over any of the terms of the 2011 Independent Contractor Agreement, including my fees.  I was simply told that this was what Nygård International paid and I needed to sign the 2011 Independent Contractor Agreement.

5.      Exhibit B to the Marks Declaration filed by the Nygård Parties on September 18, 2014 contains a copy of the November 21, 2011 Independent Contractor Agreement.  However, the Nygård Parties have annexed an additional page to that contract, page ten of the exhibit, titled "Camera Loaner Agreement with Nygård International Partnership (the "Company")" (the "Camera Loaner Agreement").  The Camera Loaner Agreement is dated November 28, 2011, and is separate from the Independent Contractor Agreement that I signed.  Rather, the Camera Loaner Agreement was a document that was prepared when I "checked out" a particular camera to record videos.  I never signed the Camera Loaner Agreement or agreed to be bound by it.  I returned that camera when it malfunctioned, around September 2012.  At that time, I was given

another camera to work with by James Adams, a videographer who worked with Nygård International. I did not fill out a form with respect to the new camera.

6.     Less than two months after signing the 2011 Independent Contractor Agreement, on Friday, January 6, 2012, I sent an email to Peter Nygård with the subject line, "Resignation," informing him that I was resigning as an independent contractor for Nygård International. In the email, I explained why I was resigning, and stated that I would work through the remainder of the weekend until Sunday, January 8, 2012. In response, Peter Nygård emailed back stating, "I understand -there is NOT enough work just for Filming -." After resigning and terminating the Independent Contractor Agreement in writing via email, I stopped working for Nygård International and performed work for other clients. Subsequently, on or about February 23, 2012, Daane Clifford, Manager of Technology Operations for Nygård International, contacted me and asked me to return as a contractor for Nygård International. Mr. Clifford explained that there was an upcoming trip to China and Nygård International had obtained additional staff, so I would not have to perform multiple jobs, which had been one of the reasons for my resignation in January 2012. I agreed to return and provide additional services as creative director. At the time I returned, I was not asked to sign any contract and did not sign any contract. There was no discussion concerning whether the 2011 contract would resume, and I never agreed that it would. I continued to be paid as I had been before I resigned.

7.     Later, about February 15, 2013, I was asked to sign a new Independent Contractor Agreement with Nygård Inc. covering the period September 10, 2012 to February 28, 2014. However, this contract inaccurately stated at ¶ 4.3.2 that Nygård Inc. would pay an editing fee of $1,000 per approved edited video when in fact I was promised an editing fee of $1,500 per

3

approved edited video.  Because the wrong amount was included in this provision, I refused to sign this contract and never signed a the 2013 Independent Contractor Agreement.

8.      I read the September 18, 2014 declaration of Daane Clifford which states that I entered into the February 15, 2013 Independent Contractor Agreement with Nygård Inc. (Clifford Decl. at ¶ 6.)  For the reasons explained above, this is incorrect.  In fact, the copy of the 2013 Independent Contractor Agreement submitted by the Nygård Parties is not signed by me, and it includes a "Supplier Automatic Control Policy" attachment unrelated to my video services. I also read Mr. Clifford's statement that "[e]ach time Feralio came back to work for the Nygård Companies, he and those entities agreed that his return engagement was pursuant to the terms of 2013 Agreement."  For the same reasons, this is also incorrect.  I never agreed that the February 15, 2013 Independent Contractor Agreement would apply because it always contained the wrong editing fee.  Because I did not sign the 2013 Independent Contractor Agreement, I billed for and was paid an editing fee of $1,500 per video.  Attached as Exhibit A is a true and correct of copy a payment receipt dated May 6, 2013 in the amount of $1,500 memorializing a payment for the editing fee for an approved edited video.

9.      On August 13, 2013, I was asked to sign an Intellectual Property Assignment Agreement.  As with the 2011 Independent Contractor Agreement, I had no access to legal advice, and could not afford a lawyer.  No one explained to me the meaning of the agreement. There was no negotiation over any of the terms of the Intellectual Property Assignment Agreement, and I received nothing in exchange for signing the Intellectual Property Assignment Agreement.  I was simply told that this was what Nygård International needed me to sign.

10.     The circumstances surrounding my signing of the August 13, 2013 Intellectual Property Assignment Agreement are as follows:  Around July 2013, at the direction of Peter

Nygård, I created and uploaded to a "Peter Nygård" related YouTube channel a video entitled, "Nygård Takes Bahamas Back." According to a July 22, 2013 article in *The Nassau Guardian*, the video showed Peter Nygård "celebrating the Progressive Liberal Party's 2012 election win while watching Prime Minister Perry Christie's victory rally address. Nygård proclaimed as he watched, 'Yes. We got our country back.'" The article further states, "Later in the eight-minute video, a group of new Cabinet ministers is shown at Nygård Cay for a meeting with Nygård." Following the release of the video, there was significant criticism of Peter Nygård and the new government officials for their apparent close relationship. I was told by Tiina Tulikorpi, a Human Resources official with Nygård International, that to respond to that criticism, I should sign the Intellectual Property Assignment Agreement which would demonstrate that Nygård International purposefully created the "Nygård Takes Bahamas Back" video, and was therefore proud of its content (there was some conjecture that this was an unauthorized video). Accordingly, I signed the Intellectual Property Assignment Agreement but did not intend to cede any additional rights in my work-product. The strategy did not dull the criticism of the video, and eventually I was directed by Tiina Tulikorpi to take the "Nygård Takes Bahamas Back" video down from the "Peter Nygård" YouTube channel, and I did so.

11.    To my knowledge, none of the agreements that I signed with Nygård International prohibited me from retaining copies of my work, or required me to delete raw video footage or my completed work-product. Unless there were specific instructions to delete all copies of a particular scene to avoid keeping a video record of certain events (that happened only on one occasion), I always understood I would maintain a copy of my work-product. I believed I could keep my work-product and use it as part of my marketing portfolio. Based on my industry experience, this is standard practice for videographers and creative directors.

**B.     VIDEO RECORDINGS**

12.     Throughout the time I was associated with Nygård International and Peter Nygård, I was never an employee of the Nygård Companies and always an independent contractor.  I used my personal computer and hard drive when performing my services, and submitted invoices to Nygård International for payment for my services.  For tax purposes, I received 1099s, not W-2s, from Nygård Inc.  When I first began providing contracting services at Nygård International, I supplied my own Mac laptop computer to edit video files, and my own hard drives to store the video files.  Nygård International supplied equipment for filming, including cameras and lights.  At some point, the track pad on my Mac computer stopped functioning.  At that time, Maria Miller, the Corporate Events and Public Relations Manager at Nygård International, purchased for me a new Mac laptop computer to replace my broken computer.  Later, around the end of 2013, I turned in the broken Mac laptop to Sharon Clarke at Nygård International in Winnipeg and retained the newer Mac laptop.  They accepted the broken Mac laptop as a trade for the new Mac laptop computer, and no one ever asked me to return to them the new Mac laptop computer.  If they had insisted that I return the new Mac laptop to them, I would have done so in exchange for receiving my original Mac laptop back.

13.     As part of my job, I traveled with Peter Nygård to various locations around the world and recorded video images of Peter Nygård's activities.  Primarily, I used a 6 TB hard drive I had purchased to store the video files I recorded.  Eventually, that hard drive became full and I relied on various small hard drives that I owned.  Over time, it became difficult to travel with numerous small hard drives.  In or about 2013, Daane Clifford purchased for me an 8 TB hard drive to use in place of the numerous small hard drives I had supplied, so I would have less to carry when I traveled.  At the time, I understood that Nygård International purchased this 8 TB

6

drive for me so I could perform my work. There was no discussion or agreement that I would return it at the end of my tenure. In addition, because my personal 6 TB drive had filled up with video files related to Peter Nygård, I understood that the 8 TB drive was provided to replace the occupied space on the 6 TB drive, so I could store on the 8 TB drive files related to Peter Nygård, files related to projects for other clients, and personal files. Based on that understanding, I stored on the 8 TB drive, among other things, electronic files related to projects for other clients and personal files. I would not have stored my personal and other business files on the 8 TB drive had anyone expressed to me that I was obligated to return the 8 TB drive to Nygård International at the end of my services. Later, when I ceased consulting with Nygård International, in accordance with my expectations, no one sought the return of the 8 TB drive.

14.     Our travels sometimes brought us to the Nygård International corporate offices in Winnipeg, Canada. Generally, when I was at the Winnipeg office, my practice was to upload the various files I had recorded and edited on to the computer server for Nygård International. This allowed Nygård International to retain copies of the video files I recorded and edited, and acted as a back-up in case any of my work-product on the hard drives was lost or damaged. Because we traveled to Winnipeg on an irregular basis, my files were not uploaded to the Winnipeg server with regularity. At Winnipeg, I generally provided my hard drives to Shelby Davidson, a videographer with Nygård International. Ms. Davidson uploaded my work-product to the server and kept an excel spreadsheet that was used to archive the various videos stored on the server. After she uploaded my files, Ms. Davidson returned the hard drives to me. She never requested to keep the hard drives nor did she ask me to delete my work-product after uploading the files to the server.

15.     In their brief, the Nygård Parties speculate that my work-product may contain video recordings of confidential communications between Peter Nygård or employees of the Nygård Companies and their attorneys for purposes of obtaining legal advice.  (Nygård Parties Memorandum at 6.)  I do not ever recall attending or recording meetings or discussions with attorneys where legal advice was sought or discussed.  On one occasion, I accompanied Peter Nygård to a meeting with an attorney in Florida.  Peter Nygård directed me to wait outside the room and not record the meeting, and I did not record it.  My review of the video files to date has not produced any recordings of attorney-client confidential communications, and I do not believe I possess such recordings.

## C.     I DID NOT STEAL OR MISAPPROPRIATE ANY MATERIALS FROM PETER NYGÅRD OR THE NYGÅRD COMPANIES

16.     In its September 10, 2014 letter to the Court and its September 18, 2014 court filings, the Nygård Parties claim that I misappropriated the video files that I recorded and stored on the hard drives.  This is categorically false.  I did not misappropriate or steal any electronic files from Nygård International or Peter Nygård.  In his declaration, Daane Clifford asserts, "When Feralio ceased working with the Nygård Companies in 2013, and again in early 2014, representatives of the Nygård Companies requested that, in accordance with the Contractor Agreements and the Assignment Agreement, Feralio return all equipment and all copies of any recordings or other work product he created as part of his services to the Nygård."  (Clifford Decl. at ¶ 12.)  I do not know who these unnamed "representatives" are supposed to be.  With regard to my work-product -- the video recordings, edited videos and other computer files that I created -- this simply did not occur.  No one ever asked me to return "all copies of any recordings or other work product" that I created.  I never signed an agreement that prohibited me from retaining copies of my work-product such as the raw video files or completed movies;

8

required me to delete my work-product from the hard drives; or required me to return all copies of my work-product. To the contrary, as I already stated, it is customary and accepted in the industry for videographers to retain copies of their work-product and use those materials in one's portfolio of completed works.

17.      I stopped working for Nygård on four occasions -- around January 8, 2012, August 2013, December 2013 and March 2014. On various occasions that I stopped providing services to Nygård International, individuals associated with Nygård International collected from me certain equipment that Nygård International provided me to film videos, such as video cameras and lights. On occasion, when I left mid-project, I provided a copy of my raw work-product on a mini-drive to other colleagues to complete the project, but I retained copies of my work-product in case that mini-drive was lost. No one ever requested that I turn over the 6 TB or 8 TB hard drives, or all copies of any recordings or any other work-product. No one requested that I delete from the 6 TB or 8 TB hard drives any of my work-product, such as the video files or movies I created. In fact, it was useful for me to hold on to those files because I was able to help Nygård International employees find specific clips when they needed the materials, even after I stopped providing consulting services.

18.      In his declaration, Daane Clifford also claims that the Nygård Parties only recently learned, based on the Section 1782 Application, that I retained my work-product. (Clifford Decl. at ¶ 12.) This is also wrong. I was not required to delete the electronic files from the hard drives, and it was well known that I retained those files. Officials associated with Nygård International knew that I retained copies of the files I created, did not claim that I had done anything improper in retaining those files, and on one occasion offered to pay me to locate on my hard drives a certain image they sought to use in a project.

9

19.     Specifically, on July 10, 2014, I received a text message from Daane Clifford. He told me Sajjad Hudda, President of Nygård Retail, needed to speak with me. When I texted Mr. Clifford back to ask why Sajjad Hudda needed to speak with me, there was no response.[1] A true and correct copy of the July 10, 2014 text messages are attached here as Exhibit B. Later, on July 21, 2014, I was contacted by Jeeven Valel, the Visual Presentation Manager for Nygård International, via Snapchat.[2] Mr. Valel told me that Sajjad Hudda and Heather Roseborough, an official with the Nygård Fashion Network, were searching for a specific high-definition photo of Peter Nygård that they could not locate and were "desperate for it." Mr. Valel sent me a picture of the photo. The photo they were searching for was one that was taken by an HBO cinematographer around May 2012, and that I obtained as part of my independent contractor services for Nygård International. According to Mr. Valel, he told Mr. Hudda and Ms. Roseborough that he would "try to reach out" to me to see if I had a copy of the high-definition photo in my files. In addition, according to Mr. Valel, "They said they'll pay for the photo." When I responded, "Who?", Mr. Valel replied, "Heather and Sajjad." As for a price, Mr. Valel suggested, "Ask for 700 lol." A true and correct copy of photos of the Snapchat conversation and the photo sent to me by Mr. Valel are attached as Exhibit C. I responded to Mr. Valel by email (as opposed to Snapchat), but never received a follow up communication concerning the high-definition photo.

_____

[1]  Shortly after Mr. Clifford contacted me, I changed my phone number so I do not know whether he eventually responded to my text message.

[2]  Snapchat is a photo messaging application. Using the application, users can take photos, record videos, add text and drawings, and send them to a controlled list of recipients. These sent photographs and videos are known as "Snaps." Users set a time limit for how long recipients can view their Snaps (as of April 2014, the range is from 1 to 10 seconds), after which they will be hidden from the recipient's device and deleted from Snapchat's servers. *See* http://en.wikipedia.org/wiki/Snapchat (last visited on 9/22/14).

20.    Similarly, around May 2013, as part of my services for Nygård International, I met a director/producer (the "Director/Producer") who was creating a documentary for HBO about wealthy people trying to extend their lives.  Peter Nygård was one of the subjects of the movie.  As part of my services for Nygård International, I assisted in the filming of the documentary by operating a second camera and handling some of the lighting.  Peter Nygård directed me to share a set of my footage with the Director/Producer and to retain a copy of the Director/Producer's footage.  In December 2013, I asked a colleague to send a hard drive containing relevant video files to the Director/Producer for use in the documentary.  Later in April 2014, May 2014 and June 2014, I was again contacted by email by the Director/Producer who wanted me to locate certain additional footage from the hard drive files to use in the HBO documentary, even though I was no longer providing services to Nygård International.  According to the Director/Producer, she tried to obtain the footage directly from Nygård International but they were not familiar enough with the files located on their server to locate the particular footage.  Like the officials at Nygård International, it was not hidden from the Director/Producer that I retained the video files.

**C.    THREATENING CONDUCT**

21.    In their September 10, 2014 letter to the Court, the Nygård Companies state, "[E]ven though Feralio, in his declaration, refers to what he 'personally witnessed over the course of the years [he] was a contractor for Nygård International' (Feralio Decl. ¶ 10), he does not describe a single instance of violence or threat of violence by Mr. Nygård during their two-year period of daily interaction."  (9/10/14 Ltr. at 11.)  Now, in their recent court filing, the Nygård Parties suggest that I be required to return to the Bahamas to provide testimony and

evidence in a court in the Bahamas.  In light of these statements, I feel that I must respond by describing some of what I have witnessed.

22.     As I explained in my declaration dated August 11, 2014, I have serious concerns about my physical well-being and safety, and fear that Peter Nygård will retaliate against me through financially ruinous litigation and other forms of intimidation.  Because of the threat to my safety, I recently move to another city.  My failure to detail in my declaration my personal observations and experiences was intentional.  In an abundance of caution and in an optimistic effort to avoid retaliatory litigation, I specifically omitted any detailed description of Peter Nygård's threatening and abusive behavior that I personally witnessed in order to avoid even the suggestion that I violated the confidentiality provision of the 2011 Independent Contractor Agreement.  Because the Nygård Parties have placed the matter at issue and suggest that I could safely return to the Bahamas, and that I do not have any genuine or legitimate fear of Peter Nygård, I am compelled to relate some of the abusive and threatening behavior that I personally observed and was subjected to while working with Peter Nygård.  My serious concerns regarding my physical well-being and safety emanate in large part from those experiences involving Peter Nygård.

23.     Specifically, while I provided services to Nygård International, I personally witnessed Peter Nygård's abusive and threatening behavior.  For example, while in Milan on December 6, 2013, I witnessed Peter Nygård explode in rage at an employee of Nygård International.  In his rage, he yelled and screamed at the employee, his face was bright red, his nose was touching the employee's nose, spit was coming out of his mouth onto the employee's face, and he was physically prodding the employee with his finger into the employee's chest repeatedly.  I attempted to intervene to protect the employee.  As a result of my intervention, I

12

was dismissed from the trip and sent back to Los Angeles from Milan. On other occasions, I regularly saw Peter Nygård loudly screaming at people (including me) without any basis, often with his fists clenched.[3]

24.     I am fearful of returning to the Bahamas, have no intention to return to the Bahamas, and would feel threatened if I did. I have witnessed first-hand the way Peter Nygård cultivates close relationships with, and influences, high powered people in the Bahamas. I witnessed Peter Nygård meet with the Prime Minister, other high government officials and law enforcement officials at Nygård Cay. On another occasion, Perry Christie, the current Prime Minister, and David Shane Gibson, a member of Parliament and former government minister, attended the wedding of Peter Nygård's daughter in Winnipeg, Canada, where Perry Christie gave a speech. Another time, my bag of camera equipment was held up by Customs at the airport in the Bahamas because I lacked a work permit. I was told I needed either a work permit or to pay a tax on the equipment. When I arrived at Nygård Cay, I reported that my bag had been held up. When I returned to the airport a day or two later, I was told that Nygård had cleared everything up. I was given the camera equipment without providing any work permit or paying any tax. At this point, given what I have seen and experienced, I would not return to the Bahamas. I fear that if I were to return to the Bahamas, I may be subjected to arrest or assault, and that my evidence could be stolen or confiscated by authorities. I am unwilling to jeopardize my physical safety in this way.

---

[3]     In response to my statements that I feel threatened and fear Peter Nygård, the Nygård Companies included a footnote and attached to its September 10, 2014 letter an email from me to Peter Nygård on February 20, 2014 in which I expressed concern about "being followed by a silver Mercedes" in the Bahamas and inquiring whether Peter Nygård was "still having issues with [his] neighbor." (9/10/11 Ltr. at 11 n.12 & Ex. B.) To be clear, I was not followed by any car at the time. Rather, I wrote this email to Peter Nygård in order to get a reaction from Peter Nygard and determine whether he was still in conflict with Mr. Bacon. My recollection of the remainder of the email chain is that after Peter Nygård replied with some concern, I responded that I must have been mistaken and ended the email conversation.

25.     Just after the Section 1782 Action was made public on the Court's docket and in

the press on August 13, 2014, Peter Nygård's adult son (the "Son") contacted me through a

Facebook message.  He told me that "Pistol" -- the Son's nickname for Peter Nygård -- had

called about the Section 1782 Action: "Yo - pistol just called me, can you and I talk about this."

When I initially did not respond on Facebook, the Son sent me a message on the morning of

August 14, 2014 via iMessage where he urged me to contact him to "really weigh in on all sides

before making any permanent decisions . . . ."  The Son explained that he "spoke to pistols side

and i can at least communicate with you on that . . . . ."

26.     Later that day, August 14, 2014, at the direction of counsel, I responded and

exchanged a series of messages via Facebook with the Son in which the Son, apparently at Peter

Nygård's instigation, urged me to speak with him about this matter.  The Son wrote, "I just want

to understand where you are at . . . . this is important to u and pistol and even me in some ways I

guess."  I told the Son that I did not want to discuss this matter with him, but would speak to

someone else from Peter Nygård's "side."  A true and correct copy of my correspondence with

the Son on August 13, 2014 and August 14, 2014 via Facebook and iMessage is attached as

Exhibit D.

27.     The following day, on August 15, 2014, while I avoided speaking with the Son,

Peter Nygård attempted to pressure me through my Former Roommate.  My Former Roommate

informed me that Peter Nygård had sent him numerous emails since the previous day.  Via a

video chat, my Former Roommate showed and read to me portions of two emails that Peter

Nygård had sent to him.  I understood that there were many more emails.  My Former Roommate

was fearful of forwarding the emails to me.  In one email my Former Roommate showed me,

Peter Nygård wanted my Former Roommate to help him locate me before I suffered permanent

14

negative consequences from my actions.  Peter Nygård wrote, "we need to find him before he ruins the rest of his life."  In a second email that my Former Roommate read to me, Peter Nygård wrote, "we need to make him [Feralio] turn on Bacon."  After my Former Roommate showed and read to me these emails, we agreed that my Former Roommate should not get further involved in this matter if we could avoid it.

28.  The Son continued to contact me via email messages on August 16 and August 18, 2014.  In response to his emails, I wrote to the Son, "I'm not really sure what your dad wants from me at this point."  The Son responded, "I think he wants this to stop and he wants to figure out what your thoughts are on that."  The Son concluded, "I hope u know what ur doing . . . ."  A true and correct copy of my email correspondence with the Son on August 16, 2014 and August 18, 2014 is attached as Exhibit E.

29.  I believed at the time, as I do now, that these communications by Peter Nygård's Son and by Peter Nygård to my Former Roommate were specific attempts by Peter Nygård to intimidate me, threaten me, harass me, and influence my testimony and production of evidence.  When the Son asked me to "weigh in on all sides before making any permanent decisions," I saw this as an effort to encourage me to recant my truthful statements to the investigator before I suffered permanent consequences.  As the messages to my Former Roommate made clear, these communications were efforts to exert pressure on me to make me "turn" on Mr. Bacon and, as the Son made clear, to make this "stop."  The implication that my actions were "permanent decisions" that might "ruin[ ] the rest of [my] life" -- presumably through Peter Nygård's retaliatory actions -- caused me extreme anxiety and fear.  The Nygård Companies' letter of September 10, 2014 suggests that the communications I received from the Son and my Former Roommate were "completely innocuous" or "unremarkable."  (9/10/14 Ltr. at 10.)  To the

contrary, I felt threatened by the communications from Peter Nygård conveyed to me by both the Son and my Former Roommate. I believed that these communications were threats directed at me and efforts to dissuade me from cooperating, providing evidence and testifying truthfully. I continue to remain fearful for my personal safety and fear further retaliation from Peter Nygård.

30.     On September 17, 2014, the Nygård Companies filed a lawsuit against me in Superior Court, in Los Angeles County, California. I believe this is a further effort to intimidate me. Among other things, the lawsuit seeks an order requiring me to turn over all copies of the the video files and other electronic evidence. This is the kind of retaliatory litigation that I feared Peter Nygård would commence against me. I continue to fear what the future holds for me.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 24, 2014.

_____
Stephen J. Feralio